# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

Nathan M. Poke,

     Plaintiff,

     v.                          Case No. 19-cv-33

The City of La Crosse, Wisconsin,
and Ron Tischer, Chief of Police,
in his official and individual capacities,

     Defendants.

# COMPLAINT

## I.    NATURE OF ACTION

101.   This is a civil action brought by the Plaintiff in order to obtain redress for the violation of rights secured to him by Title VII of the Civil Rights Act of 1964, as amended, § 2000e, *et seq.*, the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution (which is enforceable in a private suit for damages under the Ku Klux Klan Act [the Civil rights Act of 1871], codified at 42 U.S.C. § 1983) and the Civil Rights Act of 1866, codified at 42 U.S.C. § 1981, which occurred when he was discriminated against on the job because he is a member of the black race.

1

## II.     JURISDICTION AND VENUE

### A.     Jurisdiction

201.     Jurisdiction over the Plaintiff's claims under Title VII of the Civil Rights Act of 1964 is conferred on this Court by 42 U.S.C. § 2000e-5(f)(3).   This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 1343(a)(3) (42 U.S.C. § 1983 jurisdiction).

### B.     Venue

202.     The Western District of Wisconsin is the proper venue for this action because the plaintiff's claims arose within the geographical boundaries of the Western District of Wisconsin within the meaning of 28 U.S.C. § 1391(b), and because it is a judicial district in the state in which the unlawful employment practice is alleged to have been committed within the meaning of 42 U.S.C. § 2000e-5(f)(3).

## III.     PARTIES

### A.     Plaintiff

301.     The Plaintiff is an adult male citizens of the United States with the capacity to sue and be sued in this Court.

### B.     Defendants

302.     The Defendant City of La Crosse is a legal entity, with the capacity to sue and be sued in this Court. It is an employer within the meaning of Title VII and

is subject to the Equal Protection Clause of the Fourteenth Amendment to the United

States Constitution.

303.    Defendant Ron Tischer was at times material hereto Chief of Police

of the Defendant City of La Crosse.


IV.    **ALLEGATIONS OF FACT AS TO ALL CAUSES OF ACTION**

A.    **2011:  Nathan Poke joins the La Crosse Police Department
and, initially, thrives.**

4001.    In 2011, the Plaintiff, Nathan M. Poke, became a member of the La

Crosse, Wisconsin, Police Department.

4002.    For most of the time he worked in that position, Mr. Poke was one

of only two African-American officers on the force.

4003.    Initially, Mr. Poke received very favorable comments and

evaluations from his superiors. For example, in his very first evaluation, his evaluator

praised his knowledge and appearance and wrote:

> Officer Poke always has a smile on his face and brings a great attitude to work every day, Nate is professional and courteous with the public he serves, his peers and his supervisors. Nate is also very willing to assist on calls or take calls for other officers who have a larger workload.
>
> Nate's efforts throughout the shift show in his high activity level and desire to learn and do more. Nate is one of the shift leaders in activity level.
>
> Officer Poke does a very good job with his report writing and citations. Nate's reports are well written and descriptive. Nate's reports contain all the necessary information. Nate is becoming very accustomed to using dictation for his reports and his reports are easy to read.

> Nate has received numerous positive emails from supervisors
> acknowledging his performance and report writing.  Those emails show
> that Officer Poke really puts a lot of effort into what he does and what he
> signs his name to.

4004.   The La Crosse Police Department evaluates its officers on various

dimensions of performance using a five-point scale, and in each of his evaluations,

Officer Poke received mostly fives and no rating lower than four. In his second

evaluation, the Department evaluator cited, "numerous positive e-mails and

supervisory notes given by command staff," and wrote:

> Nate embraces the teamwork philosophy with his peers and supervisors
> by volunteering for calls and aiding fellow officers. Officer Poke is
> respectful and courteous with the public and his peers.

> Officer Poke . . .  is one of the leaders in self-initiated activity on second
> shift. Nate is a very active officer in our department.  He accepts calls that
> he is dispatched to and provides great service to the community, while at
> the same time being very proactive during his down time.

4005.   The La Crosse Police Department also tracks officer performance

using quantitative metrics. One quarterly summary of Officer Poke's statistics read:

> Officer Poke's self-initiated activity is at a 4.4 which is way above the shift
> high performance standard of 4.1. His total activity was at a 9.1 which is
> also above the shifts average of 8.0.

> It should be noted that Officer Poke was also above shift average in calls
> for service for the year.

4006.   In March, 2013, La Crosse Chief of Police Ron Tischer appointed

Officer Poke to the department's new position entitled, "Neighborhood Response

Officer" (NRO).  This program was designed to allow the department to go out into the

community and build positive relationships and partnerships with different

stakeholders in the local community.  Numerous people in the department applied for

4

this position, but after a selection proces involving interviews and essays Mr. Poke was selected for this position.

4007.   During Officer Poke's time as Neighborhood Response Officer he made a positive difference in a number of lives among the youth of La Crosse.

4008.   Officer Poke spent a lot of time at the local Boys and Girls Club, and worked with the local YMCA and Big Brothers Big Sisters programs.

4009.   On May 15, 2014, Chief Tischer presented Officer Poke with the Department's Traffic Safety Award, commending him for "leading the department in the combined traffic enforcement of operating while intoxicated, speeding, seatbelt and traffic signal violations with 523 total traffic stops" in 2013.

4010.   In 2015, Officer Poke was assigned to the same squad car as another NRO Officer, Dan Ulrich, who is white.

4011.   La Crosse police officers were required to report misconduct by their fellow officers.

**B.      August 12-13, 2015.**

4012.   On August 12 or 13, 2015, Officer Ulrich told Officer Poke that Ulrich had some "stuff" that he had been holding onto for a while and needed to get rid of.

C.   **August 14, 2015: Officer Poke finds contraband and turns it in.**

4013.   On August 14, 2015, Officer Poke was working by himself and started his shift by cleaning the squad car he regularly shared with Officer Ulrich.

4014.   In the course of cleaning the squad car, Officer Poke found a number of unusual items in two different evidence bags in the trunk of the car.

4015.   Those items included two BB Guns, numerous hypodermic needles (both clean and used), several Adderall pills, several other pills, a food-stamp card for Josiah Jensen-Innis, drug paraphernalia, and smaller gem bags containing a clear glass-like residue that Officer Poke thought was methamphetamine.

4016.   Officer Poke decided to speak with his direct supervisor, Sergeant Andy Dittman, then acting Sergeant of the Vice Unit and the Neighborhood Response Officer unit, about the items he had found in the squad car.

4017.   Sergeant Dittman rode in Officer Poke's squad with him to run an errand and, while they were on the way back to the Police Department, Officer Poke pulled over into an alley and asked to speak with Dittman.

4018.   Officer Poke asked Sergeant Dittman what the protocol was for supervisors searching department vehicles, and then asked Sergeant Dittman if Dittman could search Poke and Ulrich's squad car.

4019.   Sergeant Dittman asked why, and Officer Poke told him that there were some items in the trunk of the squad car that Poke wanted Dittman to take into his possession.

4020.   Officer Poke told Sergeant Dittman that Dan Ulrich had begun doing things during work hours that Officer Poke could not condone. Officer Poke said that he was afraid Officer Ulrich's misconduct was getting progressively more serious, and that Poke did not want to be a part of it anymore.

4021.   Officer Poke made these reports to Sergeant Dittman about Ulrich's misconduct pursuant to Poke's duties as a La Crosse police officer.

4022.   Officer Poke told Sergeant Dittman that he feared that his own career could be in jeopardy, since Officer Poke was Officer Ulrich's partner.

4023.   Sergeant Dittman retrieved the unusual items from the rear of the squad car and took possession of them.

4024.   Sergeant Dittman asked Officer Poke if Poke know where any of them came from.

4025.   Officer Poke told him that Poke didn't know where any of the items had come from, but he knew that Officer Ulrich knew about the items, because Ulrich had recently told Poke that he had stuff he needed to get rid of.

4026.   During this conversation. Sergeant Dittman told Officer Poke that he had noticed that Poke had not appeared to be happy at work recently.

4027.   Sergeant Dittman also told Officer Poke that other people had approached him and asked him what was going on with Poke and why Poke did not seem to be normal.

4028.   In response, Officer Poke told Sergeant Dittman that Poke had dreaded coming to work for some time.

7

4029.   Officer Poke told Sergeant Dittman that he and Officer Ulrich did not get along well and did not work well together.

4030.   Officer Poke said that in almost a year and a half, Poke had only driven their shared vehicle six or seven times, and that he felt more like Officer Ulrich's subordinate than his partner.

4031.   Sergeant Dittman told Officer Poke that Poke needed to speak with Ulrich and tell him that Poke did not want to be a part of doing illegal things or things that could be perceived as improper.

4032.   Sergeant Dittman said that Officer Poke needed to separate himself from Officer Ulrich, in case Ulrich ever got sued, so that Poke could say that he had not condoned what Ulrich was doing nor had he had any part in it.

4033.   Sergeant Dittman asked Officer Poke why Poke thought Ulrich may have been holding onto the items that were in the trunk of the vehicle.

4034.   Officer Poke told him that Officer Ulrich had a history of throwing things away.

4035.   Officer Poke told Sergeant Dittman that Ulrich had thrown away property belonging to people that he did not like, and had thrown away property that he did not want to take the time to place into evidence.

4036.   Officer Poke told Sergeant Dittman that, about a week earlier, when Poke had come to work one day, there had been a sweatshirt on the back of the squad car.  Ulrich had told Poke it belonged to a woman in jail. Officer Poke asked Ulrich if he

8

was going to stop at the jail to turn it over to be placed with her property, and Ulrich had said that he was just going to throw it away instead.

4037.   Officer Poke explained his concern that Ulrich might retaliate if he knew that Poke had told Sergeant Dittman about the unusual items in the trunk.

4038.   Officer Poke said that working with Officer Ulrich was already bad enough, and that Poke did not want to have the additional stress of worrying about retaliation.

4039.   This conversation ended with Sergeant Dittman telling Poke that he was going to send an email to both Ulrich and Poke saying that he had randomly searched their vehicle and come across the above items in it.

4040.   Sergeant Dittman said that he would then ask them both to write him memos about their knowledge of these items.

4041.   Sergeant Dittman did send such an email, at 12:45 p.m. that day.

4042.   Officer Poke understood that Sergeant Dittman would have to report the information Poke had conveyed to him to his own superiors, possibly including Lieutenant Matt Malott and Captain Shawn Kudron.

4043.   Officer Poke assumed that these superiors would initiate an investigation into Ulrich's conduct and that Officer Poke would then be interviewed about it in greater depth.

4044.   A very short time after Sergeant Dittman and Officer Poke ended their conversation, Officer Ulrich texted Officer Poke and asked if Officer Poke was

9

working.  Officer Poke responded by saying "yea, drama," and Ulrich replied to the effect of, "Don't worry I have a story already about the things in the vehicle."

4045.   Poke saved this exchange and on August 31, 2015, he allowed Captains Kudron and Jason Melby to view these messages and take pictures of them.

**D.      August 30, 2015: Poke and Ulrich arrest Marcus Chandler and Ulrich discards Chandler's bong.**

4046.   On August 30, 2015, Officer Ulrich and Officer Poke were involved in a high-speed pursuit, which culminated in apprehending the driver of the pursued vehicle, Marcus Chandler.

4047.   Chandler's car was searched by numerous La Crosse police officers.

4048.   The officers located contraband, including a water bong that Officer Ulrich brought back to the Police Department as evidence.

4049.   Officer Ulrich later discarded this bong by throwing it away in the garbage can located in the Police Department break room.

4050.   When Officer Ulrich threw this away, Officer Pond was standing in the break room talking with Officer Ulrich.

**E.      August 31, 2015, Officer Poke is demoted and reports Ulrich's misconduct to his captains.**

4051.   When Officer Poke arrived at work on August 31, 2015, the Neighborhood Response Officers on duty were asked to meet in Investigative Sergeant Blockhius's office.

4052.   Officer Poke could tell that there was something unusual going on because Sergeant Blockhius told the other Neighborhood Response Officers that they should go find something to do to stay busy.  After dismissing everyone, else, he told Officer Poke to stay behind.

4053.   Sergeant Blockhius told Officer Poke that Captains Shawn Kudron and Jason Melby wanted to meet with him.

4054.   Officer Poke was then escorted into the investigative conference room where Captains Melby and Kudron were waiting for him.  During this meeting with the two Captains, they told Poke that the Chief of Police, Ron Tischer, wanted them to remove Poke from the Neighborhood Response Officer position and have him placed back on regular shift patrol.

4055.   They explained to Officer Poke that the Chief had made this decision for two reasons.  First, it had been reported to Chief Tischer that while Officer Poke had been assigned to work a football camp, he had left the camp and not participated.  Second, they said, a few weeks earlier, Sergeant Dittman had ordered both Officer Ulrich and Officer Poke to go to Hamilton Elementary School, and Poke had not gone.

4056.   Officer Poke explained to both captains that these two reasons for demoting him were groundless.  Officer Poke asked them whether they had interviewed any of the staff that worked the football camp when Poke and Ulrich had, and whether they had spoken with Neighborhood Response Officers Tyler Pond, Dale Gerbig, or Dan Ulrich about the football camp, because they could all confirm that Poke

11

had been at the camp the entire time.  The captains stated that they did not know much about the situation and were only there to direct Officer Poke back to patrol.

4057.   Officer Poke also explained to the captains that Sergeant Dittman had not ordered Poke and Ulrich to go to the Hamilton school.  Poke told them that he remembered that day clearly:  Sergeant Dittman had simply told them that if they did not have any plans, they could stop by the Hamilton Early Learning Center.  Officer Poke told them that he remembered that because he had laughed to himself about it, since Sergeant Dittman almost never had anything for them to do and never ordered them to do anything.  Officer Poke recalled that he had also laughed because Ulrich and Poke had already been in the habit of going to that school almost daily, without anyone having suggested that they make it part of their pattern.

4058.   Officer Poke told the captains that he remembered Ulrich telling him in their squad car that he was going to go to the school. Poke said he had asked Ulrich if they could go later because Officer Poke was not in the right mood to relate properly to children with whom they had spent significant time building relationships. Poke told the captains that Ulrich chose to go there anyway and Poke had no choice because Ulrich did the driving.

4059.   Officer Poke told the captains that when Ulrich got to the school, Poke had handed him some stickers from their pack of stickers and Ulrich had gone in. When he left, he said it would only be a minute and Poke should not worry.

4060.   Poke told the captains that while Ulrich went into the school, Officer Poke sat in their squad car and checked his email.  Officer Poke also logged into

the Police Department's Records Management System program and looked at the updated warrant list and the line-up lists online.  Then Officer Ulrich came back out and got more stickers and said, "Dude, you sure you don't want to come in? The kids are nice here and not the typical shit heads." Poke told him that he was going to get the computer set up and stay in the car.  Ulrich went back inside and came back out in short order.  Poke told the captains that he estimated that Ulrich was inside the school for no more than ten minutes.

4061.   Officer Poke then asked Captains Kudron and Melby if Sergeant Dittman had come to them with the concerns that Poke had discussed with him on August 14.

4062.   They both said Dittman had not, and that they did not know what Officer Poke was referring to.

4063.   Officer Poke then told both captains everything that he had said to Sergeant Dittman on August 14.  Officer Poke also let them look at his text messages from Ulrich.  They were able to see the messages that Ulrich sent to Poke on August 14 about coming up with his story about the items in the trunk. They asked if they might take pictures of these messages and Poke allowed them to do so.

4064.   Poke also enumerated for both captains numerous other complaints that he had about Ulrich, including exaggerating the facts in police reports, not arresting people who had outstanding warrants when he encountered them, knowingly breaking rules, not turning in overtime slips when they were due so that he could try to

manipulate his tax withholding deductions, lifting weights for over an hour numerous times during work hours (even after having been spoken to about it), and other things.

4065.   Officer Poke told the captains that Ulrich had confiscated methamphetamine but thrown it away, and that he had stolen while on duty.

4066.   At the end of this discussion, Officer Poke was requested to write two memos.  The first was to be a response to the two reasons that they identified for Officer Poke's demotion. The second was to be about his complaints regarding Officer Ulrich, including all the things that Poke had just told them.

4067.   Captain Melby later confirmed the order to write the second memo in an email to Officer Poke.

4068.   Officer Poke completed and transmitted his memo about the reasons for his demotion that same day.

4069.   He completed and transmitted his memo detailing his reports about Officer Ulrich the next day, on September 1, 2015.

F.      **September 1, 2015:  Poke speaks with Assistant Chief of Police Abraham.**

4070.   September 1, 2015, was Officer Poke's first day working back on regular patrol after he was removed from his NRO position.  When he arrived at work, he first completed and turned in his memo detailing his reports about Officer Ulrich.

4071.   Officer Poke then went to the Assistant Chief of Police, Rob Abraham, to speak with him about what was going on.  This was normal for Poke; he

had a made it a routine practice to speak with Assistant Chief Abraham whenever he

had issues on the job.

4072.   When Officer Poke sat down he could tell that Assistant Chief

Abraham was angry at him.  Officer Poke asked him what was going on and why Poke

would be demoted 17 days after coming forward about Ulrich's possible misconduct.

Assistant Chief Abraham then began yelling at Poke, saying, "How the hell could you

drop a black bomb on the department like that?" Abraham said that what Officer Poke

had done was "terminal" to Officer Ulrich's career.  He also told Poke that he already

had gone to the Police and Fire Commission to tell them what was happening, and he

told Poke that, "If what you said is true, they are going to for sure fire his ass."

4073.   He then slowed down and told Poke that Poke should have just

come to him.  He told Officer Poke that Poke had made a mistake by "keeping a dirty

black book," and that Poke can't do that.

4074.   Officer Poke asked him why he had been demoted for two reasons

that were ridiculous, while Officer Ulrich did not appear to have suffered any

consequences for what he had done.  Assistant Chief Abraham responded that Poke

was lucky to even still have a job.  He told Officer Poke that Poke had been

insubordinate and that the Department had fired numerous officers for a lot less.

4075.   Assistant Chief Abraham then told Poke that Officer Ulrich had

been placed on "Desk Duty" as of that day, and that Poke was lucky that he was still

working patrol because, "Officer Ulrich's ass is on the bench."

###### G.      September, 2015: Poke speaks with Human Resources Director Wendy Oestreich and Mayor Tim Kabatt.

4076.   On September 2, 3, or 4, Officer Poke met with City of La Crosse Human Resources Director Wendy Oestreich, and spoke to her about his concerns about the Police Department.  Officer Poke spoke with her about being demoted after coming forward with information about Officer Ulrich.  He also told her that he believed that Assistant Chief Abraham was incorrectly handling donated funds and that Ulrich and Poke had been asked to lie about their needs for the Neighborhood Response Officer program.

4077.   Officer Poke told Oestreich that he believed the Police Department's administration covered things up for certain people.

4078.   A day or so later, Poke met with Oestreich and the Mayor of La Crosse, Tim Kabatt, in the Mayor's office.  Poke told Kabatt the same things that he had told Oestreich the previous day.  Officer Poke also told the Mayor that Poke anticipated that the Police Department would retaliate against him for coming forward about another officer and especially for coming forward about improper things he believed the Assistant Chief was doing.  Officer Poke told them that he believed this would happen because he had seen Department management retaliate against people for much less.

16

**H.       September 8, 2015: Poke interviews witness Lenell Carter.**

4079.   On September 8, 2015, Officer Poke returned to work after a few days off and learned that Lenell D. Carter, a black man who was believed to have knowledge about a recent shooting, had been calling the Police Department numerous times over those few days trying to speak with him.

4080.   While Officer Poke was in the report room trying to get Mr. Carter on the phone, Sergeant Dittman came into the room.  He told Poke that he knew Mr. Carter wanted to speak to Poke about the shooting, and that Poke would need to complete a report on whatever Mr. Carter told him.

4081.   Officer Poke also learned that Mr. Carter had not been cooperative with investigators at the time of the shooting and wanted to speak only with Officer Poke about it.  Officer Poke finally got in touch with him and Carter requested that Poke come to his girlfriend's house and speak with him there.

4082.   Due to the seriousness of the shooting investigation, Officer Poke made sure that his squad car recorder was turned on and recording.

4083.   Because his squad car recorder could easily prove unreliable as he got farther from his squad car, Officer Poke also turned on the sound recorder on his cell phone to make certain that his conversation with Carter could be captured.

4084.   After completing this interview, Officer Poke spoke with Investigator Corey Brandl, who was working on the same case. Officer Poke had learned that there were actually two different shootings on successive nightsd, and this helped the investigators better understand their crime scene evidence. They had found

17

bullet casings that had not made sense, because they had not known there was a shooting in the same place the night before. Officer Poke was also able to identify the likely shooter and his accomplice. Brandl said that the information that Officer Poke had gathered explained a lot of things the police had not known previously, and thanked Poke for his good work.

4085. Officer Poke then completed a report for the Investigative Bureau. In that report Officer Poke explained why he had used his phone as a back-up recording device and wrote that if the squad recorder had not captured his interview, he had a copy saved on his phone that he could place into evidence.

### I.   September 11, 2015: Poke is threatened with discipline for recording the Carter interview.

4086. On September 11, 2015, Captain Kudron (Sergeant Dittman's supervisor) read Officer Poke's report and reported Poke to Assistant Chief Abraham for allegedly violating several general orders. Assistant Chief Abraham then emailed Officer Poke saying that Poke had violated orders and suggested that Poke change his technique next time. Officer Poke believes Captain Kudron was trying to get Poke in trouble for coming forward about Officer Ulrich and Sergeant Dittman.

4087. If Officer Poke had been white he would not have been told he had violated orders in these circumstances.

**J.      September 10 , 2015:  Poke is reprimanded for contacting a citizen.**

4088.   During his time as a Neighborhood Response Officer, Officer Poke had worked closely with Heidi Stein at the Big Brothers Big Sisters program.  In early September, Ms. Stein had asked Officer Poke if he would help her with a new program her organization was hoping to start, and asked Poke to come out to meet with her.  On September 10, 2015, at 5:30 p.m., Officer Poke emailed her back to tell her that he had been removed from his duties as a Neighborhood Response Officer but that he would still help her if she wished.  Poke also told her that if she wanted to have the Neighborhood Response Officer unit help her instead, she should contact Sergeant Dittman.  Officer Poke copied Sergeant Dittman in on his email, so that Ms. Stein and Sergeant Dittman would have each other's email addresses.

4089.   Officer Poke did not say anything in this email that disparaged the La Crosse Police Department, and he did not say anything about why he had been removed from his NRO duties.  He simply emailed his response to Ms. Stein as a courtesy, not only for her benefit, but for the benefit of the Police Department, as Officer Poke wanted the Department to be able to continue to work smoothly with the Big Brothers Big Sisters program.

4090.   Thirty minutes after Officer Poke sent his email to Ms. Stein, Sergeant Dittman forwarded his copy of it to Captain Kudron.  Ten minutes after that, Captain Kudron forwarded the email to the Assistant Chief.

19

4091.   At 8:56 p.m. Officer Poke was ordered in to the sergeants' desk and given a memorandum from Assistant Chief Abraham.  It stated that Officer Poke had violated several policies by sending his email to Ms. Stein and that Officer Poke was thereafter "hereby ordered not to speak about the internal matters of this department to anyone other than his LPPNSA rep or his WPPA rep. or private attorney or command staff."

4092.   In fact, Poke had violated no orders or policies, and the accusation that he had was simply retaliation for his earlier reports of misconduct.

4093.   If Officer Poke had been white he would not have been told he had violated orders in these circumstances, or given a directive regarding contacting citizens.

K.     **September 11, 2015: Poke is placed on nondisciplinary leave by the Mayor's office and the Human Respouces Department.**

4094.   Officer Poke worked the shift he had begun on September 10, 2015, until roughly 4 a.m. on September 11.

4095.   Later that day, Officer Poke telephoned La Crosse Human Resources Director Wendy Oestriech and Mayor Tim Kabatt, leaving a message, in each case, that he wanted to meet, and asking that they call him back.

4096.   Officer Poke wanted an immediate meeting because he felt that he had been targeted and subjected to unjustified and nitpicking criticisms over his last several days of work in retaliation for his reports of wrongdoing by Ulrich and

Abraham and for having exposed Dittman for not having relayed Poke's reports about Ulrich promptly up the chain of command as he ought to have done by his reports to the captains at the time he was informed of his demotion.

4097.   Officer Poke went to the City Hall hoping to be able to meet with Oestreich in her office but he was so distraught that when he got to the City Hall he began crying in his car. He then saw Investigator Corey Brandl walking out of the City Hall and asked him if he had a minute to talk.

4098.   Brandl sat with Poke in his car for a short time.  While they sat in Poke's vehicle, Mayor Kabatt and Human Relations Director Oestreich each separately called Poke on his cell phone.  Officer Poke never really even got to speak with Brandl and Brandl eventually got out and left because he had obligations.

4099.   The Mayor told Poke that he was busy with other things and so would contact Poke within the next few days, but, meanwhile, Oestreich would be addressing his issue that day.

4100.   Oestreich told Poke the Human Resources and the Mayor's Office would see to it that Poke was placed non-disciplinary paid administrative leave until they could look into his complaints of retaliation.

4101.   Later that night Poke was contacted by several people from the Police Department asking if he was alright.  The callers said that the Mayor's wife had called the Police Department asking that someone be sent to check on the Mayor.  She said that the last thing he had told her was that he was dealing with a disgruntled police officer and she was fearful because could not reach him by phone.

4102.   People at the Police Department, including the people and supervisors who contacted Officer Poke, knew that Poke had been speaking with the Mayor over the last week and knew that the disgruntled officer the Mayor had been reportedly referring to was Poke.

**L.      September 14, 2015: Poke learns he is being watched.**

4103.   On September 14, 2015, Poke was contacted by Brandl, who told Poke that he had been questioned by Captain Kudron and Assistant Chief Abraham about the conversation Brandl and Poke had in Poke's car.  Brandl told Poke that someone was obviously watching him and had seen them talking, and that Kudron and Abraham had wanted to know exactly what they had discussed.

**M.      September 17, 2015: Poke is placed on disciplinary leave by Chief of Police Tischer.**

4104.   On September 17, 2015, Poke received a phone call from Sergeant Blockhuis, who told him that the Chief of Police had decided to place Poke on administrative leave.  He stated that he needed to meet with Poke and collect his gun and badge.  Poke asked him how this could be, as Poke had been placed on leave a few days earlier.  Blockhius stated that there were complaints lodged against Poke and that the Department might choose to bring criminal charges against Poke, in which case Poke would need a lawyer.

4105.   A short time later Officer Poke returned to the Police Department and turned in his duty gun, police identification card, and badge.  Poke was also given

a memo from Chief Tischer entitled, "Rules While on Administrative Leave" informing Poke that he was being placed on administrative leave "based on the seriousness of recently reported allegations of multiple policy violations.

4106.   If Officer Poke had been white he would not have been placed on disciplinary administrative leave in these circumstances or threatened with criminal prosecution, especially since he was already on leave as ordered by the Mayor.

### N.   September 18, 2015: Poke is interviewed by counsel for the City, Attorney Nancy Pirkey.

4107.   On September 18, 2015, Poke had a meeting with Attorney Nancy Pirkey, a lawyer hired by the City, that had been set up by the Human Resources Department and the Mayor's Office.

4108.   Present during this meeting were Pirkey, Wisconsin Professional Police Association Attorney Andy Schauer, Wisconsin Professional Police Association representative Jerold, and Poke.  This interview was conducted at the La Crosse public library and lasted approximately three hours.  It was recorded by at least one of its participants.

4109.   The purpose of this meeting was for Attorney Pirkey to interview Poke and hear his complaints so she could make an informed recommendation as to whether the City ought to hire someone to do a thorough investigation of Poke's complaints.

4110.   During the meeting in the library, Poke received an email, sent to all Police Department personnel by Chief Tischer, that read:

Per the Mayor's Office:

No member of the police department is to have any verbal or written
communication with Officer Nathan Poke.  Any matters regarding Officer
Poke shall be directed to the Mayor's Office.  If there are any questions
please see either myself or Assistant Chief Abraham."

4111.   Poke immediately gave copies of this email to Attorneys Schauer
and Pirkey.  Pirkey stated that she could not believe the Chief of Police would send an
email like that.  She said that it was very sad.

4112.   If Officer Poke had been white he would not have been
quarantined from all communications with his fellow officers in these circumstances.

4113.   After this meeting, Officer Poke learned that Attorney Pirkey had
advised the City that it appeared Poke was being targeted and retaliated against, and
that her advice was that the City conduct a full investigation.

### O.   Fall, 2015: the Lewis investigation

4114.   At some point after the meeting in the library, Poke contacted
Oestreich and asked why the Chief had prohibited roughly 120 people employed by the
Police Department, with whom he had worked for several years, from speaking with
him, not only on a professional basis but also simply as friends.  Oestreich said that she
did not know what Poke was talking about, so Poke showed her the email.

4115.   A few days later Oestreich told Poke that there must have been a
miscommunication between the Mayor and the Chief, and stated that another email had
been sent out to all Police Department employees correcting the initial email.  Poke did

24

not receive a copy of this email because the Police Department had deactivated his email account.

4116.   On a later occasion, Oestreich told Poke that the Human Resources Department had communicated to the Police Department that Human Resources wanted to move forward with a full investigation.  She told Poke that a man named Jim Lewis, the acting Chief of Police in Green Bay, would be taking over the investigation, because he would be unbiased.

4117.   Poke told Oestreich that he did not think a Chief of Police from another agency could be presumed to be unbiased.

4118.   Officer Poke also asked why a Chief of Police was being tasked with doing this investigation when all of the other investigations had been conducted by outside lawyers.  Oestreich told Poke that they hired a police chief because he would know the "ins and outs" of the police world better, and would know what is common and normal on a police force.

4119.   Around beginning of November, 2015, Poke, who was still on administratie leave with pay, contacted Wisconsin Professional Police Association Attorney Andy Schauer and asked him what was going on.  It was common knowledge that Jim Lewis was doing an investigation into Poke's concerns, but Officer Poke had not been contacted by Lewis and did not know the status of any investigations.

4120.   Attorney Schauer told Poke he would contact Lewis.  Schauer contacted Lewis, and Lewis agreed to have a phone conversation with Poke.  Lewis, Schauer, and Poke had a phone conversation later in November, 2015, that lasted about

25

five minutes.  In this brief conversation, Officer Poke told Lewis that he believed that Officer Ulrich was officially on "light duty," but explained that several times Officer Ulrich was seen out of the office and on assignments.  Officer Poke told him that Officer Ulrich was basically "partnered" up with Sergeant Dittman.  Officer Poke said he beileved Ulrich's friendly relationship with Sergeant Dittman had always trumped a professional atmosphere and that Poke believed Sergeant Dittman was covering for Ulrich.

4121.   During this conversation, the only thing Lewis wanted to know from Poke was when Poke had been placed on leave and when his father had died.  Poke told him that he had been placed on administrative leave with pay by Human Resouces and the Mayor's office before the Police Department started an investigation of him and also that it had been Officer Ulrich's father who had died, not Poke's father.

**P.      November 12, 2015: Poke learns the Department is soliciting citizen complaints about him**

4122.   On November 12, 2015, reporter Anne Jungen of the La Crosse Tribune released a story on the newspaper's Facebook page entitled, "Former La Crosse Officer Plans Federal Suit Against Agency." It was about Anthony Clark, the other African American officer who had served on the La Crosse Police Department with Poke.

4123.   While Poke was reading this article, he looked at the comments.  Officer Poke observed comments from two people that Officer Poke know well from working in La Crosse.

26

4124.   The first message, from Banesa Guerra, stated: "They racist Whitney Graham and we know fosho"  Whitney Graham then responded: "Officer Poke definitely know for sure .. especially when one there own show up asking me to make report on Poke, Clark a good officer so is Ulrich period"

4125.   Officer Poke photographed this story and the comments; Banesa and Whitney are very well known to the La Crosse Police.  A few hours later that story was pulled and removed from the Tribune's facebook page.

### Q.   November 19, 2015: Poke follows up on the solicitation of citizen complaints

4126.   Officer Poke reached out to Whitney Graham on facebook to see if she would talk to him about her comments on the web page and see if she could tell Officer Poke who from the department had gone to her asking her to make a complaint about Officer Poke.

4127.   Ms. Graham was very hesitant to speak to Poke about anything; she and Poke had had a lot of negative interactions.  She also hates the La Crosse Police.

4128.   Graham confirmed that a La Crosse policeman had come to her to ask that she lodge a complaint about Poke. She said she did not know the name of the officer who came to her, and said that she did not want to talk further about it because she did not want to deal with lawyers or get involved in his situation.

4129.   If Officer Poke had been white, the Department would not have solicited complaints about hiim from citizens in these circumstances.

R.    **November 23, 2015: The Lewis investigation clears the Department**

4130.   On November 23, 2015, Officer Poke was informed that Jim Lewis's investigation summary had been mailed to Poke.  Officer Poke was also informed that Lewis had found that the Police Department had not treated Officer Poke poorly nor retaliatd against him.

S.    **December 7, 2015, Poke confirms that the Department has solicited complaints about him.**

4131.   On December 7, 2015, Officer Poke reached out to Banesa Geurra on Facebook and she also confirmed that member of the Police Department had come to her and Whitney Graham asking them to make a complaint against Officer Poke.

T.    **January 7, 2016:  Poke is interviewed regarding his alleged misconduct.**

4132.   On Janualry 7, 2016, the investigation of Mr. Poke had progressed to a point that, on that day, he was interviewed by a lawyer the City had hired to conduct an investigation of his alleged wrongdoing, Eileen A. Brownlee, of the Madison, Wisconsin, law firm, Boardman & Clark, LLP.

4133.   This interview took several hours.

4134.   Brownlee asked Poke about the allegations of which he was aware from the time of his demotion, but she also asked him about "starting investigations" without approval by looking up general orders that the Assistant Chief Abraham might have violated when he and his friend were pulled over and his friend was arrested for

28

OWI on a boat.  Because Poke had asked another officer (Jarod Reed) what orders he thought were violated by that conduct, Brownlee was investigating Poke for having started an investigation into Assistant Chief Abraham's conduct without permission from his superiors.

      4135.   Someone had listened to all of the audio audio recordings from Poke's first week of working patrol after his demotion.  Brownlee asked Poke about having told people that he was probably going to quit the force and move away.  She asked whether Poke had asked Brenda Jackson if she had slept with Lieutenant Malott.  She asked whether Poke had asked Brenda Jackson whether Lieutenant Malott uses cocaine.

      4136.   Brownlee stated that Officer Poke had revealed the identity of an informant to someone while working.

      4137.   The last short part of the interview ended with Brownlee asking Officer Poke a few questions pertinent to his original complaints about Officer Ulrich back on August 14 and 31.

      4138.   At approximately the time of this interview, one or more City representatives told Andrew D. Schauer, a Staff Attorney for the Wisconsin Professional Police Association (WPPA), who represented Mr. Poke in an investigatory interview, that the City, meaning, at least, the Chief of Police, was absolutely intent upon terminating Mr. Poke's employment, and Attorney Schauer told Mr. Poke this in an email.

29

4139.   If. Officer Poke had been white, the City of La Crosse would not have set out to terminate him.

U.     **The end of Mr. Poke's employment as a La Crosse police officer.**

4140.   Because Mr. Poke did not believe that there was any chance to preserve his employment and reputation by opposing the City's efforts to fire him through available channels, Mr. Poke authorized his union and his attorneys to negotiate for the most favorable terms of resignation they could secure.

4141.   On August 10, and 11, 2016, respectively, the City's representative and Mr. Poke signed an agreement that effected the termination of his employment with the City of La Crosse.

4142.   Mr. Poke alleges that his resignation pursuant to this agreement was a constructive discharge, since Mr. Poke resigned only in order to avoid certain termination for alleged misconduct.

V.     **Comparators**

4143.   Over the course of Mr. Poke's service with the La Crosse Police Department, many white officers engaged in acts of misconduct as serious as or more serious than those which the City's investigator found that Mr. Poke had committed, without being in any serious jeopardy of termination.

4144.   These acts of misconduct by white police personnel who were not terminated included:

a.  One police officer who caused a motor vehicle collision by driving under the influence of alcohol;

b.  One or more officers who showed up for their work shifts under the influence of alcohol;

c.  One or more personnel who had sex on duty, in inappropriate locations;

d.  Racially derogatory comments directed at the other black police officer, Tony Clark;

e.  Anti-gay remarks in daily briefings and personal conversations; and

f.  Getting into a bar fight.

## V.    BASES OF LIABILITY

### A.    Title VII.

501.    The Defendant City of La Crosse violated Mr. Poke's right to be free from discrimination in the terms and conditions of employment on the basis of race and color secured to him by Title VII of the Civil Rights Act of 1964 when he was placed on leave and relieved of his most significant duties, and then investigated and constructively discharged from his employment.

### B.    The Equal Protection Clause of the Fourteenth Amendment.

#### 1.    Individual Defendants.

502.    Defendant Tischer violated rights secured to Mr. Poke by the

Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States to be free from discrimination in employment on the basis of race and color when he was placed on leave and relieved of his most significant duties, and then investigated and constructively discharged from his employment.

### C.    42 U. S. C. § 1981.

503.    Defendant Tischer violated rights secured to Mr. Poke by 42 U.S.C. § 1981 to be free from discrimination in his employment on the basis of race when he was placed on leave and relieved of his most significant duties, and then investigated and constructively discharged from his employment.

### VI.    DAMAGES AND EQUITY

### A.    Compensatory Damages.

601.    Mr. Poke has sustained lost wages and benefits, mental and emotional distress, damage to his reputation and lost future earning capacity as a result of the Defendants' unlawful conduct, for which he seeks an award of compensatory damages.

### B.    Punitive Damages.

602.     Because the acts of the individual Defendant herein alleged were carried out maliciously or with reckless disregard for Mr. Poke's fundamental rights,

32

the Plaintiff seek an award of punitive damages against the individual Defendant to deter him and others similarly situated from similar wrongful acts in the future.

### C.    Equity.

603.    For some of his injuries the Plaintiff may have no plain, adequate, or speedy remedy at law and he thus invokes this Court's equitable jurisdiction to award such injunctive and declaratory relief as may be necessary and appropriate to make him whole.

### VII.    CONDITIONS PRECEDENT

701.    All conditions precedent to this action within the meaning of Rule 9(c), Fed. R. Civ. Pro., have been performed or have otherwise occurred, or have been waived by the Defendants.

### VIII.    REQUEST FOR JURY TRIAL

801.    The Plaintiff requests a trial by jury of all claims triable of right to a jury.

### IX.    PRAYER FOR RELIEF

WHEREFORE, the Plaintiff prays the court to grant a judgment against the Defendants awarding the full amount of his damages together with interest, costs and attorney's fees and such other and further relief as the Court deems just.

Dated this Monday, January 14, 2019.

Respectfully submitted,

Nathan M. Poke,

Plaintiff,

By

THE JEFF SCOTT OLSON LAW FIRM, S.C.
JEFF SCOTT OLSON
State Bar Number 1016284
131 West Wilson Street, Suite 1200
Madison, WI 53703
Phone        608/283-6001
Fax          608/283-0945
Email:       jsolson@scofflaw.com

/s/ Jeff Scott Olson

_____

Jeff Scott Olson
ATTORNEY FOR PLAINTIFF