# Nathan M. Poke v. City of La Crosse

ERD CASE NO. CR2016-04-903

Transcript of the Testimony of:

## Nathan M. Poke

March 2, 2018



800.899.7222 • www.GramannReporting.com

MILWAUKEE  414.272.7878 • FAX: 414.272.1806 • 740 North Plankinton Ave, Suite 400, Milwaukee, WI 53203
MADISON  608.268.0435 • FAX: 608.268.0437 • 14 West Mifflin Street, Suite 311, Madison, WI 53703



EXHIBIT
1

```
 1                    STATE OF WISCONSIN
             DEPARTMENT OF WORKFORCE DEVELOPMENT
 2                  EQUAL RIGHTS DIVISION
   ---------------------------------------------------------
 3
   NATHAN M. POKE,
 4
                    Complainant,
 5
   vs.                          ERD Case No. CR201604903
 6                              EEOC Case No. 26G20170359C

 7 CITY OF LA CROSSE,

 8                  Respondent.

 9 ---------------------------------------------------------

10

11

12

13          Deposition of NATHAN M. POKE

14          Friday, March 2, 2018

15

                    9:59 a.m.
16
                      at
17
             von BRIESEN & ROPER, s.c.
18          10 East Doty Street, Suite 900
                Madison, Wisconsin
19

20

21

22

23

24

25       Reported by Shelly A. Loniello, RPR
```

```
 1                      Deposition of NATHAN M. POKE, a witness

 2           in the above-entitled action, taken at the instance

 3           of the Respondent, pursuant to Chapter 804 of the

 4           Wisconsin Statutes, pursuant to Notice, before

 5           Shelly Loniello, Registered Professional Reporter

 6           and Notary Public, State of Wisconsin, at von

 7           BRIESEN & ROPER, s.c., 10 East Doty Street,

 8           Suite 900, Madison, Wisconsin, on the 2nd day of

 9           March, 2018, commencing at 9:59 a.m. and concluding

10           at 2:22 p.m.

11    A P P E A R A N C E S:

12                 THE JEFF SCOTT OLSON LAW FIRM, S.C., by
                   Mr. Jeff Scott Olson
13                 131 West Wilson Street, Suite 1200
                   Madison, Wisconsin  53703
14                 Appeared on behalf of Complainant.

15                 von BRIESEN & ROPER, s.c., by
                   Mr. Christopher P. Riordan
16                 411 East Wisconsin Avenue, Suite 1000
                   Milwaukee, Wisconsin  53202
17                 Appeared on behalf of Respondent.

18

19

20

21

22

23

24

25
```

```
 1                    I N D E X

 2    Examination by:                              Page

 3    Mr. Riordan ...................................   4

 4

 5                  E X H I B I T S

 6    EXHIBIT NO.                     PAGE IDENTIFIED

 7    Exh. 1    Discrimination complaint .............  49

 8    Exh. 2    9/1/15 Memo .........................  93

 9    Exh. 3    8/31/15 Memo ........................ 100

10    Exh. 4    9/17/15 Administrative leave rules .... 103

11    Exh. 5    9/18/15 HR note ...................... 104

12    Exh. 6    8/31/15 Order to draft memo .......... 118

13    Exh. 7    Separation agreement ................. 158

14

15            (Original exhibits attached to the

16        original transcript; copies provided to attorneys

17        ordering exhibit copies.)

18

19                  R E Q U E S T S

20    By:                                           Page

21    Mr. Riordan    Emails ............................  29
      Mr. Riordan    Audio recordings ..................  30
22    Mr. Riordan    Personal notes ....................  35
      Mr. Riordan    Videos ............................  40
23    Mr. Riordan    Leave notices ..................... 130
      Mr. Riordan    Dates/times on phone ............. 191
24

25
```

Nathan M. Poke

---

Page 4

1    TRANSCRIPT OF PROCEEDINGS
2        NATHAN M. POKE, called as a witness
3    herein, having been first duly sworn on oath, was
4    examined and testified as follows:
5        E X A M I N A T I O N
6  BY MR. RIORDAN:
7  Q    Could you state your full name for the record,
8    please.
9  A    Nathan Poke, P-O-K-E; middle name Michael.
10  Q    All right.  Current address?
11  A    7400 Second Avenue South, Richfield, Minnesota,
12    55423.
13  Q    And how long have you lived at the Richfield
14    address?
15  A    I closed December 29 of '15.
16  Q    Mr. Poke, have you ever had your deposition taken
17    before?
18  A    No, sir.
19  Q    I'm assuming your counsel told you a little bit
20    about what's going on here, but just so you and I
21    understand how -- how to proceed, I'll just go over
22    some rules.  One, I need a verbal answer, yes or
23    no; if you need to explain, go ahead, just no nods
24    or uh-huhs, uh-uhs, because the court reporter
25    can't distinguish what we're talking about then.

Page 5

1  A    Sure.
2  Q    Also, if I ask a question you don't understand,
3    tell me to rephrase it.  I do ask some obtuse
4    questions every once in a while.
5  A    Sure.
6  Q    So ask me to rephrase it if you don't understand
7    it.  If you answer my question, I assume you
8    understood it.  And finally, let me get my question
9    out first before you answer, so we can make it easy
10    on the court reporter --
11  A    Okay.
12  Q    -- okay?
13        You indicated you didn't have any
14    prior deposition experience; have you ever given
15    testimony at trial before?
16  A    Yes.
17  Q    And how often have you given trial testimony?
18  A    Between prelims and jury trials, numerous.
19  Q    Okay.
20  A    Yeah.
21  Q    And I was assuming that, and I was assuming also
22    that you gave most of this trial testimony in your
23    position as a police officer?
24  A    Correct.
25  Q    Have you ever given trial testimony while not

Page 6

1    acting as a police officer?
2  A    Well, when I had testified at the -- that hearing,
3    I guess I wasn't employed as an officer, but it was
4    reference from when I was an officer.
5  Q    And what hearing are you speaking of?
6  A    There was a lawsuit that several people from
7    La Crosse had to testify in.
8  Q    Were you a party to that lawsuit?
9  A    Yes.
10  Q    Who were the other parties to the lawsuit?
11  A    Initially myself, Officer Ulrich, Sergeant Dittman,
12    Captain Kudron, several attorneys, a judge.
13        MR. OLSON:  Do you know about the case,
14    Chris?
15        MR. RIORDAN:  I do not.
16        MR. OLSON:  It was a pro se Fourth
17    Amendment civil rights damages action against a
18    number of La Crosse police officers.
19        MR. RIORDAN:  I was going to say, when I
20    saw attorneys and judges, I assumed that.
21        MR. OLSON:  Yeah, yeah.
22        MR. RIORDAN:  And just to cut this short,
23    who was the -- what was the plaintiff; do you
24    remember?
25        MR. OLSON:  I don't think I --

Page 7

1        THE WITNESS:  Phillip -- Phillip Dunn.
2        MR. RIORDAN:  Phillip Dunn.  Okay.
3        THE WITNESS:  I think it's D-U-N-N.
4  BY MR. RIORDAN:
5  Q    And he was acting as his own lawyer?
6  A    Yes.
7  Q    Okay.  So that was the only other occasion you gave
8    testimony while not being on the active --
9  A    Correct.
10  Q    -- roster?
11        Have you filed any other lawsuits or
12    claims other than this one?
13  A    No.
14  Q    Okay.  How about any worker's comp claims?
15  A    No.
16  Q    Okay.  And -- and I assume when you testified that
17    you haven't filed any other lawsuits or any other
18    claims, we're also including ERD claims or
19    discrimination claims, correct?
20  A    Correct.
21  Q    Just to move back to where you resided prior to
22    moving to Richfield, where did you live?
23  A    It -- my La Crosse address?
24  Q    Yeah.
25  A    201 Callaway Court, La Crosse, Wisconsin.

---

## Page 8

1   Q   And when did you leave that address?

2   A   I believe it was October or November of '15.

3   Q   Okay. So you moved from La Crosse to --

4   A   End of October.

5   Q   -- Richfield?

6   A   I initially moved in with my mom -- or my dad and

7     my sister for a few weeks before I closed on the

8     house.

9   Q   Okay. But the -- the next permanent residence

10    would have been the Richfield address?

11   A   Correct.

12   Q   And where do your -- you said you lived with your

13    father and your sister for a while?

14   A   I did, yes.

15   Q   And where do your father and sister live?

16   A   Bloomington, Minnesota.

17   Q   Is that where you grew up?

18   A   I grew up in Richfield, which is right there.

19   Q   Can you give me a little bit of your educational

20    background, starting with high school.

21   A   Graduated from Richfield High School, 2005, I went

22    to Winona State for two years, went to the police

23    academy at Alexandria Technical College, got my

24    two-year degree there, then went to St. Cloud State

25    in St. Cloud, Minnesota, where I'm one quarter

## Page 9

1    short of finishing my bachelor's there.

2   Q   Okay.

3   A   And I had to attend Western Technical College in

4    La Crosse, their police academy, just -- the summer

5    of 2011 is all.

6   Q   Okay. What years were you at Winona State?

7   A   2005 and 2006 school year.

8   Q   Okay. Was there any -- any particular focus when

9    you were at Winona State?

10   A   No.

11   Q   Okay. And why did you decide to leave Winona

12    State?

13   A   To get focused, spend my money wiser and dedicate

14    it towards the police academy.

15   Q   Okay. You said you next attended the police

16    academy at Alexandria Technical College, correct?

17   A   Correct.

18   Q   What years were you at Alexandria Technical

19    College?

20   A   I started there January '08 and finished July of

21    2009.

22   Q   You said you completed a two-year degree when you

23    were at the Alexandria Technical College, correct?

24   A   Correct.

25   Q   What was that degree in?

## Page 10

1   A   Law -- it was like their law enforcement associate,

2    I think an AAS or -- I'm not sure like the

3    technical form. It was like the two-year law

4    enforcement police degree.

5   Q   Okay. And the purpose of getting this law

6    enforcement degree was what?

7   A   To become a police officer.

8   Q   Okay. Is this law degree that you received at

9    Alexandria Technical College necessary for becoming

10    a police officer?

11   A   The minimum qualifications in Minnesota is that you

12    have to have an associate's degree, yes.

13   Q   Okay. So you have to have a two-year degree then?

14   A   In -- in that specific area, yeah.

15   Q   Okay.

16   A   If you have a four-year degree, you have to go

17    through some other stuff, if it's not criminal

18    justice, I suppose, related.

19   Q   Okay. So if you went to a four-year institution

20    and got a history degree, you still have to get

21    some additional training in the technical area?

22   A   Yep, yep.

23   Q   Okay. But this technical schooling gives you all

24    that?

25   A   Correct.

## Page 11

1   Q   In the -- the two years between Winona State and

2    Alexandria Technical College, what did you do?

3   A   Say it again.

4   Q   It looks like you -- you stopped going to Winona

5    State in 2006, but then began going to Alexandria

6    Technical College in 2008; what did you do for that

7    two-year period of time in between?

8   A   Well, the -- I think the 2006 calendar would have

9    been done May of '07, and then I moved back with my

10    mother.

11   Q   Okay. You indicated you also went to St. Cloud

12    State; is that correct?

13   A   Correct.

14   Q   When did you start at St. Cloud State?

15   A   I believe it would have been January of 2009 -- no,

16    let me take that back.

17   Q   And I'm just asking for your best recollection.

18   A   Right. January of 2010.

19   Q   Okay.

20   A   Until May of '11.

21   Q   And you indicated you're one short of finishing

22    your bachelor's degree; is that correct?

23   A   Yes.

24   Q   And what is your bachelor's degree in?

25   A   It would be in criminal justice.

Page 12

1 Q   And what is your plan to do with that bachelor's
2     degree once you receive it?
3 A   Meaning?
4 Q   Is there a reason why you're getting a bachelor's
5     degree above and beyond the two-year associate's
6     degree that you received?
7 A   Continuing education, some jobs offer stipends
8     based on having that degree. I mean, it's
9     competitive, so it helps --
10 Q   Okay.
11 A   -- with the hiring processes.
12 Q   Okay. And -- and the reason I ask that question is
13     because you indicated that a lot of police forces
14     require the two-year associate's degree in order to
15     become a police officer?
16 A   Uh-huh.
17 Q   Are there positions that you're going for that
18     require a bachelor's degree?
19 A   Sure. I guess the state minimum is the two-year
20     degree; most departments want you to have your
21     bachelor's degree.
22 Q   Okay.
23 A   Some departments, it's a requirement for you to
24     even apply, to have a bachelor's degree.
25 Q   Does the bachelor's degree have to be in criminal

Page 13

1     justice?
2 A   For?
3 Q   For the police work you want to do.
4 A   Is the expectation of like those departments you
5     mean?
6 Q   And that was a bad question, so let me rephrase
7     that.
8          When we talked about earlier getting
9     the associate's degree to go on --
10 A   Uh-huh.
11 Q   -- to become a police officer, you indicated you
12     could get a four-year degree, but then you would
13     probably have to get some additional training in
14     the actual police sciences?
15 A   Yep.
16 Q   With the bachelor's degree that you're going for at
17     St. Cloud State, does that have to be a specific
18     focus in criminal justice in order to get further
19     on in the police force or can it be in any area?
20 A   To -- I guess -- I'm not -- I guess I'm not
21     following.
22 Q   Sure. And it's a bad question, and I appreciate
23     you -- you calling me out on that.
24          I guess, if you get a -- a four-year
25     bachelor's degree in history, would that help you

Page 14

1     in your drive to get further in the police
2     department?
3 A   Well, once you're hired or beforehand?
4 Q   Once you're already hired.
5 A   I think at that point it would help with your --
6     your stipend, you would get paid more, and probably
7     advancement, yes.
8 Q   Okay. If you were not already a police officer,
9     would a bachelor's degree in history help you get a
10     job?
11 A   Yes.
12 Q   Okay. You said that -- that's in some departments,
13     they're looking for a bachelor degree?
14 A   Right. I mean, with still having the other
15     technical stuff, yeah.
16 Q   Okay. You also indicated that you took a course --
17     course at the Western Technical College in
18     La Crosse in 2011?
19 A   Yes.
20 Q   And what was that for?
21 A   It was the Wisconsin 520 police certification
22     course, basically the -- the technical portion in
23     order to get hired in Wisconsin that I had
24     completed already in Minnesota.
25 Q   Okay. So it was the Wisconsin equivalent?

Page 15

1 A   Yes.
2 Q   Okay.
3 A   Yeah.
4 Q   So in order to work in La Crosse, you had to take
5     this course?
6 A   Yeah -- yes. Yep.
7 Q   And you indicated you took the course in 2011,
8     correct?
9 A   Correct.
10 Q   And that was before becoming a police officer with
11     the La Crosse Police Department?
12 A   Yes.
13 Q   Okay. Presently, where are you employed?
14 A   City of St. Paul Police Department.
15 Q   And when were you hired by the City of St. Paul
16     Police Department?
17 A   I started their training on October 16 of '17.
18 Q   October 16 of 2017; is that what you said?
19 A   Correct.
20 Q   Okay. I'm sorry, I just didn't hear you.
21          And how long was the training?
22 A   Seventeen weeks.
23 Q   What is your designation while you're in training?
24 A   Police recruit, I suppose.
25 Q   And where is the training performed?

## Page 16

1  A   At one of their training facilities.
2  Q   And what facility did you train at?
3  A   The address is 600 Lafayette -- I don't know if
4      it's a street or a road, 600 Lafayette, it's in --
5      the -- they just built a brand-new training
6      facility for St. Paul.
7  Q   Okay.  So it's in St. Paul?
8  A   Correct.
9  Q   Did you have to go through any other courses or
10     training other than the 17-week period that you
11     just discussed?
12  A   No.
13  Q   And once you completed the training, what was your
14     designation?
15  A   Right now I'm in what they call field training.
16  Q   And when did you begin field training?
17  A   February 11, if that -- I believe that's a Sunday,
18     February 11.  Yeah.
19  Q   Okay.  Of 2018 I assume?
20  A   Correct, yes.
21  Q   So you go from the 17-week training period to this
22     field training portion?
23  A   Correct.
24  Q   How long is the field training?
25  A   Four months.

## Page 17

1  Q   And what does the -- the field training entail?
2  A   You're partnered with a senior officer who
3      basically teaches you the way of the St. Paul
4      Police Department on the street.
5  Q   Are -- are you a full-fledged -- full-fledged
6      member of the police force when you start the field
7      training?
8  A   Yes.
9  Q   Okay.
10  A   I got my badge pin on -- I believe it was the --
11     Thursday, the 8th.
12  Q   Of which month?
13  A   February.  We had like a --
14  Q   Oh.
15  A   -- like a graduation ceremony.  I believe that's
16     when you technically become an officer, I think.
17  Q   So February of 2018, you became a full-fledged
18     officer?
19  A   Correct.
20  Q   Okay.  And how are you paid once you become a full
21     officer?
22  A   Every two weeks.
23  Q   Is it -- are you paid by the hour, by the week?
24  A   Hour.
25  Q   And what's your hourly rate?

## Page 18

1  A   $27.03.
2  Q   Does that change when you become a -- a
3      full-fledged officer?  Were you -- were you paid
4      differently when you were in training?
5  A   No.
6  Q   All right.  So once you got into training, you were
7      paid $27.03?
8  A   Correct.
9  Q   Okay.  And how many hours do you work now as the --
10     a full-fledged member of the police force?
11  A   Eighty hours a pay period.
12  Q   And how long is a pay period?
13  A   I -- 14 days, I believe.
14  Q   What -- what's your schedule presently?
15  A   It can -- always switching.  I do like four on,
16     four off for a certain amount of weeks, then it
17     switches to five on, three off for a certain amount
18     of weeks, then it switches back.  But during FTO,
19     you go to whatever scheduling-off group that
20     officer's on, so you -- I just kind of -- changing.
21  Q   Okay.  So once you get to field training, you're on
22     the senior officer's schedule?
23  A   Yes.
24  Q   Okay.
25  A   So that's midnights, afternoons, days.  It just --

## Page 19

1      it keeps switching.
2  Q   So --
3  A   So the shift switch in -- is your days -- your work
4      days off.
5  Q   Okay.  But the -- the pay period is still 14 days?
6  A   You still -- whatever -- if it's 4/4, 5/3, you
7      still, at the end of the 14 days, put in 80 hours.
8  Q   Got it.
9          When you resigned from the La Crosse
10     Police Department, what -- what was your pay at
11     that time?
12  A   I -- 29 and some change, I believe.
13  Q   Okay.  And we're talking about September of 2016,
14     correct?
15  A   Yes.
16  Q   Okay.
17  A   My best recollection was 29 and some change.  It
18     might have been more.
19  Q   Okay.  I'm just looking for your best recollection.
20  A   Yeah.  I -- I stopped literally looking at my
21     La Crosse mail.  It was just -- it was just -- it
22     was direct deposited.
23  Q   Okay.  Was it the -- the same type of pay period in
24     La Crosse as it is now for St. Paul, 80 hours?
25  A   Yes.

Page 20

1  Q   When you were in La Crosse, did you get pay raises
2      or did you start out at 29 and some change?
3  A   Pay raises.
4  Q   Okay.  What did you start out at in La Crosse?  I
5      know this is taking you back.
6  A   23 or 24.
7  Q   And I know you -- you started in, I think, 2011 you
8      indicated?
9  A   August 23, 2011.
10 Q   Okay.  And how many pay raises in those five years
11     with La Crosse, if you can recall?
12 A   Two or three, I believe.
13 Q   Do you remember what the pay raises were, in
14     amount?
15 A   No.  I think they go -- like steps, like after a
16     year, there's a raise, three years, there's a
17     raise.  I think we got back paid from our contract
18     getting resolved at some point.
19 Q   Okay.  How long were you making 29.06 at La Crosse?
20 A   I'm not sure.
21 Q   Okay.
22 A   After my third or fourth year.
23 Q   Okay.
24 A   Yeah.  I -- I believe it was after my third or
25     fourth year.  I -- I -- I don't remember --

Page 21

1  Q   Okay.
2  A   -- exactly.
3  Q   And, again, I'm just looking for your best
4      recollection.
5          With the St. Paul Police Department,
6      are there going to be raises as well, as there were
7      in La Crosse?
8  A   Yes.
9  Q   Okay.  And what's the scale; when -- when do they
10     occur?
11 A   I haven't even thought about asking those questions
12     yet.
13 Q   Okay.  But from --
14 A   My assumption is probably similar, three, five,
15     seven --
16 Q   Okay.
17 A   -- ten.
18 Q   The -- the benefits that you're -- received at the
19     La Crosse Department, are they different than those
20     you're receiving from the St. Paul Police
21     Department?
22 A   Like health and dental?
23 Q   Yeah.
24 A   Like are they similarly priced or --
25 Q   First of all, are you -- are you getting the same

Page 22

1      benefits, or more or less?
2  A   I'm getting health and dental, yes.
3  Q   Okay.  And that was the same at La Crosse?
4  A   Correct.
5  Q   Okay.  Any price differential?
6  A   I'm not sure, to be honest.
7  Q   Okay.  That's okay.  I'm just asking for your best
8      recollection, so --
9  A   Yeah, I -- as far as like premiums and deductibles,
10     I -- I don't go to the doctor very often --
11 Q   Okay.
12 A   -- so I don't really -- I'm not sure what the
13     deductibles are.
14 Q   Okay.
15 A   Once I sign up with HR, it gets deducted and I have
16     no idea.
17 Q   Much like everybody else.
18 A   Yeah.
19 Q   So you -- you were receiving the -- the same type
20     of benefits at La Crosse as you are presently
21     receiving at St. Paul?
22 A   Yes.
23 Q   Okay.  No real change?
24 A   Presently?
25 Q   Yeah.

Page 23

1  A   No.
2  Q   Okay.  With the field training that you're doing
3      presently with St. Paul, is it in a particular area
4      or for a particular unit?
5  A   I work for the east -- Eastern District of
6      St. Paul.
7  Q   Is the -- the work at St. Paul divided up into
8      districts then?
9  A   St. Paul is divided into three, it would be a
10     western, a central and an eastern district.
11 Q   Okay.  Are you with any particular unit or just
12     patrol?
13 A   Patrol.
14 Q   Okay.  Is there some type of unit within the
15     St. Paul Police Department that you would gravitate
16     toward or -- or want to join later on in your
17     career?
18 A   I'm sure.
19 Q   Okay.  But there's nothing that comes to mind right
20     away?
21 A   Yeah, I mean, there's so many opportunities there
22     that I -- that I -- I'm not even sure of everything
23     that they offer right now.
24 Q   Okay.  Was the -- the St. Paul Police Department
25     the first police department that you applied to

Page 24

1   after leaving La Crosse?
2 A   No.
3 Q   What other police departments did you apply to?
4 A   I applied to Richfield Police Department twice,
5    Lakeville Police Department twice.
6 Q   I'm sorry, Lakefield?
7 A   Lakeville.
8 Q   Lakeville. Okay. Okay.
9 A   Minneapolis Police Department, Bloomington Police
10    Department. I believe just -- I believe that's it.
11 Q   Okay. With regard to these applications to these
12    various police departments, were you rejected or
13    they didn't have a job opportunity or -- or what
14    happened with those various applications, if you
15    know?
16 A   I had interviews.
17 Q   Who'd you interview with?
18 A   With Richfield and with Lakeville and -- oh, also
19    with St. Paul before I got hired this time.
20 Q   Okay. Okay. So the rest that -- the Minneapolis,
21    Bloomington you didn't get interviews with?
22 A   Correct. I had an inter -- no, I never had an
23    interview with either of those.
24 Q   It was Richfield, Lake -- Lakeville and St. Paul
25    you had interviews with?

Page 25

1 A   Correct.
2 Q   Did you have any other job offers other than
3    St. Paul?
4 A   No.
5 Q   Are you married?
6 A   No.
7 Q   Have you ever been married?
8 A   No.
9 Q   Any children?
10 A   Not yet. One on the way.
11 Q   And when are -- when is your child due?
12 A   July 2.
13 Q   And who's the significant other?
14 A   Her name?
15 Q   Yeah.
16 A   Jamie, J-A-M-I-E, Noonan, N-O-O-N-A-N.
17 Q   Being Irish, I know how to spell Noonan.
18 A   Huh?
19 Q   I said being Irish, I know how to spell Noonan.
20      And I assume she's living at --
21    living with you at the Richfield address?
22 A   Correct.
23 Q   Okay. Has she -- was she with you in La Crosse?
24 A   Were we dating at that time?
25 Q   Yes.

Page 26

1 A   Yes.
2 Q   Okay. Mr. Poke, did you do anything in preparation
3    for this deposition?
4 A   Did I do what?
5 Q   Anything in preparation for this deposition?
6 A   No.
7 Q   Okay. Didn't review any documentation?
8 A   No.
9 Q   And if you talked to your attorney, I don't -- I
10    don't want to know what's been said, and I'm not
11    going to ask you, but --
12      So you didn't review anything; were
13    you shown any videotapes or anything like that?
14 A   No. I gathered everything that I had, but I worked
15    last night, so --
16 Q   Okay.
17      (Reporter clarification.)
18      THE WITNESS: I said I gathered
19    everything I had in case I had time to, but I
20    worked last night and then flew out here this
21    morning, so I really never --
22      MR. RIORDAN: Okay.
23      THE WITNESS: -- had free time.
24 BY MR. RIORDAN:
25 Q   What did you -- what did you gather?

Page 27

1 A   Just -- I don't know, copies of everything I had I
2    think, memos I was made to turn in, a copy of a few
3    emails I think I have, findings from the first kind
4    of investigation the City did, personal notes I
5    wrote to myself.
6 Q   Okay. That's all you -- of the things that you
7    gathered?
8 A   I have an audio recording of that interview. I
9    have -- I mean, I haven't been able to look or
10    listen to it.
11 Q   Anything else?
12 A   No.
13 Q   Did you keep a notebook or a diary type of document
14    to put down events that occurred with regard to
15    your discrimination claims?
16 A   No.
17 Q   Okay.
18 A   I haven't.
19 Q   Videotape or audiotape recordings regarding what
20    happened with regard to your claims of filing for
21    discrimination?
22 A   I was given a copy.
23 Q   Okay. Have you made any personal videotapes or
24    audiotapes regarding the events?
25 A   No.

Page 28

1  Q  Okay. You said you had collected copies of emails
2     prior to coming here; tell me about those emails,
3     who were they from, who were they to?
4  A  I think a copy I have is from the chief to the
5     entire department, I think the other one I have is
6     an email from the mayor to the chief maybe.
7  Q  Okay.
8  A  I haven't went through this stuff in so long
9     that --
10  Q  Okay. Is there a lot more emails or is this pretty
11    much the sum and substance, these two emails?
12  A  I think I have one from Wendy, the old HR lady, I
13    got emails of them directing me to do -- write
14    different memos to them.
15  Q  I assume what you're talking about -- emails from
16    them to write memos, you're talking about emails
17    from the police department?
18  A  Correct.
19  Q  Okay. And they're to write memos regarding certain
20    events and so forth?
21  A  Yes.
22  Q  Okay. Any other notes you can think of?
23  A  Oh, I got all the emails from Abraham, I have like
24    my -- my write-ups that I got, his emails
25    explaining every time he thought I did something

Page 29

1    wrong after that.
2  Q  And by he, you mean Abraham?
3  A  Correct.
4  Q  Okay.
5  A  I think that was all the emails.
6  Q  Okay. I -- I would ask to make sure that you keep
7    those and if you could send them to your attorney,
8    I -- I may request them later on, okay?
9  A  Sure.
10  Q  You also talked about, in the information that you
11    gathered, findings from the first investigation; do
12    you recall specifically who the investigator was
13    with regard to that first investigation?
14  A  I would have to grab that file.
15  Q  Okay.
16  A  The City hired an attorney to do like a preliminary
17    investigation to decide if the City then should do
18    a real investigation, so I have her findings.
19  Q  Okay. And it's just a --
20  A  I have Jim Lewis' response or brief or summary.
21  Q  Okay.
22  A  Yeah.
23  Q  Anything else regarding that discussion of findings
24    from the first investigation?
25  A  I have the audio recording from the whole

Page 30

1    interview, I have her response to the City.
2  Q  Meaning the investigator's response?
3  A  Correct.
4  Q  Okay. And, again, I'd ask the same, if you could
5    send those to your attorney, we can request copies
6    of those. And make sure that you keep them, okay?
7         Anything else that you can recall
8    from that first investigation that you discussed?
9  A  That I have?
10  Q  Yeah.
11  A  Just the audio and -- and the summary.
12  Q  Okay. And the audio you're talking about is the
13    interview that you gave with regard to this
14    investigation; is that correct?
15  A  Say it again.
16  Q  Sure. The audio recording that you're -- you've
17    been referencing --
18  A  Yep.
19  Q  -- that's from the interview that you gave with
20    regard to this investigation, I'm assuming?
21  A  Well, it was my interview to -- for them to start
22    an investigation, yeah.
23  Q  Okay. And who conducted that interview?
24  A  The hired attorney lady from Madison or Milwaukee.
25  Q  Okay. Does the name Brownlee sound familiar?

Page 31

1  A  Brownlee. Eileen, yeah.
2  Q  Okay.
3  A  Yeah, there it is.
4  Q  All right. And she was the one that signed the
5    first investigation report?
6  A  Isn't that her name, Eileen, right?
7  Q  I don't recall her first name.
8  A  Yeah, Brownlee.
9  Q  Okay.
10  A  That was it.
11  Q  So this is the -- the audiotape we're talking about
12    is the interview of Ms. Brownlee of you?
13  A  Yes.
14  Q  Okay. And you don't have any other audio
15    recordings other than the one we just discussed?
16  A  Referencing the first investigation?
17  Q  Yeah.
18  A  No. I only met with her once.
19  Q  Okay. Any other audio recordings that you have
20    with regard to your discrimination claims?
21  A  I have a copy of the -- my interview with Lenell
22    Carter.
23  Q  I'm sorry, Lenell Carter?
24  A  Lenell Carter.
25  Q  How do you spell Lenell?

Page 32

1  A   L-E-N-E-L-L.
2  Q   And who is Lenell Carter?
3  A   A resident of La Crosse.  He was a witness to a
4      shooting.
5  Q   Does this audiotape of Lenell Carter play into your
6      discrimination claims?
7  A   I have no idea.
8  Q   Okay.
9  A   What -- what do you mean?
10 Q   I'm just wondering, this --
11 A   I got in trouble for recording that.
12 Q   Okay.  So you recorded Lenell Carter because she
13     was a witness to a shooting in La Crosse; is that
14     correct?
15 A   Lenell Carter witnessed a shooting, refused to talk
16     to any of the La Crosse investigators, only wanted
17     to talk to me.
18 Q   Okay.
19 A   I went to speak with him, not knowing that it was
20     about the shooting.
21 Q   Okay.
22 A   I -- this is after I was no longer an NRO, didn't
23     have any audio recording devices.  When he started
24     talking about a shooting, I recorded it with my
25     phone so that I could burn it into evidence, which

Page 33

1      I did.
2  Q   Okay.  So this is -- this recording occurred after
3      2015 then; is that correct?
4  A   No.  This happened when I was still employed.
5  Q   Okay.  But not an NRO?
6  A   It was after I was removed from the NRO duties.
7  Q   Okay.  Okay.
8  A   So like September/Octoberish of '15.
9  Q   And why did you get in trouble for recording -- was
10     it Ms. Carter?
11 A   Mr.
12 Q   -- Mr. Carter?
13 A   Mr. Abraham seemed to think it was a policy
14     violation.
15 Q   Okay.  Did he tell you why he thought it was a
16     policy violation?
17 A   He never told me anything.  He sent a lengthy email
18     about it.
19 Q   Okay.  And this is one of the emails that you kept,
20     correct?
21 A   Yes.
22 Q   Okay.  One of the emails we've talked about just
23     previously?
24 A   Yes.
25 Q   Okay.  In that email, what did Mr. Abraham indicate

Page 34

1      was inappropriate about you recording Mr. Carter?
2  A   I would have to review what policy he said I
3      violated.
4  Q   Okay.
5  A   It was -- you know, he printed like all the policy
6      and then highlighted what he thought corresponded
7      with me violating it.
8  Q   Okay.  Any discipline as a result of this
9      recording?
10 A   I don't recall.  It was towards the end.
11 Q   Any other recordings other than these two
12     recordings that we talked about, the one with
13     Brownlee and the one with Carter, that you have
14     still in your possession?
15 A   No.
16 Q   Okay.  You also talked about you gathered personal
17     notes that you made, correct?
18 A   I'm -- like I would write down like dates that this
19     happened, dates I met with whomever.
20 Q   So these personal notes you took were drafted
21     contemporaneously with the events that you were
22     taking notes about?
23 A   Say -- say it again.
24 Q   Sure.  These personal notes that you have --
25 A   Uh-huh.

Page 35

1  Q   -- that you've gathered, they're notes of events
2      that occurred that you determined were important to
3      your claim; is that correct?
4  A   I don't know if at the time I thought it was
5      important to the claim, I just documented when I
6      did what, so I knew.
7  Q   So the -- these notes of the events were taken
8      contemporaneously with the event?
9  A   Can you use a different word than --
10 Q   Sure.  The -- you -- you took these notes at the
11     same time the events occurred?
12 A   For some of them, yes.
13 Q   Okay.  If we looked at the notes, would we be able
14     to determine if they were taken at the time the
15     event occurred or -- or documented later?
16 A   Some of them, yes.
17 Q   Okay.  And, again, what was the reason for taking
18     these notes?
19 A   For my personal knowledge at the time.
20 Q   Okay.  And, again, like I asked with the other
21     information, if you could make sure you keep those
22     and then send copies to your counsel.  We may
23     request those as well.
24 A   Sure.
25 Q   Thank you.  I -- I think we've gone over all the

Page 36

1    information that you've -- you've gathered prior to
2    this deposition, but maybe not reviewed; is that
3    correct?
4    A    Yeah.
5    Q    Okay.  So you don't have anything else that you
6    gathered in preparation for this deposition that we
7    haven't discussed?
8    A    No.
9    Q    Okay.  And, again, you haven't memorialized any of
10   the events in any other fashion, such as a notebook
11   or diary, correct?
12   A    No.
13   Q    You first started with the La Crosse Police
14   Department in August of 2011; is that correct?
15   A    Correct.
16   Q    And I think you indicated it was August 23?
17   A    Correct.
18   Q    And I assume that was right after you finished that
19   class at the Western Technical College for your
20   certification?
21   A    I believe it was the next week, yes.
22   Q    Did you go through a training period as well with
23   the La Crosse Police Department?
24   A    A field training process, yes.
25   Q    Very similar to the field training process you're

Page 37

1    going through presently with St. Paul?
2    A    No.
3    Q    What's the difference?
4    A    I mean, yes.
5    Q    You travel around with a senior officer and
6    determine how La Crosse practices or does their
7    policies and procedures?
8    A    Yes.
9    Q    How long was the field training?
10   A    I -- I believe it was three to four months.
11   Q    Were you with the -- the same officer during this
12   field training for three to four months?
13   A    No, not the entirety.
14   Q    Okay.  Who were the officers that you were with for
15   your field training?
16   A    Lisa Barrix, Andy Rosenow, I was with Tony LeQue
17   for a while.
18   Q    How -- how --
19   A    L-E -- L-E Q U-E.
20   Q    Okay.
21   A    Oh, let's see.  That's all I can remember as far as
22   FTOs.
23   Q    Okay.  After your field training in La Crosse for
24   three to four months, did you get placed on patrol
25   or what happened next?

Page 38

1    A    Yes.
2    Q    Okay.  When you're placed on patrol, are you placed
3    with a -- a partner or how does that work?
4    A    No, you ride individually.
5    Q    Okay.  Was there a particular area that you were
6    patrolling when you first became a patrolman after
7    field training?
8    A    No.  Every day they kind of put you where needed.
9    Q    Okay.  Were -- were you assigned a specific area of
10   the police department in order to do this patrol?
11   A    What do you mean?
12   Q    You know, sometimes they have areas such as, you
13   know, urban crimes, white collar crimes --
14   A    No.  It was just patrol.
15   Q    Okay.  And how long were you on patrol?
16   A    Until I got into NRO.
17   Q    Okay.  And that was in 2015, correct?
18   A    Oh, I got more files too, for discrimination.
19   Q    Okay.  We're going back to what you gathered?
20   A    Uh-huh.
21   Q    Okay.  Why don't we finish up with what you -- the
22   files, before we go any further on this.
23   A    I just thought about it when you asked me --
24   Q    No.  And -- and that's fine.  And I should have
25   given you this instruction at the beginning as

Page 39

1    well.  If you recall something, you can just do
2    this and just say fine, I've just remembered
3    something, or if you want to change something
4    because the recollection is different, that's fine
5    too, just -- just tell me.
6    A    Okay.
7    Q    So you recall some different files that you have,
8    correct?
9    A    Yeah.  Just like printouts.
10   Q    And tell me what the printouts are.
11   A    Several news articles, I guess I have like the
12   videos quasi saved, like their YouTube page, but --
13   several -- several news articles that the news did
14   about me prior to September/October 2015, several
15   articles and videos that were aired and printed
16   post September/October '15.
17   Q    Okay.  Are these articles from local papers then?
18   A    There was -- I think there was an article printed
19   here, there was one in some other state that I had
20   found, but the majority are from, yes, like the
21   La Crosse localized channel 19, 8, the Tribune.  I
22   think there was one in Eau Claire that I put in.
23   Q    Okay.  And I assume the videos are also of these
24   news items as well?
25   A    The -- what?

Page 40

1  Q   You said you have some articles and some
2      videos that you --
3  A   Yeah.  Copies of like what they aired.
4  Q   Okay.  And, again, same instruction, if you want to
5      just keep those and pass them on to your attorney,
6      I may ask for those.
7          Anything else with regard to the
8      files that you just remembered?
9  A   No.
10 Q   Okay.  Going back to what we had talked about
11     earlier, you were on patrol until you became a
12     neighborhood response officer, correct?
13 A   Correct.
14 Q   And when did you become a neighborhood response
15     officer?
16 A   Was it like -- I believe -- I think Dan started
17     like a month before me, so he was -- I don't know
18     the exact time.  I want to say like winter '13,
19     start of the year '14, in that gap.
20 Q   Okay.  So generally the end of 2013, beginning of
21     2014?
22 A   Yeah, I want to say that's when it started.
23 Q   You indicated Dan Ulrich started about a month
24     before you did?
25 A   Yeah.

Page 41

1  Q   Okay.
2  A   Maybe a couple weeks.
3  Q   Okay.  So from 2011 to 2013/'14, you were on
4      patrol?
5  A   Correct.
6  Q   And you were traffic patrolling individually by
7      yourself?
8  A   Correct.
9  Q   Did you have any complaints about the La Crosse
10     Police Department from the time you stopped field
11     training until the time you started neighborhood
12     response officer?
13 A   Did I make any complaints?
14 Q   Yeah.
15 A   Formal complaints?
16 Q   Yeah.
17 A   Never like formal written down.
18 Q   Okay.  Was it -- did you -- did you make some
19     complaints that weren't formal to the higher-ups at
20     the La Crosse Police Department?
21 A   To a sergeant.
22 Q   Okay.  Who was the sergeant that you had made
23     complaints to?
24 A   To Craig Olsen.  I think it's S-E-N maybe.
25 Q   First of all, do you know when that complaint was

Page 42

1      made, time frame?
2  A   No.
3  Q   Okay.  Do you remember the -- the substance of that
4      complaint?
5  A   Yeah.
6  Q   What was the substance?
7  A   About two officers possibly engaging in sexual
8      behavior in the building.
9  Q   Is this something you witnessed?
10 A   No.
11 Q   Okay.
12 A   Not -- not --
13 Q   So it's something that you heard about?
14 A   Heard about, and she -- a girl worked second shift,
15     her boyfriend worked third shift, they'd be down in
16     the basement, he would -- he would be missing for a
17     while, I think other people, managers, brought it
18     up as well.
19 Q   Okay.
20 A   So never like a formal complaint, but just like a
21     -- really?
22 Q   Got it.  So it -- it was -- I'm going to say a
23     rumor that was kind of floating around the police
24     station, that these individuals were having sex in
25     the building?

Page 43

1  A   Uh-huh.
2  Q   Yes?
3  A   Yeah.
4  Q   And that's something you brought to the attention
5      of Sergeant Olsen?
6  A   Yeah.
7  Q   Do you remember his response?
8  A   No.
9  Q   Do you remember if there was anything done with
10     regard to this rumor?
11 A   No.  And I think -- I think Officer Rindfleisch
12     also said something about it.
13 Q   Officer -- I'm sorry?
14 A   I think it's like R-E-I-N-D-F, maybe
15     L-I-S-C-H(sic.), something similar, Rindfleisch.
16 Q   So Officer --
17 A   I heard that he brought -- he complained about it
18     as well.
19 Q   Okay.  The -- same two officers having sex?
20 A   Yeah.
21 Q   Who were the two officers, if you recall?
22 A   Brooke Privet and Steve Pataska.
23 Q   Okay.  Is this something that continued on after
24     the complaints or do you think they ended?
25 A   I don't know.

**Page 44**

1  Q   Okay.  Any other complaints that you made to anyone
2      prior to becoming a neighborhood response officer?
3  A   Again, it wasn't like a formal complaint --
4  Q   Right.
5  A   -- but I was having issues with my field trainer at
6      the beginning because he would leave me in a car
7      when he would go into his girlfriend's apartment
8      for whatever reasons, numerous, numerous nights, so
9      I kind of -- I didn't -- I quasi got questioned/in
10     trouble, like why are you not progressing, why are
11     you not having this and this and this checked off
12     your FTO sheet, and it was because I wasn't really
13     doing anything.  So they kind of asked me what was
14     going on.  Their excuse was that he's going through
15     a rough patch, he just got a divorce, so that was
16     their response to me.
17 Q   Okay.  Which field trainer was this?
18 A   Andy Rosenow.
19 Q   And -- and who did you speak to with regard to the
20     Rosenow issue?
21 A   I believe I had to talk to Lisa Barrix about it
22     because I went to her after, so I think -- it
23     stemmed from that, because she looked -- you know,
24     during FTO, you're supposed to have this checked
25     off, this checked off, saying that you're capable

**Page 45**

1      of handling this, before you go to the next phase.
2      I think I had Andy Rosenow and then Lisa Barrix.
3  Q   Okay.
4  A   And she was confused as to why I hadn't done any of
5      this or it was -- explained how to deal with some
6      type of things in the book that should have already
7      been done.
8  Q   Okay.
9  A   So then I went to Joe Smith, who was a lieutenant,
10     and we kind of had to like re -- not restart, but
11     kind of get a new direction on my training.
12 Q   Okay.  So you started out with Rosenow, then when
13     you went with Barrix, she looked at your sheet and
14     said hey, you should be farther along, what
15     happened?
16 A   Yeah.  I think what happened is he had me sign off
17     on like -- sign off on a whole bunch of stuff that
18     I had never done, so then when I didn't know how to
19     handle it, she goes back in the book and says well,
20     you've already done it, and I said no --
21 Q   Okay.
22 A   -- I've never done this, here's my book.  So then
23     that's where it came into -- with a lieutenant and
24     what was going on --
25 Q   Okay.

**Page 46**

1  A   -- why are you behind.
2  Q   When you testified that he had you sign off, you're
3      talking about Rosenow?
4  A   Yes.
5  Q   Okay.  So it sounds like you -- also Barrix and
6      Lieutenant Smith got together and put a -- a plan
7      together to get you back up to speed?
8  A   Yeah.  And I think -- I think I had to write a memo
9      about it that should be somewhere.
10 Q   Okay.
11 A   I mean, this was -- I don't have a copy of that,
12     but -- from my recollection, I think I had to write
13     like what happened, why I was behind or --
14 Q   Okay.  But you got caught up and then you entered
15     into the patrol?
16 A   Correct.
17 Q   Okay.  So this didn't delay your development to a
18     patrol position?
19 A   Delay my development -- delay the process?
20 Q   Yes.
21 A   No.
22 Q   Okay.  So I think we've covered your field training
23     period as well as your period of patrol prior to
24     becoming an NRO with regard to informal complaints
25     that you made?

**Page 47**

1  A   Yep.
2  Q   Okay.  Anything else that you can recall
3      regarding --
4  A   Before?
5  Q   Before NRO, any informal complaints?  We've got the
6      two we just discussed.
7  A   I -- yes, that's it before.
8  Q   Okay.
9  A   Yes.
10 Q   Okay.  Now, you indicated that you started as a
11     neighborhood response officer at the end of 2013,
12     beginning of 2014, correct?
13 A   Yeah.
14 Q   And I'm not going to hold you to it if there -- if
15     there's a --
16 A   Yeah.
17 Q   -- a definite time somewhere else --
18 A   Yeah.
19 Q   -- but that's your recollection?
20 A   Correct.
21 Q   Did you start immediately with officer Ulrich as a
22     partner?
23 A   Yes.
24 Q   Okay.  And I assume Officer Ulrich was your only
25     partner while you were an NRO?

Page 48

1   A   Direct partner, yeah.

2   Q   Okay. And by direct partner, you mean the

3     individual that's in the squad with you?

4   A   Yeah.

5   Q   Okay.

6   A   Because then there was more NRO's and we were like

7     a team, a unit, you know.

8   Q   Okay. Who -- who were neighborhood response

9     officers when you first started?

10   A   When I first started?

11   Q   Yeah.

12   A   Dan and I.

13   Q   Okay. You indicated there was a -- there was a

14     group of --

15   A   When I first started -- me and Dan were the first

16     two.

17   Q   Okay. Got it. When did the other NRO officers

18     come on board after you and Dan?

19   A   I -- several months later.

20   Q   Okay. Who were the other NRO officers that came on

21     board after you and Dan?

22   A   Officer Pond, Officer Kamps, with a K. I remember

23     that one for sure, Kamps.

24   Q   Ponds and Kamps?

25   A   Yeah, Pond and Kamps.

Page 49

1   Q   Pond and Kamps.

2         Anybody else become an NRO while you

3     were an NRO other than these two individuals?

4   A   Yep. Then they got rid of Kamps and brought on

5     Gerbig.

6   Q   When did Gerbig become an NRO?

7   A   I have no idea.

8   Q   Okay. Was it soon after you became an NRO or a

9     year or so later?

10   A   So how long was I an NRO, for a year and a half

11     maybe? Okay. I want to say Kamps was maybe an NRO

12     for just a few -- oh. I don't know how long he was

13     an NRO, just several months.

14   Q   Okay.

15   A   And then Gerbig came back on, or came on for Kamps.

16   Q   All right.

17   A   I worked with Dale and Pond I want to say longer

18     than I worked with Pond and Kamps, but I -- I don't

19     recall how long each of them worked.

20   Q   And Dale would be Dale Gerbig?

21   A   Yes.

22   Q   Okay. Okay.

23       MR. RIORDAN: Let's --

24       (Exhibit 1 marked for identification.)

25   BY MR. RIORDAN:

Page 50

1   Q   Mr. Poke, I'm going to be handing you what has been

2     identified as Poke Exhibit 1. Could you just

3     review that and tell me what Exhibit 1 entails.

4       Is Exhibit 1 the discrimination

5     complaint that you filed in this case?

6   A   Yes.

7   Q   It is three pages in total, correct?

8   A   Yes.

9   Q   And it looks like you signed page 2?

10       MR. OLSON: Actually, I signed it.

11       MR. RIORDAN: I'm sorry. I couldn't read

12     the signature.

13   BY MR. RIORDAN:

14   Q   It looks like it's dated December 20, 2016; is that

15     correct?

16   A   Yes.

17   Q   Okay. And it's -- it's signed by your counsel,

18     correct?

19   A   Correct.

20   Q   I assume you provided the information to your

21     counsel for this discrimination complaint?

22   A   Yes.

23   Q   Okay. In looking at this complaint, it's generally

24     indicating that you felt that you were

25     discriminated against because of your race; is that

Page 51

1     correct?

2   A   Correct.

3   Q   Okay. And the individual or entity that

4     discriminated against you was the City of La

5     Crosse, specifically the police department; is that

6     correct?

7   A   Yes.

8   Q   At the bottom of page 1, we have the dates of

9     discrimination, we have a beginning date of

10     September 11, 2015 and the most recent

11     discrimination date as August 10, 2016; do you see

12     those dates?

13   A   Yes.

14   Q   What was the September 11, 2015 event that you felt

15     was discriminatory, if you can recall?

16   A   I think that was the day I was removed from NRO.

17   Q   Okay. And if that -- if that date doesn't coincide

18     with the time that you reviewed -- removed as a

19     neighborhood response officer, it -- is it the

20     initial event of having you being removed as an NRO

21     that you believe was the initial discriminatory

22     event?

23   A   No.

24   Q   Okay. Why don't we start out with what you feel

25     the original -- the initial discriminatory event

Page 52

1   was?
2   A   Not taking any of my complaints seriously.
3   Q   Okay.
4   A   Oh, you want to know like the first time I felt
5       like the police department was racist towards me?
6   Q   Yeah.
7   A   Oh, boy.  Not that day.
8   Q   No, and I -- that's why I'm asking you.  We have a
9       specific date down -- why don't -- why don't you
10      tell me when you first felt that the police
11      department was discriminating against you --
12  A   Uh-huh.
13  Q   -- that makes up the basis for this claim.
14  A   First time -- it probably started with Trenton Bowe
15      calling me and my -- my music jigabooish.
16  Q   Trenton Bowe?
17  A   B-O-W-E.
18          When the Ferguson incident happened,
19      when the captain wanted to go outside and talk to
20      the press without me -- or didn't want to go out
21      there without me.  I'm sorry.
22  Q   We got the -- the Trenton Bowe statement?
23  A   Yeah.  Okay.  Captain Lawrence -- so there was the
24      shooting in Ferguson, the -- there was kids at the
25      U -- University of Wisconsin-La Crosse that had

Page 53

1   started -- I don't know if you want to call it a
2   protest, but a march to the police department and
3   were demonstrating outside there.  Our captain
4   decided that he was going to go address them and
5   the media, I had no idea about that, previously I
6   had -- think I may have stopped and arrested like
7   three people out of a car, they got drugs and
8   stuff, so I was tied up, I kept getting calls on
9   the radio and on my work phone, the captain wanted
10  me, I couldn't come because I was tied up, he
11  wanted me to come stand by him for the news article
12  strictly because he thought that would help the
13  police department's image.  I brought that forward,
14  I had to have a meeting with him about it, where he
15  apologized and gave me this long spiel that he
16  didn't realize that that was insensitive and didn't
17  -- you know, whatever, whatever.  Them putting
18  bananas in my friend's locker, them calling my
19  friend a house dog.  Tyler Pond telling me the only
20  reason I got the NRO job was because I was black.
21  Let's see --
22  Q   So this is the -- the beginning of the
23      discrimination?
24  A   Yeah, I had heard stories, but that was like when I
25      started like seeing just how it was.

Page 54

1   Q   Okay.  And I -- I didn't mean to cut you off.  I
2       thought you were done.  Are you -- is there other
3       instances?
4   A   No, I'm just -- I have purposely pushed this in the
5       back of my head, so you're making me think about
6       uncomfortable stuff.
7   Q   Okay.  Well, let me -- let me take some of the
8       instances that you -- you've discussed, and if
9       something pops up in your head, just tell me.
10          I asked you to describe the first
11      instances of discrimination that you felt occurred
12      while at the La Crosse Police Department and you've
13      given me a few, starting out with Trenton Bowe
14      indicating -- or calling your -- your music
15      jigabooish; is that correct?
16  A   Uh-huh.
17  Q   Yes?
18  A   Yes.
19  Q   And when did that occur?  I mean --
20  A   I -- I mean --
21  Q   And -- and if you want to put it in I was in field
22      training or I was on patrol or I was an NRO
23      officer?
24  A   I was on patrol I believe the first time he started
25      saying that stuff.

Page 55

1           Tyler Pond singing -- singing --
2   trying to sing songs and using -- saying nigger out
3   loud, saying that it was cool if he says it because
4   they say it in the songs.  All -- we would always
5   have like blue blanket, like go pound the hood,
6   arrest any hood rats that you can find, stop every
7   hood rat that you see driving, just like the
8   context of which they did daily operations.
9   Q   Okay.  And I want to get a time frame on all these,
10      so I'm going to go back to the -- the Trent --
11  A   Trenton Bowe.
12  Q   -- yeah, the Trenton Bowe comment.
13  A   Uh-huh.
14  Q   You said it happened while you were on patrol; do
15      you remember what year?
16  A   '13, '14.
17  Q   Okay.  So it was right before you became an NRO?
18  A   Like '12, '13, yeah.
19  Q   Okay.  And he just referenced that he felt like
20      your music was jigabooish; is that correct?
21  A   Yeah -- well, he used that word more than just
22      that, but --
23  Q   Okay.
24  A   -- he would -- that was like his word for, you
25      know -- other people would say ghetto or whatever,

Page 56

1    he -- he used the word jigaboo.
2  Q    Okay.
3  A    Like he's a jigaboo, like that was his -- that's
4      his word.
5  Q    Okay.  That's how he referenced anything
6      African-American?
7  A    Right.
8  Q    Okay.  And you talked about the Ferguson incident
9      with Captain Lawrence?
10  A    Uh-huh.
11  Q    Yes?
12  A    Yes.
13  Q    And that was where he asked you to come out with
14      him to talk to the press when the UW-La Crosse
15      students were marching as a result of the shootings
16      in Ferguson?
17  A    He didn't want me to talk; he just wanted me to
18      stand by him and smile.
19  Q    Okay.  So that occurred about the same time as the
20      shootings in Ferguson?
21  A    Yeah.  Shortly after.
22  Q    He --
23  A    I believe -- I believe that was the Ferguson
24      shootings.
25  Q    Okay.

Page 57

1  A    I don't know, I'd have to look at that, the date,
2      or the year.
3  Q    But, again, that would have been --
4  A    Like -- if I knew when that happened, that would
5      help.
6  Q    If we could look back and find out when the
7      Ferguson shootings are, that's about the time that
8      that incident --
9  A    Yeah, it's around that -- that time frame.
10  Q    Okay.  And he apologized to you for using you in
11      this particular way?
12  A    Uh-huh.
13  Q    Yes?
14  A    Yes.
15  Q    Okay.  You also indicated that there were some
16      instances involving bananas in your friend's locker
17      as well as someone calling your friend a house dog,
18      correct?
19  A    Correct.
20  Q    Who was the friend you were talking about?
21  A    Tony Clark.
22  Q    When did the banana incident occur?
23  A    I -- I don't know the time frame.  '12, '13,
24      maybe '14.
25  Q    Okay.  I assume that's the same -- about the same

Page 58

1      time frame in which Officer Clark was called a
2      house dog as well?
3  A    Yep.  He was asked to color his skin with a marker.
4  Q    Did -- did you ever get bananas in your locker?
5  A    No.  I had all my stuff taken though.
6  Q    You had all your stuff stolen from your locker?
7  A    No, I didn't have all my stuff stolen from my
8      locker.  I had all my stuff taken from the locker.
9  Q    You're going to have to draw the distinction there
10      for me.
11  A    So like I wear an outer -- well, I don't know if it
12      was an outer then.  Normally like your vest is so
13      hot and wet and sticky, like you either spray it
14      down with like Febreze and hang it.
15  Q    Got it.
16  A    I feel like if you lock it in a locker, it doesn't
17      air out, so we had hangers, racks --
18  Q    Got it.
19  A    -- you know what I mean, so I would hang all my
20      stuff up, because -- because I had a hanger right
21      next to my locker.
22  Q    Okay.  So you'd hang your -- your vest up after a
23      shift?
24  A    My vest, my uniform.
25  Q    Okay.

Page 59

1  A    Yeah.
2  Q    And that was to -- to air it out?
3  A    Uh-huh.
4  Q    Yes?
5  A    Yes.
6  Q    And that was taken?
7  A    Correct.
8  Q    Was it stolen; was it given back; what happened in
9      the end?
10  A    Oh, I got it -- I got it back, yes.
11  Q    Okay.
12  A    It was under Troy Nedegaard's desk.
13  Q    Okay.  And who took it?
14  A    Troy Nedegaard.
15  Q    What was the reason for Mr. Nedegaard taking your
16      uniform and vest?
17  A    Appearance of the locker room he stated.
18  Q    He -- he thought it should be in your locker as
19      opposed to hanging up?
20  A    Correct, mine in particular and not the other stuff
21      that was hanging up still.
22  Q    Okay.  Were there other individuals that hung stuff
23      up as well?
24  A    Yeah, it was a very common practice.  You would
25      find all of the racks hung with jackets, boots on

Nathan M. Poke

## Page 60

1     top.
2  Q  Okay.
3  A  Dirty men's locker room.
4  Q  I know -- I know what you speak of.
5        Anybody other -- anyone else's stuff
6     taken at any other time?
7  A  No idea.
8  Q  Okay.  So you don't know if anyone else's things --
9  A  People would like joke around and move something --
10    you know, somebody would tie your shoes together or
11    somebody would put your badge upside down, so you
12    didn't realize it or -- like look goofy stuff.
13    People wouldn't just remove your items from the
14    locker room so that you were unable to do your job
15    or get dressed or even go help your comrades, God
16    forbid if you needed to, because you didn't have
17    your vest or shirt.
18  Q  Okay.  So people would mess with people's stuff,
19    they just went a little further and took your
20    stuff?
21  A  My stuff was removed from there, brought up two
22    floors and hidden underneath a desk.
23  Q  Okay.  And you don't know if that was done with
24    anybody else's gear at any other time, correct?
25  A  No idea.

## Page 61

1  Q  Okay.  But that was -- so --
2  A  I was told he did that because people were coming
3    to look at the building.
4  Q  Okay.
5  A  What's that word -- oh, what's the word?
6    Accreditation people.
7  Q  Oh, it was --
8  A  Maybe.
9  Q  So someone from an outside agency?
10  A  Somebody was coming to look at the department, and
11    he thought that my stuff there gave a bad
12    impression, but not -- this is the reasoning that I
13    was given.
14  Q  Okay.
15  A  You would have to ask them.
16    Okay.
17  A  I ran upstairs to the assistant chief's office and
18    started yelling did I get fired.
19  Q  Then you got your uniform back and your vest
20    back and --
21  A  About an hour later, yeah.
22  Q  Okay.  You also indicated another instance where
23    Tyler Pond indicated that you got the NRO job
24    because you were black?
25  A  Uh-huh.

## Page 62

1  Q  Yes?
2  A  Yes.
3    And when did this occur; when did this --
4  A  Several times.
5  Q  Okay.  This wasn't just a one-time event?
6  A  No.
7  Q  You also talked about blue blankets where everybody
8    would just go out and start arresting people;
9    explain that a little bit more for me if you could?
10  A  If we had excess people for a day or a specific
11    assignment that whomever thought up, we would do
12    like different details.  Whenever they did blue
13    blanket, it would be like a specific area that they
14    wanted you to go.
15  Q  Okay.  Was blue blanket a formal term they used or
16    was it just a -- a term that was referenced by the
17    officers?
18  A  Yeah, I'm sure -- I don't think it was on a piece
19    of paper saying go do that, but --
20  Q  Okay.  But when --
21  A  It was like the term operation blue blanket today,
22    everybody knew what that meant.
23  Q  Okay.  So when you had -- I don't want to -- I
24    don't want to say an excess number of people, but
25    when you had more people available, they might say

## Page 63

1    okay, we're going to go out and canvass this
2    particular area?
3  A  Yeah.
4  Q  Okay.  And that was blue blanket?
5  A  Yes.
6  Q  Okay.  And they would pick various areas to do
7    this?
8  A  Normally the same spot.
9  Q  Okay.  What was the same -- what was the spot
10    normally?
11  A  Like Fifth Street -- I would say like Fourth Street
12    to Seventh Street, from Market Street to -- what's
13    the -- to Hood Park, I don't even know what street
14    it is anymore, like a --
15  Q  Okay.
16  A  -- condensed area.
17  Q  Was it a -- an area of high crime?
18  A  I mean crime, I suppose.
19  Q  Okay.  These blue blankets would be done in other
20    areas at other times?
21  A  I think I did one on the north side one time.
22    Primarily it was right in that area.
23  Q  Okay.  How many blue blankets did they do while you
24    were an officer with the La Crosse Police
25    Department?

Page 64

1   A   I don't know, three, four, five.

2   Q   Okay.

3   A   Like formal ones, yeah.

4   Q   Okay.  So when they'd say okay, we're going to

5       focus our attention on this particular area, three

6       or four times over your career that would happen?

7       And I'm looking just for your --

8   A   Yeah.

9   Q   -- your best recollection.

10  A   I would say five.

11  Q   Okay.  Getting back to Exhibit 1, your -- your

12      complaint, it focuses on your time with

13      Officer Ulrich, correct?

14  A   Yes.

15  Q   Okay.  And this is primarily the basis for your

16      discrimination complaint, correct?

17  A   Yes.

18  Q   Okay.  In your complaint, you indicate that

19      Officer Ulrich engaged in a fair amount of

20      misconduct while you were together as NRO officers,

21      correct?

22  A   Correct.

23  Q   When did this misconduct by Officer Ulrich begin or

24      when did you first notice it?

25  A   The first time -- I mean, probably a couple --

Page 65

1       maybe a -- two months, three months after we

2       started riding together.

3   Q   Okay.

4   A   I just slowly started like picking up stuff.

5   Q   So I'm just going to go back to what you told me

6       about when you started.  You indicated you started

7       about end of 2013, beginning of 2014, so you would

8       have started noticing Ulrich's misconduct in, what,

9       end of January or early February?

10  A   I mean, do you have like the day I started so I

11      could use that to reference or --

12  Q   The day you started --

13  A   NRO.  And then I can maybe have a better mental

14      map.

15  Q   I don't know if I have that.

16  A   I mean, are -- am I close?

17  Q   To tell you the truth, I don't know.  I've

18      forgotten right now.  I've got it written down

19      somewhere I'm sure.  But in general, and I --

20  A   A few months after we were partnered together.

21  Q   Okay.  So if -- and just as a hypothetical, if you

22      started on January 1, 2014, the misconduct would

23      have -- you would have started noting the

24      misconduct in, what, early February?

25  A   Yeah, I -- I think he might have started in

Page 66

1       February and I started in March or something.

2   Q   Okay.

3   A   So probably like that summer.

4   Q   But this is --

5   A   Spring, summer.

6   Q   -- something that -- that happened right away that

7       you started noticing, Ulrich?

8   A   Yeah.

9   Q   Okay.

10  A   A few months into it.

11  Q   And what kind of misconduct did you -- did you

12      notice at the beginning?

13  A   Just that he felt superior.  I mean, he violated

14      the policies.  He would lift for an hour, two hours

15      a day, he would come in late on the weekends, he

16      would do personal errands in the squad, he'd go to

17      Minnesota to go to the bank, so people didn't see

18      him I mean.  During his wedding, I mean, we made

19      probably three, four, five stops so he could go pay

20      for rings, look at this, that and the other and --

21      just like little stuff where I just was like -- you

22      know.  And then as you see more and more of it,

23      like that's not right.

24  Q   So it sounds like this violation of police policy

25      by Ulrich was kind of a -- a constant throughout

Page 67

1       your -- your time with him as an NRO?

2   A   Uh-huh.

3   Q   Yes?

4   A   Yes.

5   Q   Okay.

6   A   Sorry.

7   Q   It wasn't just one event here, one event there, it

8       was something that would happen all the time

9       throughout your time with -- with Ulrich?

10  A   Yeah.

11  Q   Okay.  Did you ever speak to Officer Ulrich about

12      this and say hey, listen this is not cool that

13      you're violating department -- department policy

14      with me right here?

15  A   I don't know if we had like a direct conversation,

16      but the times where like -- he would -- he -- like

17      so you can have like a half hour lunch, you know,

18      he would -- he would go lift for an hour and a

19      half, two hours, and then they would just be like,

20      dude, you can't do that, and he'd do it again,

21      like, dude, you just can't do that.  And started

22      perceiving like they don't really care what the

23      hell he does, like you can only get yelled at, you

24      know, so many times without either getting written

25      up or disciplinary action, you know what I mean, so

Page 68

1   like -- the one time I said no to him was when he
2   wanted me to throw this gun in a trash can.
3 Q   Okay.
4 A   That time I stood up to him and said no.  I grabbed
5   it -- I walked over there, and I grabbed it back
6   and said I ain't doing this.
7 Q   Okay.
8 A   So then I just started feeling like people were
9   like going to be -- you know what I mean?  It's
10   like I'm not participating in what you're doing.
11 Q   Okay.  When you were talking about Ulrich taking
12   longer lunches to work out, would that happen like
13   three or four times a week?
14 A   It would be typically on weekends.
15 Q   Okay.
16 A   Because we didn't have any supervision on weekends,
17   or he'd come late or --
18 Q   So this abuse of the policy regarding lunchtime
19   would usually occur on the weekends with Ulrich
20   when he'd work out?
21 A   Yeah, because during -- during the week, we would
22   have a meet -- a briefing every morning --
23 Q   Okay.
24 A   -- so -- or else, you know, our boss would go and
25   then he'd go lift at night or --

Page 69

1 Q   Okay.  So he -- he'd skirt around the supervisors
2   to work out?
3 A   Uh-huh.
4 Q   Yes?
5 A   Yes.
6 Q   Okay.  And I assume these trips to Minnesota to
7   do -- to do his banking were in violation of police
8   policy as well?
9 A   I would believe so.
10 Q   Okay.  And I assume he -- he did so to -- he --
11   strike that.
12       You indicated he did so so people
13   wouldn't see him do his banking; is that correct?
14 A   I would assume so.
15 Q   So supervisors at the --
16 A   I believe he said like -- I forget what words he'd
17   say.  They can't see us over here or -- I don't
18   know.  I don't know if I -- I -- you'd have to ask
19   him why he wanted to go to Minnesota to go to the
20   bank.
21 Q   When he said to you that they -- they can't see us
22   over here, he was referring to the -- his
23   supervisors at the police department, I assume?
24 A   I would assume so.
25 Q   Okay.  And so he would try to do this outside of

Page 70

1   the purview of the La Crosse Police Department?
2 A   I -- if you're asking me what his intentions -- why
3   he did it, I -- I don't know.
4 Q   Okay.  But this was something that --
5 A   A purposeful event to -- to not be caught would be
6   my assumption as to why he would go to Minnesota.
7 Q   Got it.  Okay.  And I assume that'd be the same for
8   these stops you made for his wedding as well?
9 A   Yeah, but those were in -- in Wisconsin, so --
10 Q   Okay.  He just stopped to run errands for his
11   wedding?
12 A   Just -- just personal errands on duty time, that
13   kind of stuff.
14 Q   Did you ever notice this kind of misconduct with
15   anyone else other than Ulrich?
16 A   Just Andy Rosenow when I was in training.
17 Q   Okay.  When we talked about -- what we talked about
18   earlier?  Yes?
19 A   Yeah.  So do you want like her name and the address
20   of where I used to be parked when he would leave me
21   and that kind of stuff or just --
22 Q   We'll -- we'll get to that.
23 A   Oh --
24 Q   We'll get to that.
25 A   -- okay.  Sorry.  I just -- that came to me too.

Page 71

1 Q   No, and -- and that's fine.  I mean, we might as
2   well cover that now anyways as long as you brought
3   it up.
4       You're talking about Ulrich's
5   fiancée, I assume?
6 A   What?
7 Q   About her name and --
8 A   No, no, no.  Andy Rosenow, my old trainer, that
9   used to leave me in the car to go sleep with his
10   girlfriend.
11 Q   Sure.  What was the girlfriend's name?
12 A   Her name was Chelsea something.  Her, and then
13   there was another address, her name was Valerie.
14 Q   So these were the individuals that the -- Andy
15   Rosenow was stopping off at during your training?
16 A   Correct.
17 Q   Okay.  Back to Officer Ulrich; it -- it sounds like
18   the -- this type of -- of policy violations were
19   occurring on a pretty routine basis while you were
20   with him?
21 A   Yeah.  I mean, like it started out being like that,
22   like minimal stuff.
23 Q   Okay.
24 A   Bringing girls into the police department from the
25   bar, like --

Page 72

1  Q   So Ulrich was bringing girls into the police
2      department?
3  A   I -- I will just say -- I only saw them once, him
4      and Pond brought some girls from the bar into the
5      police department late night.
6  Q   And when did that happen?
7  A   That was like beginning NRO days.
8  Q   Okay.
9  A   Maybe before -- it was maybe even like right before
10     we became NRO's.
11 Q   Okay.  I assume they snuck these girls past --
12 A   In the back door, yeah.
13 Q   -- past all the supervisors and so forth?
14 A   Yeah.  If you go in the back door, you can just go
15     straight to the basement.
16 Q   Got it.  So you -- you saw them do this, this isn't
17     something you -- this isn't --
18 A   I saw them walking in.
19 Q   Okay.
20 A   I think Officer Bowe saw it too.  I think we were
21     parked next to --
22 Q   And this was prior to your NRO days, correct?
23 A   Yeah, it had to be like right before, like right at
24     the early beginnings, like right -- give or take
25     two, three months maybe.

Page 73

1  Q   Did you ever complain to anybody about Ulrich
2      bringing in girls?
3  A   I just shook my head.
4          (Reporter clarification.)
5      THE WITNESS:  I said no, I didn't -- I
6  didn't formally make any complaints, no, I just --
7      MR. RIORDAN:  Shook your head?
8      THE WITNESS:  -- shook my head and
9  watched.
10     MR. RIORDAN:  Okay.
11 BY MR. RIORDAN:
12 Q   You also mentioned there was one occasion which you
13     witnessed Ulrich try to dispose of a gun, which you
14     said hey, you can't do that?
15 A   Uh-huh.
16 Q   Correct?
17 A   Yes.
18 Q   Tell me about that instance.
19 A   He took a BB gun off of --
20         (A discussion was held off the record.)
21     THE WITNESS:  I don't know where the -- I
22  can't recall where the gun came from.
23     MR. RIORDAN:  Okay.
24     THE WITNESS:  At some point he had a gun
25  in -- in the car that for some reason he wasn't

Page 74

1      going to put into evidence or whatever like you
2      should.  He drove across the bridge to this like
3      park up in the river, wanted to throw it in a
4      Chinese box in the trash instead of just putting it
5      into evidence.
6          MR. RIORDAN:  Okay.
7  BY MR. RIORDAN:
8  Q   And your response on this occasion was you can't do
9      that?
10 A   Well, he pulled up, the garbage was here, I was on
11     the passenger side, he wanted me to throw it, I got
12     out, he was going to put it in -- I don't remember
13     if I put it in or was sitting there, holding it,
14     thinking, but I came back and said I'm not doing
15     that, and he drove to what would be like the north
16     end of the park and threw it in the trash over
17     there.
18 Q   Okay.  And what -- what was your response then when
19     he threw it in the trash?
20 A   I -- nothing.
21 Q   Okay.
22 A   Towards the end, we just had animosity and didn't
23     really talk.
24 Q   Okay.  But this was a BB gun you said?
25 A   I believe that one was a -- like a BB or pellet,

Page 75

1      like airsoft cartridge --
2  Q   Sure.
3  A   -- type gun.
4  Q   And you don't remember where he originally got the
5      gun?
6  A   I think that one -- I think it was a traffic stop,
7      to be honest, on like Rose Street.  I don't
8      remember those streets anymore, just north of the
9      viaduct coming like --
10 Q   Okay.
11 A   Yeah, Rose Street.
12 Q   Okay.
13 A   There's like an overpass driving into the north
14     side, and it was like right in there.
15 Q   According to your complaint, you -- you finally
16     made the La Crosse Police Department aware of all
17     this misconduct at some point in time; is that
18     correct?
19 A   Uh-huh.
20 Q   Yes?
21 A   Yes, yes.
22 Q   Okay.  And that was your conversation with
23     Sergeant Dittman; is that correct?
24 A   Well, before that, I had a talk with
25     Captain Kudron.

Page 76

1 Q How do you spell Kudron, I'm sorry?
2 A K-U-D-R-O-N.
3 Q Okay. So you had a -- you had a conversation with
4    Captain Kudron regarding Ulrich's misconduct?
5 A Not specifics.
6 Q Okay.
7 A Just like explaining to him that I wasn't really --
8    it wasn't working out, me working with Dan, just
9    explained like we didn't -- we weren't working,
10    like we weren't very compatible. I think I said
11    something like he's doing stuff that I don't
12    believe in, but I don't want to say -- I just
13    didn't give specifics, I think he kind of like --
14    was like well, I need to know, and I said -- I
15    don't know what I said, like I don't -- I'm not
16    trying to start -- I'm not trying to make it more
17    than it is, or something like that.
18 Q Okay.
19 A I was like -- so at that time, I -- I didn't get
20    like specific in with Captain Kudron, but I brought
21    to his attention that I was unhappy in that
22    situation and was not in the -- what I said,
23    conducive working environment with Dan.
24 Q Okay. When was this conversation with
25    Captain Kudron?

Page 77

1 A Man, this was -- this was maybe -- I -- I don't
2    know. I think it was like --
3 Q Well, you spoke with Sergeant Dittman in -- I think
4    it was August 15, 2015?
5 A Yep, I know I remember that.
6 Q Okay. So was this before --
7 A This was before then.
8 Q Okay. I'm sorry, it was August 14, 2015 you spoke
9    with him.
10 A 14th?
11 Q Yeah.
12 A Okay.
13 Q How -- how much before your conversation with
14    Dittman did you speak with Kudron?
15 A I would say a few weeks.
16 Q Okay. And, again, it sounds like you were just
17    telling Captain Kudron that you and Officer Ulrich
18    didn't mesh?
19 A Right.
20 Q Okay. You didn't get into any specifics regarding
21    the misconduct that was going on, correct?
22 A Correct.
23 Q The first time that you talked about the misconduct
24    that you witnessed going on with Officer Ulrich was
25    the conversation with Sergeant Dittman on

Page 78

1    August 14, 2015; is that correct?
2 A First time I -- I talked to a supervisor about it?
3 Q Yes.
4 A Yes.
5 Q Did you talk to anybody else about this misconduct
6    with Ulrich prior to talking to Dittman?
7 A Officers are you saying?
8 Q Yeah.
9 A Yes. I think I talked to Kamps about it, Bowe I
10    think we've talked about it a few times. I used to
11    live with Bowe.
12 Q Okay.
13 A And like family.
14 Q Okay. The only officers that you talked with
15    regarding Ulrich's misconduct were Kamps and Bowe?
16 A Parshall, I'm sure I talked to Parshall numerous
17    times about it.
18 Q I'm sorry?
19 A Heath Parshall. I think it's P-A-R-S-H-A-L-L.
20 Q Okay.
21 A There was a Kyle Houlzhausen that works for West
22    Salem I talked to about it. Your guess is as good
23    as mine.
24 Q Pronounce it again.
25 A H-O-U-L -- I don't think it's a Z, so maybe it's

Page 79

1    like H-A-U-S-E-N maybe.
2 Q Okay. Kyle Houlzhausen?
3 A Holzhausen, yeah.
4 Q Okay. And he was with what department?
5 A West Salem.
6 Q That's different than the City of La Crosse,
7    correct?
8 A Correct.
9 Q So the -- the individuals that you spoke with that
10    were employed by the La Crosse Police Department
11    were Kamps, Bowe and Parshall?
12 A Pond, I talked to Pond. Me and Pond used to -- so
13    I know I talked to Pond about me and Dan. I don't
14    know some of -- I'm not good with names.
15 Q Were these conversations that you had with the
16    officers more along the lines of the conversation
17    you had with Captain Kudron, like we're not getting
18    along?
19 A No. I mean, Pond I -- we used to talk about
20    different instances because he worked with us, but
21    Pond and Ulrich are inseparable.
22 Q Pond and --
23 A Ulrich, Dan.
24 Q Oh, Ulrich. Got it. Okay.
25 A Me and Parshall used to talk about everything

Page 80

1    together. So those guys were more specific.
2    Kudron, it was just -- not as specific.
3  Q   Okay. So the -- you got into specifics with --
4    with -- with Parshall and -- and Pond, and the
5    others were just general, like Kudron?
6  A   I got into in specific with probably Bowe, Pond,
7    Parshall, Kamps.
8  Q   Okay. And when did these conversations occur in
9    relationship to your conversation with
10    Sergeant Dittman?
11  A   Quick.
12  Q   Okay. Did you get into specifics about Ulrich
13    violating police department policy?
14  A   With them?
15  Q   Yeah, with -- with -- with Bowe, Kamps, Parshall
16    and Pond?
17  A   Yeah.
18  Q   Okay.
19  A   I would tell them what was going on.
20  Q   Specifically like --
21  A   I mean, I don't think I would reference that it was
22    a policy violation by any means, but I would --
23    he's doing this or he's taking this or he's --
24    stopping people illegally or he's --
25  Q   Okay.

Page 81

1  A   -- you know, he's -- he's flipping people and --
2    and making CI's without arresting them or without
3    turning in evidence or drugs that they had on them,
4    circumventing the whole system. I talked to -- I
5    talked to them about that, absolutely.
6  Q   Okay. And this was all before your conversation
7    with Sergeant Dittman?
8  A   Yes.
9  Q   The first time you spoke to a -- a supervisor was
10    your conversation with Dittman though?
11  A   Correct.
12  Q   About the specifics?
13  A   Correct.
14  Q   Okay. And so the -- the misconduct by Ulrich was
15    occurring for how many months prior to your
16    conversation with Dittman?
17  A   Months -- well --
18  Q   Give me --
19  A   -- like the big -- like stealing the gun or trying
20    to ditch the gun or taking the drugs or flipping
21    people like that was like three, four months before
22    that, like all -- like -- going to Minnesota or
23    having girls in the room or -- or coming in late
24    or, you know, taking two-hour breaks and stuff,
25    that was almost the whole time.

Page 82

1  Q   Okay. So the -- I don't want to say the -- the
2    minor stuff, but --
3  A   Yeah, so it just progressed.
4  Q   -- the -- the minor stuff was going on throughout
5    your entire involvement with -- with Ulrich?
6  A   Uh-huh.
7  Q   Yes?
8  A   Just about.
9  Q   And the -- the major stuff with regard to the --
10    the gun and the other things happened, what,
11    three at --
12  A   So at the -- at the very start of us getting to
13    NRO, it was like -- here's what they wanted, they
14    wanted two people that were basically going to go
15    out, arrest the bad dudes, not need a lot of
16    supervision and that could go to these community
17    meetings and like be their spokesperson.
18  Q   Right.
19  A   At the start, it was way more like -- in front of
20    the cameras, taking pictures here, there, positive
21    PR for the department. When they knew what it was
22    going to morph into, it was like their kick-ass
23    squad is what they said, like --
24  Q   Okay.
25  A   -- you're going to go arrest these people -- you're

Page 83

1    basically drug investigators without us having to
2    call you that, that's what it focused into.
3  Q   Okay.
4  A   And as soon as that got more narrow is when he
5    started just doing his own thing.
6  Q   Okay. So a few months prior to the conversation
7    with Dittman, that's when the serious misconduct
8    occurred?
9  A   Yeah -- yes.
10  Q   And we're talking about two, three, four months;
11    how many months?
12  A   It's a long -- I think -- I want to know if I was
13    NRO for one or two years. I think it was two
14    years. I would say like four -- four or five
15    months before.
16  Q   Okay. That's when the serious stuff took --
17  A   Before August, yeah.
18  Q   That's when the serious stuff started occurring?
19  A   Yeah.
20         MR. RIORDAN: Okay. We've been going
21    about two hours; do you want to take a break?
22         MR. OLSON: Yeah.
23    (Recess taken from 11:54 a.m. until 12:00 p.m.)
24  BY MR. RIORDAN:
25  Q   I think we left off before the break talking about

Page 84

1   the fact that the first supervisor you talked with
2   regarding Officer Ulrich's misconduct was Dittman,
3   correct?
4 A  Yes.
5 Q  Okay. What was that conversation like with
6   Sergeant Dittman on August 14, 2015?
7 A  What was it like?
8 Q  Yeah. What -- what did you tell him specifically?
9 A  Basically everything, that there was a trunk full
10   of evidence that he never turned in, there was some
11   pills, there was a little bit of meth, there was a
12   gun, needles, all that crap was in the car, he can
13   take all that because I'm not trying to drive
14   around in a car with all that. I told him that he
15   was stealing stuff, told him that he was flipping
16   CI's without going through that and, you know,
17   throwing drugs away and -- it seemed -- like
18   everything, man. I told him I wasn't trying to
19   risk my career working with a guy that was doing
20   that. You know, he was asking me if I wanted to go
21   back to patrol. Yeah, everything.
22 Q  Okay. What -- what -- strike that.
23        What made August 14, 2015 the time
24   that you decided to go to Sergeant Dittman to speak
25   with him regarding Ulrich's misconduct?

Page 85

1 A  That was -- that day I cleaned out -- that day I
2   worked and Dan didn't.
3 Q  Okay.
4 A  So I never drive when it's Dan and I, so I wanted
5   to drive, and me and Dan have different cleanliness
6   expectations, so I cleaned out the car before I
7   started driving, and I found all that stuff in the
8   back.
9 Q  Okay. Did you know that stuff had been in the back
10   of the car prior to August 14, 2015?
11 A  Not all of that stuff, no.
12 Q  But you knew some of the stuff was back there?
13 A  Did I know -- I knew that he had a -- that other
14   BB gun in the car, because he kept saying he was
15   going to do it later; pills and drugs and stuff,
16   no.
17 Q  Okay. So you -- you were aware of the be BB gun,
18   you weren't aware of the -- the drugs?
19 A  Yep.
20 Q  Anything else that you were aware before
21   August 14, 2015 that Dan kept in the car?
22 A  No.
23 Q  Okay. So there wasn't a particular event that made
24   you decide to talk to Sergeant Dittman, it was just
25   the opportunity that you had the car?

Page 86

1 A  Yep. I was driving -- we had to go get a key made
2   for the car, I was driving, and I just -- I had
3   like a -- I was going like this, man, I was not
4   enjoying my job, I was getting sick of it, there
5   was a lot of stress, and I just pulled over in this
6   alley and basically came to tears.
7 Q  Okay. Was Sergeant Dittman assigned to you that
8   day?
9 A  Dittman was always our direct supervisor.
10 Q  Okay. Why was he riding with you that day?
11 A  We had to go get a key, a key on the north side.
12 Q  Okay. So you took the opportunity to be with
13   Dittman to explain to him what's been going on with
14   Ulrich?
15 A  Uh-huh. Basically I -- it started with I just was
16   like straight up like what's the policy for you
17   searching your car, and I was like can you somehow
18   search our car? I said I don't -- I'm not trying
19   to have it where like all of a sudden everybody in
20   the department's against me because I spoke up
21   against an officer because -- that's -- it's not
22   exactly common or a -- I guess the word would be a
23   respectable, you know, thing that people do, so I
24   requested that he anonymously search our vehicle
25   and find those items.

Page 87

1 Q  Okay. So it -- it wasn't a common practice for
2   officers to speak up against other officers is what
3   you're telling me?
4 A  God no.
5 Q  My statement was correct?
6 A  Correct.
7 Q  Okay. So you took the opportunity to have Dittman
8   search the car because he was going to be in the
9   car with you?
10 A  No. Dittman was already in the car with me.
11 Q  Right.
12 A  So I basically used -- what I had found earlier in
13   the day was -- was like my breaking point, but
14   instead of me coming out and saying -- I wanted him
15   to just find this stuff because if you search our
16   car and find that stuff, hopefully you have to then
17   investigate why the heck that's in there --
18 Q  Right.
19 A  -- and then they can -- you know what I mean?
20 Q  Right.
21 A  I wasn't worried about that stuff because it wasn't
22   mine.
23 Q  No, no -- and -- and that was a poor question.
24 A  So I -- yeah, I didn't come and say hey -- I didn't
25   start it like this is what's happening.

Page 88

1  Q   Right.
2  A   I started it basically, can you basically find this
3      to investigate what the heck is going on.
4  Q   Right.  And --
5  A   Yeah.
6  Q   -- and my question --
7  A   Yeah.
8  Q   -- my question was poor.
9          What -- what you did was -- you
10     didn't want to tell him here's what's going on, you
11     wanted him to search the car to find the stuff?
12 A   Correct.
13 Q   Okay.  So in fact you -- you didn't --
14 A   And that's how I started it.
15 Q   Right.
16 A   He never searched the car.  I -- he went and got
17     the stuff after I told him what was in there.
18 Q   Right.
19 A   Yeah.
20 Q   So if -- if this opportunity with Dittman wouldn't've
21     have occurred, you wouldn't have gone to him on
22     your own and said hey, this is what's happening,
23     here's what we found?
24 A   I didn't say that.
25 Q   Okay.  I -- I'm just asking you.

Page 89

1  A   I -- I don't know what my plan was.  That was just
2      -- I just kind of had a moment right there and I
3      broke down.
4  Q   Okay.
5  A   Because I -- he's -- you know.  Dittman was my
6      supervisor, I had somewhat respect for him, you
7      know what I mean?
8  Q   Sure.
9  A   But you got to -- I'm not from there, I don't have
10     family that grew up there, I don't have family that
11     was cops there, like a vast majority of these
12     people do.
13 Q   Right.
14 A   You know, Dan and Dittman are very good friends,
15     like -- it's just a poor setup, having friend
16     supervisors, you know.  So I always felt like I was
17     the oddball out, like -- you know what I mean?
18 Q   Yes.
19 A   I felt like that from day one, I mean.
20 Q   Okay.
21 A   In the inception of the police department, you've
22     had three black officers, two of which work here at
23     the exact same time, one everybody has nothing but
24     negative things to say about.  You were always an
25     outsider, you know what I mean?  Everybody there

Page 90

1      hunts, fishes, wears orange, drives big old trucks,
2      like -- you're -- you know what I mean, like that's
3      not me.
4  Q   Right.
5  A   So I always was hesitant to speak up about
6      anything, because --
7  Q   You were an outsider?
8  A   Yeah.  Everybody's like -- everybody's married to
9      each other's sister, like it's -- it's weird.  You
10     know what I mean, like --
11 Q   So, I mean, you -- you felt like an -- an outsider
12     in this police force because, one, you weren't from
13     the area, you didn't do all the activities that
14     these police officers did, such as hunting and
15     fishing and so forth, you know, and, as well, you
16     were one of two black officers, correct?
17 A   At this point I think I was one of one.  I think I
18     was the only one then.
19 Q   Okay.
20 A   I think Clark was already gone.
21 Q   Okay.  But this is why you felt like the odd man
22     out, for the reasons we just talked about?
23 A   Yeah.  And I -- I -- you've seen that -- other
24     officers go against the grain, what happens to
25     them, and how they get their -- get targeted by

Page 91

1      administration and --
2  Q   So, as you indicated before, speaking up against
3      officer was not very common in this police
4      department, correct?
5  A   Correct.
6  Q   Okay.  And you said you -- you saw --
7  A   People would talk about people doing bad stuff all
8      the time, it was general knowledge most of the
9      time, but --
10 Q   Between the officers is what you're saying?
11 A   And a lot of the supervisors.
12 Q   Did you ever talk to any supervisors about other
13     bad things that were happening other than Dittman?
14 A   No, not directly.
15 Q   Did you ever see any other officers speaking to
16     supervisors about other bad things that were
17     happening?
18 A   About Dan?
19 Q   Just in general.
20 A   No.
21 Q   Okay.  And I assume you didn't see any other
22     officers talking to supervisors about the bad
23     things that Ulrich was doing, correct?
24 A   Did I see that?  No.
25 Q   Okay.  What -- did -- did Dittman talk to you about

Page 92

1    what he was going to do with this information once
2    he obtained it?
3  A    He said he was going to send us an email, that he
4    had went in our car to find something and found
5    that and wanted us to write him a memo as to what
6    that stuff was.  I think that's what we decided.
7  Q    Okay.
8  A    Because he was asking me how to -- how he should
9    bring it forward.
10 Q    And he didn't want to implicate you in this?
11 A    I told him that I didn't -- that's not what I
12    wanted to do.
13 Q    Okay.  And he was going to do that for you by
14    writing this email saying I found this stuff, what
15    is this; is that -- was that the plan?
16 A    Correct.
17 Q    Okay.  Did he follow through with that email?
18 A    Yes.
19 Q    Okay.  And -- and you did write an email back to
20    him as well?
21 A    Uh-huh.
22 Q    Yes?
23 A    I don't know if it was -- I think it was a memo.
24 Q    Okay.
25       MR. RIORDAN:  I think I've got the memo,

Page 93

1    so we'll just mark that.
2       (Exhibit 2 marked for identification.)
3  BY MR. RIORDAN:
4  Q    Mr. Poke, I'm going to hand to you what's been
5    marked as Poke Exhibit 2.  It looks like a memo
6    dated September 1, 2015 from you to Captain Melby;
7    is that the memo we're talking about?
8  A    Nope.
9  Q    No.  Different?
10 A    Different.
11 Q    Okay.  Was this memo directly to Dittman?
12 A    Correct.  He didn't cc anybody on it.  This --
13    yeah, this is different.
14 Q    Okay.
15 A    I'm -- I'm fairly certain it was a memo.  It
16    could -- it could have been an email, but I'm
17    pretty sure it was a memo.
18 Q    Okay.  But you responded to Sergeant Dittman either
19    through email or memo?
20 A    Yes.
21 Q    Okay.  Do you know if Ulrich responded to him as
22    well?
23 A    Yes.
24 Q    Okay.  So he sent a -- a memo as well --
25 A    Yes.

Page 94

1  Q    -- or an email?
2       Did you read Ulrich's memo or email?
3  A    At that time?
4  Q    At any time.
5  A    I think I got a copy of it -- no.  I did read it.
6  Q    You did read it?
7  A    Yes.
8  Q    Would it have been about the time that Ulrich sent
9    the email or memo?
10 A    Yeah.  So that -- so the day that this happened, he
11    was not at work, right --
12 Q    The August --
13 A    -- Dan was not at work.
14 Q    Right.  -- August 14, 2015?
15 A    Yes.
16 Q    Okay.
17 A    So he sent an email -- we got work phones that we
18    always had to carry, so I'm sure Dan got the email
19    right away.  Dan texted me saying something like
20    did you get the memo from Dittman?  And then he
21    said something to the effect of I already have my
22    story figured out what I'm going to tell him,
23    something like that.
24 Q    Okay.
25 A    Those text messages were photographed,

Page 95

1    screenshotted and they took them to the police.
2  Q    Okay.  Who took them to the police?
3  A    This day, this day --
4       MR. OLSON:  Wait.  When you point at
5    something --
6       THE WITNESS:  Yeah, I'm sorry.
7       MR. OLSON:  -- and say this day --
8       THE WITNESS:  I'm sorry.  September 1.
9       MR. RIORDAN:  Okay.  Thank you.
10       THE WITNESS:  I-- well, it might have --
11    is it -- I don't know if September 1 is the day
12    that I had to meet with Kudron.  The day that I was
13    removed formally from being an NRO --
14       MR. RIORDAN:  Right.
15       THE WITNESS:  -- I allowed Captain Melby
16    and Captain Kudron to take photographs of those
17    text messages.
18       MR. RIORDAN:  Okay.
19       THE WITNESS:  So I won't use a specific
20    day, I don't know what day that was, but -- on that
21    day that they reassigned me together --
22       MR. RIORDAN:  Okay.
23       THE WITNESS:  -- is the day that they
24    took pictures of that too.
25  BY MR. RIORDAN:

Page 96

```
1   Q   And you had the text messages on your phone?
2   A   Correct.
3   Q   And that's what they took pictures of?
4   A   Correct.
5   Q   Okay.
6   A   I think it's verbatim somewhere.
7   Q   Okay.  So you either drafted a memo or emailed a
8       response to Sergeant Dittman a day or so after his
9       email to you, correct?
10  A   Yeah, it -- within a day.  I think it might have
11      been that same day.  It was like one page -- or one
12      line.
13  Q   Okay.  What was that one line to Dittman?
14  A   Something like I don't know anything about the
15      items that are in the car.
16  Q   Okay.
17  A   Something similar to that.
18  Q   Okay.  So you didn't detail any information to
19      Dittman per your agreement with him?
20  A   Right, because I had already talked about it with
21      him in the car.
22  Q   Okay.  Do you remember if Ulrich, in his email or
23      memo to Dittman, explained what happened or why all
24      that stuff was in the car?
25  A   Uh-huh, yep.
```

Page 97

```
1   Q   He did?
2   A   Yep.
3          MR. OLSON:  Try to say yes or no.
4          THE WITNESS:  Yes.  I'm sorry.
5          MR. RIORDAN:  That's okay.  You're
6       covering your mouth, and that's --
7          THE WITNESS:  Yeah.
8          MR. RIORDAN:  -- difficult for her to --
9          THE WITNESS:  I'm sorry.  Yes.
10  BY MR. RIORDAN:
11  Q   What do you recall that memo or email said?
12  A   I -- some long -- something like the things had no
13      evidentiary value, he -- he took the gun off of
14      somebody for safekeeping or something and forgot to
15      book it into evidence, something like he couldn't
16      figure out what those pills were or something.  He
17      had a nice lengthy reasoning for them.
18  Q   Did you agree or disagree with his explanation as
19      to why that -- why that material was in the car?
20  A   Disagree.
21  Q   With -- with just about everything in the text
22      message or -- or memo?
23  A   No, the text message just told me he already came
24      up with --
25  Q   Oh.
```

Page 98

```
1   A   -- his story of --
2   Q   Got it.
3   A   -- his lie.  What he put in his thing I disagree
4       with, yes.
5   Q   Okay.  With the memo he gave on to -- to the
6       supervisors?
7   A   Uh-huh.
8   Q   Yes?
9   A   Yes.
10  Q   Okay.  It didn't comport with what you actually saw
11      or witnessed Ulrich doing?
12  A   What do you mean?
13  Q   The -- the information that Ulrich submitted to
14      Dittman --
15  A   Yep.
16  Q   -- explaining why the stuff was in the car, it --
17      that didn't jibe with what you actual saw happened;
18      is that correct?
19  A   Correct.
20  Q   Okay.  Did you file a -- any follow-up with Dittman
21      saying no, no, this is not what happened?
22  A   No.  Nobody talked to me about it --
23  Q   Okay.
24  A   -- after that.
25  Q   Okay.  And -- you didn't supply any additional
```

Page 99

```
1       information?
2   A   To Dittman?
3   Q   Yes.
4   A   No.
5       My statement is correct?
6   A   Correct.
7   Q   Okay.  In -- in going back to --
8   A   I didn't know what was going on.  I already told
9       them what was going on, so I had no idea what --
10      after I wrote that, nobody asked me for any further
11      information.
12  Q   Okay.  In -- in your complaint, going back to it,
13      in a general sense, you're indicating that once you
14      made these complaints about Ulrich, that you then
15      became a focus of investigation; is that correct?
16  A   Correct.
17  Q   When did you learn that you had become the focus of
18      an investigation?
19  A   The day I was reassigned.
20  Q   The day you were taken off NRO?
21  A   Correct.
22  Q   Okay.  And -- did someone tell you that you were
23      the subject of an investigation on that date?
24  A   Yes.
25  Q   And who told you that?
```

Case: 3:19-cv-00033-slc   Document #: 24   Filed: 08/30/19   Page 29 of 54

Page 100

1  A   Captain Melby and Captain Kudron -- no.
2     Captain Melby and -- yeah, Kudron.
3          MR. RIORDAN:  This might help, so --
4          (Exhibit 3 marked for identification.)
5  BY MR. RIORDAN:
6  Q   Mr. Poke, we've marked as Exhibit 3 a memo it looks
7     like that you wrote to Dr. -- to Captain Melby.  It
8     looks like it's August 31, 2015, and I think it's
9     the day that you were taken off of NRO.  If you
10    would review that for me, I would appreciate it.
11         The -- Exhibit 3, could you explain
12    to us what that is?
13 A   A memo -- that's the memo that I had to write
14    answering those two questions.
15 Q   Okay.  And Exhibit 3 is dated August 31, 2015,
16    correct?
17 A   Correct.
18 Q   And it's a memo from you to Captain Melby, copying
19    in Captain Kudron, correct?
20 A   Correct.
21 Q   And this would have been the date that you were
22    removed as a neighborhood response officer,
23    correct?
24 A   Yes.
25 Q   Okay.  So that would have been the day you learned

Page 101

1     about the investigation into you, into your
2     conduct, correct?
3  A   Correct.
4  Q   Okay.  And it was Captain Melby that informed you
5     that you were being investigated?
6  A   Him and Kudron, during that conversation.
7  Q   Okay.  They were both in this -- in this meeting?
8  A   Yes.
9  Q   Okay.  Did they indicate to you what you were being
10    investigated for?
11 A   I think these.
12 Q   The items that are -- that are set forth in the
13    memorandum?
14 A   Just these two things, yeah.
15 Q   Okay.  And they had asked you to -- to explain what
16    had happened on the two instances that are set
17    forth in the memo?
18 A   Yep, correct.
19 Q   Okay.  Did they ever talk to you about being
20    investigated for a delay in reporting misconduct of
21    Ulrich?
22 A   Nope.  That was brought up by Abraham --
23 Q   Okay.
24 A   -- during a conversation I had with him.
25 Q   When did -- that's the -- Assistant Chief Abraham?

Page 102

1  A   Yep -- yes, sir.
2  Q   When did he tell you that you were being
3     investigated for a delay in notifying the police
4     department about Ulrich's misconduct?
5  A   I was never notified I was being investigated for
6     that.
7  Q   Oh, okay.
8  A   I was told that it was bullshit that I didn't come
9     forward right away, and then told that you know it
10    could be a violation that you never came forward.
11 Q   Okay.
12 A   He was basically pissed off.  He said you can't
13    drop a black box on the department like this,
14    something to that effect.
15 Q   And these are conversations you had with Abraham?
16 A   Correct.
17 Q   And when was that conversation?
18 A   After this day, after this August 31.  It would
19    have been -- after I was reassigned, because I went
20    into his office after -- I think I went in the
21    office twice.
22 Q   We -- let me see if I can put this in perspective
23    to help you out.
24 A   Uh-huh.
25 Q   You were put on administrative leave on

Page 103

1     September 17, 2015, correct?
2  A   Maybe that's the date.
3  Q   Okay.  Well -- did you have this conversation with
4     Assistant Chief Abraham prior to being put on
5     administrative leave?
6  A   Yes.
7  Q   Okay.  So it was sometime after August 31, 2015 and
8     sometime before you were put on administrative
9     leave that you had the conversation about the delay
10    in reporting misconduct?
11 A   Yep.  It was -- it was prior to Dan being on -- on
12    administrative leave, but during this little window
13    that they put him on a desk duty.
14 Q   Okay.  Let's do -- let's do this, maybe get some
15    better time frames.
16 A   Yeah.
17         (Exhibit 4 marked for identification.)
18 BY MR. RIORDAN:
19 Q   Mr. Poke, I'm going to hand you what's been marked
20    as Poke Exhibit 4.  Could you review that, please.
21 A   Yes.
22 Q   Exhibit 4 is your notification that you're being
23    placed on administrative leave, correct?
24 A   Correct.
25 Q   And it looks like you were placed on administrative

## Page 104

1 leave on September 17, 2015; is that correct?

2 A   Well, which one is this? I was first placed on a

3 nondisciplinary leave by the mayor's office and by

4 HR. I was then subsequently later placed on a

5 different leave when I was already on leave.

6       (Exhibit 5 marked for identification.)

7 BY MR. RIORDAN:

8 Q   Mr. Poke, I'm going to hand you what's been marked

9 as Poke Exhibit 5. Could you review that and then

10 just identify that for me, please.

11 A   Okay. Yes.

12 Q   Okay. Exhibit 5 is a note from human resources to

13 you from a Wendy Oestreich; is that correct?

14 A   Correct.

15 Q   The letter is dated September 18, 2015; is that

16 correct? Exhibit 5, the date on Exhibit 5 is --

17 A   No, I'm just comparing as to why I would have

18 received this after -- yes.

19 Q   Okay. So the -- the date on Exhibit 5 is

20 September 18, 2015?

21 A   Correct -- well, yes, that's when it was dated.

22 Q   Okay. It's indicated that it was delivered to you

23 in person; is that correct? Underneath your name.

24 I mean, that's what the letter says?

25 A   That's what it says, yes.

## Page 105

1 Q   Do you recall having this delivered to you in

2 person?

3 A   No.

4 Q   Okay. It indicates in Exhibit 5 that this letter

5 is to confirm that on Saturday, September 12, 2015,

6 under the mayor's authority, you were placed on

7 paid administrative leave due to your workplace

8 concerns, correct?

9 A   Yes.

10 Q   Okay. So you had gone to the mayor prior to

11 September 12, 2015 and made some complaints about

12 the workplace; is that correct?

13 A   Correct.

14 Q   Okay. And it looks like the -- the mayor put you

15 on paid administrative leave due to your concerns,

16 correct?

17 A   Correct.

18 Q   And it looks like the leave started on

19 September 12, 2015; is that correct?

20 A   Correct.

21 Q   Okay.

22 A   September 11 was my last day of working.

23 Q   Okay. So in Exhibit 4 -- do you have that there?

24 -- you were put on administrative leave from the --

25 A   So this was nondisciplinary, then this is

## Page 106

1 disciplinary.

2 Q   Okay. So Exhibit 5 was non --

3       MR. OLSON: When you say this --

4       THE WITNESS: I'm sorry.

5       MR. OLSON: -- and hold up a paper, the

6 transcript can't tell what you're holding up.

7       THE WITNESS: Sorry.

8       MR. RIORDAN: Which is why I'm going to

9 get --

10       MR. OLSON: So you have to refer to these

11 by exhibit number.

12 BY MR. RIORDAN:

13 Q   So Exhibit 5 was a nondisciplinary --

14 A   Voluntary leave, yes.

15 Q   Okay. So you voluntarily left the police

16 department, and that's evidenced by Exhibit 5,

17 correct?

18 A   Correct.

19 Q   Okay. And the mayor allowed you to do so?

20 A   Correct.

21 Q   So Exhibit 4 is the disciplinary leave of absence

22 that you talked about earlier, correct?

23 A   Correct.

24 Q   So if -- if I'm remembering this correctly, I think

25 you testified that Assistant Chief Abraham informed

## Page 107

1 you that you were being investigated for your delay

2 in notifying the police department about Ulrich's

3 misconduct after August 31, 2015, but before you

4 were placed on nondisciplinary --

5 A   No.

6 Q   -- leave?

7 A   What I said was that he never informed me --

8 Q   Okay.

9 A   -- that I was being investigated. During our

10 conversation I will call it, he stated that that

11 was a policy and that -- he said that it was a

12 policy. He never said I was under any

13 investigation for that.

14 Q   Okay. So the only investigation that you were

15 aware of into your conduct involved the information

16 that is set forth in Exhibit 3, correct?

17 A   At -- at what point?

18 Q   Just in -- in general.

19       MR. OLSON: You mean ever, going right up

20 to the spring of the following year?

21       MR. RIORDAN: Yeah. I just -- just so we

22 can get a basic question. I mean, I understand --

23 I understand that there was --

24       THE WITNESS: No. At -- at a later date,

25 I was informed of several other --

## Page 108

1      MR. RIORDAN: Okay.

2      THE WITNESS: -- issues that they brought

3   forward.

4      MR. RIORDAN: Okay.

5   BY MR. RIORDAN:

6   Q   So -- but the -- but the first time that you were

7     aware of any investigation into your conduct --

8   A   Was these two questions.

9   Q   -- was the questions that are set forth in

10    Exhibit 3?

11   A   Correct.

12   Q   Okay. So the first time you figured out you were

13    being investigated was on August 31, 2015, for the

14    -- the conduct that is set forth in the memo in

15    Exhibit 3?

16   A   Correct.

17   Q   Okay. You had this conversation with Assistant

18    Chief Abraham regarding the delay in misconduct

19    sometime after August 31, 2015, but before you were

20    placed on nondisciplinary leave; is that correct?

21   A   Yes.

22   Q   Okay. And that's when he told you hey, you should

23    have come forward with these issues and you've

24    dropped a black box on us?

25   A   I went -- I talked to Abraham twice.

## Page 109

1   Q   Okay.

2   A   Once was -- once was this day, September 1, okay?

3   Q   Okay.

4   A   Well, it may not have been September 1. Once was

5    close to September 1, I went in there and -- and

6    asked, you know, what is going on.

7   Q   Okay.

8   A   He -- that is the time that he told me that I was

9    dropping this black box on the department, this,

10    that and the other and why would I hold on to stuff

11    for so long, this, that and the other. I went and

12    I talked to Abraham another day, a day after there

13    was a shooting, somebody got shot and killed, there

14    was a vigil at the park on Jackson and West Avenue.

15    I went back -- because I was pissed off because Dan

16    Ulrich was at that vigil in plain clothes with

17    Dittman while Ditt -- or while Dan was supposed to

18    be on desk duty at the department.

19   Q   Okay.

20   A   Okay. So I was pissed off and went up there

21    because why the hell is Dan Ulrich, A, still in the

22    NRO unit; two, at a vigil when you're on desk duty

23    and in plain clothes, when I thought you -- you're

24    supposed to be in the office? So that's when I

25    went back up there and said what the heck is going

## Page 110

1   on? I said how is Dan -- how am I reassigned and

2    Dan still gets to do all this other stuff? And

3    then I was told I should be happy that I -- I'm not

4    on the wood like Dan, basically benched, he has to

5    be on desk duty, and I said well, no, he's not

6    benched, because he's out in public at community

7    events still, as a member of this unit. What are

8    you talking about? You know, so I went and

9    disputed with him as to why I got automatically

10    removed from NRO, but yet Dan still was, and then

11    two, three days later I kept getting in trouble and

12    then I was no longer working.

13   Q   Okay. So the -- the second conversation you had

14    with Abrahamson -- Or Abraham occurred before you

15    were put on administrative leave?

16   A   Yes. Oh, yeah, I haven't talked to him since.

17   Q   Okay. So the two conversations with Assistant

18    Chief Abraham occurred after August 31, 2015 but

19    before you were put on administrative leave in

20    September, correct?

21   A   The first time I talked to him was a day or two

22    after August 31.

23   Q   Okay.

24   A   The last time I talked to him was -- September 11

25    was my last day of working, so probably five or six

## Page 111

1   days before that.

2   Q   Okay.

3   A   Because after I had that conversation with him is

4    when I all of a sudden started to get in trouble

5    for every action I did at the department.

6   Q   Okay. After the second conversation?

7   A   Correct.

8   Q   Okay. And that's when you started to get in

9    trouble for everything you were doing?

10   A   Correct.

11   Q   Okay. You indicated that Ulrich was placed on desk

12    duty?

13   A   Correct.

14   Q   When was he placed on desk duty?

15   A   I -- I don't know.

16   Q   Do you know why he was placed --

17   A   Several days after the 31st.

18   Q   Okay. -- do you know why he was placed on desk

19    duty?

20   A   I have an assumption, but I -- I don't know.

21   Q   Okay. No one ever told you why he was placed on

22    desk duty?

23   A   No.

24   Q   You also indicated that he was put on

25    administrative leave; is that correct?

Page 112

1  A   Correct.
2  Q   When was he put on administrative leave?
3  A   The same day, the 17th.
4  Q   September 17?
5  A   I think his was the 18th, because I think his dad
6      died on the 17th or something.
7  Q   About the same time you were placed on
8      administrative leave?
9  A   We were both, yes, placed on disciplinary leave on
10     the same 48-hour span.
11 Q   Okay.  Do you know why he was placed on
12     disciplinary administrative leave?
13 A   No.
14 Q   Okay.  No one ever told you?
15 A   No.
16 Q   Okay.
17 A   I mean, I assume from the stuff I brought forward,
18     but that --
19 Q   Okay.  But, I mean, no one came to you and said
20     this is why Ulrich's on desk duty --
21 A   No.
22 Q   -- or this is why Ulrich's on administrative leave?
23 A   Correct.
24 Q   Okay.  The second conversation you had with
25     Assistant Chief Abraham regarding Dan being at a --

Page 113

1      a vigil was you indicating to him why is Dan at
2      this vigil, he's supposed to be on desk duty,
3      right?
4  A   Correct.
5  Q   He was in plain clothes at the vigil?
6  A   Correct.
7  Q   He wasn't in -- he wasn't in uniform?
8  A   Well, I take that back.  Dittman would have been
9      probably in plain -- I don't remember -- I don't
10     remember if Dan was in uniform or not.
11 Q   Okay.
12 A   I -- I take that back.  I can't for sure say that
13     he was in plain clothes.
14 Q   Okay.  But he was with Dittman?
15 A   He was with Dittman at the vigil.
16 Q   Okay.
17 A   On the side.
18 Q   Was -- was Dittman on duty, if you know, at that
19     time, during the vigil?
20 A   No idea.
21 Q   Okay.  Did you know if Dan was on duty at that time
22     during the vigil?
23 A   No idea.
24 Q   Okay.  If he wasn't on duty, could he have shown up
25     at the vigil?  I'm -- just asking.

Page 114

1  A   I'm sure he -- it is very possible that he could
2      have went there, yes.
3  Q   All right.  But he shouldn't have been at the vigil
4      if not -- if he was under discipline is what your
5      statement to Abrahamson -- Abraham was, correct?
6  A   My statement was if you're on desk duty -- yeah.
7      Because he's out going to lunch with these guys,
8      I'm seeing him drive around all the time doing --
9      do -- he was doing another detail, so I said if
10     you're on desk duty, why do you get to still
11     participate in these things?
12 Q   Okay.  So your -- your criticism to Assistant -- to
13     the assistant chief was hey, listen, Ulrich's on
14     desk duty, why is he doing these normal activities?
15 A   No.  My criticism is why the heck is he still --
16     why is he not on leave?  Why is he still working
17     was my thing?  I just brought forward drugs and
18     guns and lies that he gave you, anybody else, you
19     would have done -- this is exactly what I've been
20     telling him, anybody else, or if that was me, I
21     wouldn't be at work.  And I said furthermore, the
22     things that you guys said I did, these two
23     questions, compared to what Dan did, how am I
24     removed from my position and he still holds his
25     position?  And his response was be happy that

Page 115

1      you're not on desk -- or you're not riding the
2      wood, like he is, and I said that's bullshit, he's
3      not riding the wood, he's still working, he's going
4      to these vigils, he's doing A, B and C, and that's
5      why it's -- that's -- because I'm still working, so
6      I'm seeing him out and about.
7  Q   Okay.  So you were -- after August 31, 2015, you
8      were back on patrol?
9  A   From -- at -- I don't --
10 Q   After you were removed from --
11 A   After I was removed, I think I went home for the
12     day.  I believe the 1st was my first day back.
13     Before I had to go out on the street, I had to
14     write this memo.  I don't know how many days, but I
15     worked from September 1 to September 11 on patrol,
16     with days off somewhere in between.
17 Q   Okay.  So are you -- you were out on patrol,
18     Dittman was allegedly -- or I mean -- excuse me.
19     You were out on patrol, Ulrich was allegedly on
20     desk duty during this period of time, before
21     September 17?
22 A   Correct.
23 Q   Okay.  What is your understanding of desk duty?
24 A   My understanding?
25 Q   Yes.

Page 116

1  A   You're sitting at the desk taking calls, taking
2      report calls or -- not doing anything with the
3      public, I mean -- suspended with still being able
4      to come and sit.
5  Q   Okay.  Is he --
6  A   Because we don't have like a front desk that cops
7      sit at.
8  Q   Right.  But it's your assumption that being placed
9      on desk duty is some type of discipline, correct?
10 A   Yes.
11 Q   Okay.  And that there is some expectations as to
12     what you're supposed to be able to do and not do
13     while on desk duty, correct?
14 A   Correct.
15 Q   Okay.  So you're not supposed to be acting in your
16     regular assignment when you're on desk duty; that's
17     your assumption, correct?
18 A   Correct.
19 Q   Okay.  So that was your complaint to the assistant
20     chief, that hey, I was removed from the
21     neighborhood response officer position, but Ulrich
22     has only been placed on desk duty?
23 A   No.  My complaint is why is he still working.
24 Q   In general?
25 A   In general.

Page 117

1  Q   Got it.
2  A   Why is he -- not -- I don't expect that he's going
3      to get fired with a five-day notice, but why are
4      you not on leave.
5  Q   Okay.  But you weren't on leave as well, at the
6      time?
7  A   Was I on a leave?
8  Q   Yeah.
9  A   No.
10 Q   Okay.
11 A   But I wouldn't assume that these fictitious things
12     would hold the same level of discipline as somebody
13     stealing and -- and holding on to evidence and --
14     and admitting to lying to their supervisor.
15 Q   When -- when you -- again, when you talk about
16     these things, we're talking about --
17 A   Exhibit 3.
18 Q   -- we're talking about the items that are set forth
19     in Exhibit 3?
20 A   Correct.
21 Q   You wouldn't expect those to qualify you for desk
22     duty?
23 A   I wouldn't qualify these as being suspended
24     immediately.
25 Q   Okay.

Page 118

1  A   The things that I brought forward on Dan, I would
2      definitely hope so, yes.
3  Q   Okay.  Did someone ever tell you why Ulrich was not
4      suspended immediately after you made the
5      complaints?
6  A   No.
7                (Exhibit 6 marked for identification.)
8  BY MR. RIORDAN:
9  Q   Mr. Poke, I'm going to hand you what's been marked
10     as Exhibit 6.  It's an order to draft memo dated --
11     it looks like August 31, 2015.  Could you review
12     that, please.
13             This is a -- Exhibit 6 is an order
14     to you from Captain Melby; is that correct?
15 A   Correct.
16 Q   It's dated August 31, 2015, correct?
17 A   Correct.
18 Q   And it's asking you to set forth in full
19     description the conversation you had with
20     Sergeant Dittman on April 14, 2015, correct?
21 A   Correct.
22 Q   And this order, which we have as Exhibit 6, you
23     complied with by drafting your memo to
24     Captain Melby dated September 1, 2015, which is
25     Poke Exhibit 2, correct?

Page 119

1  A   Correct.
2  Q   Okay.  Exhibit 2, the items set forth in this memo
3      by you, that's the entire context of the
4      conversation you had with Dittman on the 14th; is
5      that correct?
6  A   From what I can remember.
7  Q   Okay.  So all the events that you set forth in
8      Exhibit 2 occurred prior to August 14, 2015,
9      correct?
10 A   Can you say it again.
11 Q   Sure.  Let me try it this way, you were asked by
12     Captain Melby to memorialize your conversation that
13     you had with Sergeant Dittman on August 14, 2015,
14     correct?
15 A   I was asked -- can you say it one more time.
16 Q   Sure.  I'm sorry.
17 A   I was reading.
18 Q   Sure.  That was -- that's okay.  In -- in
19     Exhibit 6, you were asked by Captain Melby to put
20     down your entire conversation that you had with
21     Sergeant Dittman on August 14, 2015, correct?
22 A   Correct.
23 Q   So all the items that you listed in Exhibit 2 were
24     events that occurred prior to August 14, 2015 when
25     you talked with Sergeant Dittman, correct?

Page 120

1  A   Yes.
2  Q   Okay.  Did you speak with Captain Melby or anybody
3      else regarding your September 1, 2015 memo which
4      we've marked as Exhibit 2?
5  A   Did I talk to anybody else about this?
6  Q   Yes.
7  A   Like a supervisor?
8  Q   Yes.
9  A   I believe I gave a copy of this to the mayor.  Like
10     was I asked to have follow-up about it are you
11     asking?
12 Q   Well, first of all, did you provide this memo to
13     anybody else other than Melby, and you indicated
14     that you gave a copy to the mayor; is that correct?
15 A   I believe the mayor has a copy of this.
16 Q   Okay.  Did you personally give the mayor a copy of
17     this memo which is Exhibit 2?
18 A   I either gave it to him or to Wendy during our --
19     when I met with the mayor, it was with Wendy.
20 Q   Okay.  And that's the HR person?
21 A   Correct.
22 Q   Okay.  And that was later on in September, correct?
23 A   Correct.
24 Q   Right before the --
25 A   This was between September 1 and September 11.

Page 121

1  Q   Okay.
2  A   No, I -- I -- not between those dates.  I met with
3      Wendy after September 11, I believe.
4  Q   Okay.  Okay.  Okay.  When -- when did you meet with
5      the mayor?
6  A   I think twice.
7  Q   Do you remember the dates?
8  A   I do not.
9  Q   Okay.  You were put on --
10         MR. RIORDAN:  I'm sorry.
11         MR. OLSON:  Was it the day you were put
12     on leave by the mayor?
13 BY MR. RIORDAN:
14 Q   Yeah, I was going to just talk to you about
15     Exhibit 5, which is the letter from Wendy Oestreich
16     indicating to you that you were placed on
17     nondisciplinary administrative leave on
18     September 12, 2015.  Could that have been the date
19     that you met with the mayor, September 12, 2015?
20 A   Yes -- well, I think it -- it was before this date,
21     because I think he told me over the phone not to --
22     that I was okay to not go to work on that day.
23 Q   Okay.  So you had requested not to go back and the
24     mayor agreed?
25 A   Excuse me?

Page 122

1  Q   You had requested not to go back to -- to work and
2      the mayor said fine, don't go back to work?
3  A   I don't know if I requested it.  Not going back to
4      work until they could look at what was going on was
5      a -- was something that we discussed.
6  Q   Okay.
7  A   Yeah.  I wouldn't -- I don't think I requested
8      to --
9  Q   Okay.
10 A   -- not go to work.
11 Q   But you -- you agreed that that was the best course
12     of action?
13 A   Correct.
14 Q   Okay.  So your conversation with the mayor would
15     have been sometime very close to September 12,
16     2015?
17 A   Say it again.
18 Q   Your conversation with the mayor would have been
19     sometime close to September 12, 2015?
20 A   One of the times.  I believe another -- I believe
21     the first time was before that.
22 Q   Okay.
23 A   Because I had brought him all the things that they
24     were saying I did wrong or writing me up for, and I
25     said I told you that I -- or I said I -- I told you

Page 123

1      that this was going to happen, that they were going
2      to retaliate against me, and that's when that
3      decision was made.  So I had talked to the mayor
4      and Wendy on more than one occasion.
5  Q   Okay.
6  A   But it -- I must have, on the 12th or 11th, after
7      being -- what happened to that paper?  The 11th --
8      the 11th was my last working day, that's when I had
9      received my last like you did something wrong
10     thing.
11 Q   Okay.
12 A   And that -- and I had brought that stuff forward,
13     saying I told you that this was going to happen,
14     and they were like well, until we -- you know, then
15     that's when that decision was decided upon, that I
16     would not be going back to work until they could
17     look at what the heck was going on.
18 Q   Got it.  This first occasion when you talked to the
19     mayor and Wendy in HR and -- and brought them
20     information --
21 A   Uh-huh.
22 Q   -- what -- what information did you bring them?
23 A   I explained what was going on.
24 Q   Specifically like what -- did you -- like what
25     pieces of paper or what documents did you bring the

## Page 124

1   mayor?

2 A   I -- I don't recall if I brought papers that day or

3    if I just verbally explained what was going on. I

4    -- I don't recall.

5 Q   Okay. Did you ever provide either Wendy or the

6    mayor with any documentation about what was going

7    on with you at the police department?

8 A   I brought them -- I believe I gave them a copy of

9    like the -- the -- of -- of Exhibit 2, I -- I

10   believe I gave them a copy of this, and I believe I

11   gave them a copy of -- possibly No. 3, but -- like

12   the write-ups, the -- the things that I'm --

13   telling you what I did wrong.

14 Q   Okay. So the -- the notices that you received from

15   the police department?

16 A   Correct.

17 Q   Okay. Do you remember specifically which notices

18   you gave them or was it a number or --

19 A   I think it was -- because I -- and when I initially

20   met with them, I anticipated what was going to

21   happen, I said watch, and that -- and then I think

22   that's why I brought them the papers at the end. I

23   think it was the Lenell Carter -- the phone

24   issue -- I don't -- I can't recall the -- the stuff

25   I gave them.

## Page 125

1 Q   Okay. So it's only two occasions which you spoke

2    to the mayor, and we've covered those two

3    occasions; is that correct?

4 A   In person. And then I believe I talked to him on

5    the phone one time.

6 Q   Okay.

7 A   That Saturday, the 12th of September.

8 Q   Okay. That's when he told you about being placed

9    on nondisciplinary administrative leave?

10 A   Correct.

11 Q   Okay. So have we covered all the conversations

12   you've had with the mayor regarding the alleged

13   discrimination claims?

14 A   No. I spoke with the mayor a couple other times

15   because I hadn't -- I spoke with the mayor several

16   times after I was placed on leave on the 12th.

17 Q   Okay.

18 A   Because I even completed a DWI report in his

19   office.

20 Q   A DWI report being what?

21 A   I -- I think I arrested somebody for drunk driving

22   on like the 10th or 11th and blue stamped the

23   report, which meant it needs -- I'll do the report

24   later, my next shift or something.

25 Q   Okay.

## Page 126

1 A   Obviously since she was arrested and charged, at

2    some point I needed to do that report, which had

3    not been done prior to me being on leave, so they

4    requested that I come in to get the report

5    completed so that she could be charged.

6 Q   Got it. So --

7 A   So I know I -- I know I spoke with the mayor after

8    that day.

9 Q   So -- but the DWI report has nothing to do with the

10   discrimination claims, they just wanted you to

11   finish up some paperwork?

12 A   Correct.

13 Q   Okay. That's where my confusion --

14 A   Yeah.

15 Q   -- lies.

16 A   Yeah.

17 Q   Okay. So those are the -- those are all the

18   occasions that you spoke with the mayor regarding

19   your discrimination claims?

20 A   And Wendy.

21 Q   And Wendy.

22 A   I spoke with her several times too.

23 Q   Okay. When was the first time that you brought

24   these concerns to Wendy, the HR person?

25 A   Sometime between September 1 and September 11 would

## Page 127

1   have been my first time.

2 Q   Okay. And it sounds like you had a couple

3    conversations with -- with Wendy regarding your

4    concerns, correct?

5 A   Yeah. I met with -- I talked with her several

6    times.

7 Q   Okay. In between the September 1 and September 11

8    time frame?

9 A   Yes.

10 Q   Did you ever provide her with documentation or fill

11   out any forms for her?

12 A   I do not recall.

13 Q   Okay.

14 A   But I met with her before I met with the mayor.

15 Q   Got it. Now, throughout this deposition, we've

16   gone over a lot of your contacts with supervisors

17   in the police department as well as Wendy in HR and

18   the mayor, have -- have we hit all the contacts

19   that you've had with those individuals that we just

20   -- that I just raised?

21 A   With the supervisors?

22 Q   Yeah.

23 A   Regarding like this time frame?

24 Q   Regarding all the -- the complaints that you had

25   regarding discrimination, yeah, in this -- in the

**Page 128**

1   time frame these -- of all the exhibits, yes.
2   Okay. I'll tell you what, I'll make it easier.
3   Let's strike that question.
4          Have we covered all the
5   conversations you've had with supervisors at the
6   police department since your initial contact with
7   Sergeant Dittman in -- on August 14, 2015?
8 A   I talked to Sergeant Blokhuis I believe on the
9   17th, I think that's who served me this.
10 Q   The -- Exhibit --
11 A   Exhibit 4.
12 Q   Okay.
13 A   I got -- I got two of these though, because --
14       MR. OLSON: Do you want to say the
15   exhibit.
16       THE WITNESS: I got two Exhibit 4's, two
17   different leaves, because on the first one I had to
18   come into the department and sign to turn in my gun
19   and turn in my badge and whatnot, and then I
20   believe I had to meet them a second time to sign a
21   different form at a boat launch behind the
22   Kwik Trip.
23       MR. RIORDAN: Okay.
24 BY MR. RIORDAN:
25 Q   Were -- were they all about the same time, the

**Page 129**

1   September 17, 2015 time frame?
2 A   Yeah, in the -- in that 10-, 15-day stretch.
3 Q   Okay. But they all involved the disciplinary
4   administrative leave?
5 A   Yes.
6 Q   Okay. And you said there's other forms you filled
7   out, one to turn in your gun and badge; is that
8   correct?
9 A   Yes.
10 Q   And you said there was another form that was filled
11   out behind a boathouse?
12 A   A boat -- like a boat launch --
13 Q   A boat launch.
14 A   -- where you put it in the water.
15 Q   Okay. What was that for?
16 A   It -- I -- I thought it was similar to this.
17 Q   So Exhibit --
18 A   To Exhibit 4.
19 Q   Okay.
20 A   It had a different date maybe, or something --
21   something got amended or they added a different
22   rule or --
23 Q   Okay.
24 A   I'm not sure, because on that date, I asked
25   Sergeant Blokhuis like what was going on, and is

**Page 130**

1   this bad? And he said well, you should get a
2   lawyer, that it could be criminal against you,
3   something to that effect.
4 Q   Okay. Do you have that documentation in the
5   documents that you've gathered?
6 A   I -- I would have to look. I don't know what I
7   all --
8 Q   Okay.
9 A   -- do and don't have.
10 Q   Okay. Again, if you have that document, so those
11   two papers that we just discussed, if you could
12   provide them to your attorney.
13 A   Sure.
14 Q   Thank you. We've gone through a lot of -- of
15   documents and a lot of issues that you've raised
16   here; what -- what I want to specifically know
17   about now is, how do you feel that you've been
18   treated differently as opposed to a white officer
19   or how do you believe that you've been
20   discriminated against by the City of La Crosse
21   Police Department?
22       MR. OLSON: I'm going to -- yeah. I'm
23   going to make an objection for the record that it
24   calls for a legal conclusion on the part of the
25   witness.

**Page 131**

1       But you should answer as best you
2   can.
3       MR. RIORDAN: Yeah, I'm just looking
4   for --
5       MR. OLSON: Yeah.
6       MR. RIORDAN: -- I don't want -- I'm
7   looking for your --
8       THE WITNESS: Sure.
9       MR. RIORDAN: -- thought process. I'm
10   not looking for a legal opinion from you.
11       THE WITNESS: Sure.
12 BY MR. RIORDAN:
13 Q   I just want to know why do you feel you were
14   discriminated against by the police department?
15 A   Because I've seen countless white officers violate
16   policy, violate the law and do numerous things that
17   have either been brushed under the rug, gotten zero
18   to minimal discussion or discipline about. You
19   know, I take a poop in an alley and they want to
20   fire me? My -- my friend prioritizes a different
21   call ahead of him after he makes a complaint about
22   them, you know, being -- have -- having a prejudice
23   against him, and then they're -- they attack him
24   and fire him, same thing happened to me, like the
25   two black officers that speak up for themselves get

## Page 132

1 attacked and -- and ridiculed and -- and fired over
2 the white officers.  Dale Gerbig, you -- right
3 before this all happened drove his car drunk and
4 got in a crash.  What did the chief do?  Sent out
5 an email to the other chiefs involved after another
6 chief found out about it, saying if anybody has any
7 hit-and-runs, just let us know, you know what I
8 mean, like -- people -- people having sex on duty,
9 my FTO leaving and having sex on duty, people
10 coming to work drunk that have to get PBT'd and --
11 and fail their PBT's and get sent home.  All -- all
12 these white officers are doing these kind of things
13 and nothing is happening.
14 Q   Okay.
15 A   But then the moment -- first my friend does
16 something wrong after he speaks up for himself,
17 they target him and fire him; the moment I speak up
18 against somebody doing something, instead --
19 instead of -- instead of looking at anything that I
20 did, they want to come attack me, for -- the -- the
21 chief of police asked the BCA to investigate me, to
22 do their investigation against me.
23 Q   Okay.
24 A   The BCA, that's like the state version of the FBI.
25       MR. OLSON:  You mean the DCI?

## Page 133

1       THE WITNESS:  Or DCI.  In Minnesota, it's
2 the BC -- I'm sorry, I work in Minnesota.
3       MR. RIORDAN:  That's okay.  I was going
4 to ask the same question.
5       THE WITNESS:  The -- the -- the chief
6 asked the DCI to do my investigation, investigate
7 me, for -- for taking a poop and taking some M&M's,
8 like -- I'm -- I'm giving you somebody that's
9 stealing drugs, somebody that's stealing guns,
10 somebody that is purposely lying about his story to
11 you, but because you guys are best friends and
12 buddy-buddy and go to each other's weddings and
13 your kids play together and your wives are friends,
14 like it's all cool, it's all good, like --
15 instead -- you know what I mean, like let's just
16 keep our good boy image instead of do the right
17 thing.
18       MR. RIORDAN:  Okay.
19       THE WITNESS:  It's crazy -- the way --
20 you can't treat people like that.  You can't call
21 people -- you can't use the N word, you can't --
22 you can't call people jigaboos, you can't use me as
23 your token to come stand by you so you can look
24 cool on TV with a black officer next to you, like
25 in the -- in the time of -- of -- of oppression and

## Page 134

1 suffer -- of -- of all the social media and news
2 outlets covering all that kind of stuff, you know
3 what I mean, like I'm -- I'm more than that, you
4 know what I'm saying, like don't -- don't do that,
5 don't treat me unfairly, don't treat me differently
6 than you're treating all your white compadres.
7       MR. RIORDAN:  Okay.
8 BY MR. RIORDAN:
9 Q   So when you speak about seeing white officers
10 violating policies and the law and not being
11 punished, are you specifically referring to Ulrich
12 or others?
13 A   Others.
14 Q   Okay.
15 A   A plethora of officers.
16 Q   What -- okay.  I -- I need some specifics, what --
17 starting with --
18 A   I gave you one, Dale Gerbig driving drunk.
19 Q   Yep.
20 A   Okay.  Chalk that up to well, he's going through a
21 divorce and he's an alcoholic, so that's cool.
22       MR. OLSON:  How do you spell the last
23 name?
24       THE WITNESS:  Gerbig, G-E-R-B-I-G.
25       MR. RIORDAN:  G-E-R-B-I-G.

## Page 135

1       THE WITNESS:  He has -- he knows all
2 about Dale.  Sorry, now I'm getting passionate
3 about it.
4       MR. RIORDAN:  No, that's fine.  And I --
5 you know, if you need to take a break, that's fine
6 too.
7       THE WITNESS:  No, I'm good.
8       MR. RIORDAN:  Okay.
9 BY MR. RIORDAN:
10 Q   So we have Gerbig.
11 A   Dale Gerbig.
12       I believe there was three officers
13 that ended up getting written up for the racial
14 comments about Tony Clark.
15 Q   Do you remember the -- the officers that were
16 written up?
17 A   I think it was Bowe, Erdmann, E-A-R-D-M-A-N(sic.).
18 I'm not sure who the third was.
19 Q   Okay.
20 A   You know, they were also mad at me because I came
21 forward about Abraham stealing money, stealing
22 donated funds, that was another thing I went to
23 Wendy and -- and the mayor about, and I had other
24 officers, other supervisors, sergeants, verify what
25 I told them.

## Page 136

1  Q   Okay.

2  A   That's in that rinky-dink investigation that they

3      didn't do.

4  Q   Let me -- let me go back for a minute.

5          You raised the issue of white

6      officers not being disciplined for policy

7      violations and law violations; we talked about

8      Gerbig with the DWI, correct?

9  A   Uh-huh.

10 Q   Yes?

11 A   Yes.

12 Q   We talked about three officers being punished for

13     racial comments regarding fellow Officer Tony

14     Clark, correct?

15 A   Correct.

16 Q   And then there was Assistant Chief Abraham stealing

17     funds and was not punished, correct?

18 A   Correct.

19 Q   What -- what funds did Abraham steal?

20 A   She -- there's a lady named Sherry Hougom, I

21     believe H-O-U-G-A-A-M(sic.), is her

22     daughter was murdered like when I first started.

23     Dan was like the first responder there, gave her

24     CPR, she came back to life for a little bit, ended

25     up dying.  Mom, Sherry, became, I don't know,

## Page 137

1      infatuated with Dan, like they became like family,

2      you know.

3  Q   Okay.

4  A   When Dan got into NRO, she starts donating money to

5      our program.

6  Q   Okay.

7  A   So every year she has like a Sara softball

8      tournament that -- all those donations go to the

9      police department.  She raises money -- she raises

10     a lot of money every year and donates it to the

11     police department.

12 Q   Okay.

13 A   I don't know if it was for tax purposes or for

14     whatever accounting reasons, they told her she

15     needs to stop donating money and just donate

16     specific items that we need, because the money

17     can't be allocated towards directly to our program

18     if you give it to the police department.

19 Q   So just let me clarify a couple things, just so

20     that I'm --

21         When you say Dan, you're talking

22     about the assistant chief?

23 A   No.  Dan is is -- is Dan Ulrich.

24 Q   Oh, Dan Ulrich.

25 A   Yep.

## Page 138

1  Q   Okay.  And so the donations that Sherry Hougom was

2      making was to the --

3  A   NRO unit.

4  Q   Got it.  Okay.  Go ahead.

5  A   Yes.

6  Q   I'm sorry.

7  A   So we want to use some of this money to take kids

8      out to get pizza, ice cream, whatever, right, we

9      can't use that money for whatever reason, okay?  So

10     me and Dan, Dan and I share a -- a car together for

11     this whole duration of this time.  We didn't have a

12     -- a laptop, a computer dedicated to us, so there'd

13     be days that we didn't have one or you'd have to go

14     get one from whatever squad didn't have anybody for

15     that shift and then there was shift change, come --

16     you know, we needed a computer.

17 Q   Right.

18 A   So we were like okay, well, with this money, can we

19     go buy a laptop?  No.  Okay.  Well, Sherry, can you

20     just buy us a computer?  Because they're telling

21     Sherry, you need to tell -- or you need to donate

22     specific items.  So she of course calls Dan,

23     because her and Dan are --

24 Q   Right.

25 A   -- Dan is like her adopted son now.

## Page 139

1  Q   Right.

2  A   And -- and he says well, we need a computer, and

3      she says well, you guys already sent me pictures

4      and receipts of a computer that they bought with

5      this money.  No, we don't have a computer.  So then

6      that started that -- this rumor mill of --

7      everybody's questioning well, where the heck is

8      this money and why are we sending this lady

9      pictures and receipts of items that we supposedly

10     bought with these donated funds, right?  And so

11     fast forward however many months, the City hires

12     some guy to do some investigation as to where the

13     money went and concluded that it was an accounting

14     error and the money is back where it should be.

15 Q   Okay.  So if I catch what you're telling me is that

16     Ms. Hougom donated money to the NRO program that

17     was allegedly spent on a computer, but an

18     accountant came in -- came in, checked the funds

19     and found out there was an accounting error and

20     there was no computer bought with the money?

21 A   Correct.  She -- and she still does donate money,

22     so I don't know if they have a bank or pool or

23     account or --

24 Q   Okay.

25 A   -- we were told that if she donates money to the

Page 140

1  police department, it can't be directly for the NRO
2  program --
3  Q   Right.
4  A   -- for -- I have -- that's beyond the scope of
5      whatever I do.
6  Q   Got it.
7  A   So she was told instead of donating money, if you
8      want Dan and Nate to have specific things, ask them
9      what they need and donate -- you know, do you --
10     it's called a Toughbook, donate a Toughbook instead
11     $1200, you know what I mean?
12 Q   Yeah.
13 A   So we said well, we need this, get us -- get us a
14     computer, and our department had already sent her
15     pictures of a computer and whatnot that they had
16     purchased for us.
17 Q   Got it.
18 A   When in reality he was spending it on his boat
19     program and all this other stuff that he had going
20     on, and in -- but in return was lying and sending
21     fictitious receipts and all this kind of stuff.
22 Q   Okay.  So what you're telling me is that the
23     assistant chief was taking the money donated by
24     Hougom and spending it on his boat program, is
25     that --

Page 141

1  A   And -- and whatever else.
2  Q   Okay.
3  A   I don't know what else, yes.
4  Q   Okay.  And then sending her pictures of computers
5      that he allegedly bought for you guys?
6  A   Yes.  But the person that was sending Sherry the
7      receipts, his name was Lieutenant Hogan.
8  Q   Okay.  Did Lieutenant Hogan work with the NRO
9      program?
10 A   No.
11 Q   Where -- where did he work?
12 A   It was like out -- community outreach or --
13 Q   Okay.
14 A   Yeah, it -- I don't know -- I don't really know
15     what he did.
16 Q   And how do you know that this money that Ms. Hougom
17     submitted went to the assistant chief's boat
18     programs?
19 A   Because they bought a computer for the boat, and
20     then as soon as we started having issues about it
21     and questioning it is when -- okay, well you guys
22     can use the computer in the winter, not in the
23     summer, stop asking questions about the money, stop
24     -- you know, A, B and C.
25 Q   Got it.

Page 142

1  A   Because Dan -- Dan got pissed off because they were
2      lying to Sherry, because you know Dan and Sherry
3      have this connection.
4  Q   Right.
5  A   So the -- originally it was Dan that was pissed off
6      about all this stuff because they're stabbing, you
7      know, this lady in the back who's actually, out of
8      the kindness of her heart, thinking that, you know,
9      she's doing a good cause by giving us some money to
10     help our program --
11 Q   Right.
12 A   -- you know what I mean?
13 Q   Yeah.  So the assistant chief said hey, listen,
14     we're going to use this computer during the summer,
15     you guys can get the computer during the winter?
16 A   No.  That -- that -- after we started asking
17     questions, he was like --
18 Q   Oh.
19 A   -- just use it now.
20 Q   Okay.
21 A   Yeah.  You don't ask -- you don't get to ask
22     questions, you know what I mean?
23 Q   So when you -- when you said the assistant chief
24     was stealing funds, he stole funds from your
25     program for another program?

Page 143

1  A   He was stealing funds from our program.  I don't
2      know where they were spent.
3  Q   Okay.  You don't know if they were spent for other
4      police department programs?
5  A   I don't know.
6  Q   Okay.  Do you know if -- if the money actually went
7      into the assistant chief's pocket?
8  A   I -- I -- I have zero ability to -- to follow,
9      track, see any accountant stuff.
10 Q   Okay.  You just know that it didn't go to the NRO
11     fund?
12 A   I just know it didn't go to the NRO, and I just
13     know that we were fictitiously telling this lady
14     what we were doing with her money and sending her
15     receipts for her taxes that yes, this is what
16     you --
17 Q   Right.
18 A   -- you donated to us.
19 Q   Right.  So you --
20 A   Yes.  Which got resolved by some guy saying it was
21     just an accounting error.
22 Q   Okay.  Any other specific instances where you felt
23     that white officers had violated policies or laws
24     and -- and didn't get punished, other than the ones
25     we've just talked about?

## Page 144

1  A   I -- I mean, I got to sit here and think of every
2      time people did bad stuff.  Yep, Captain Melby --
3  Q   Okay.
4  A   -- and people even reported on him, every day he
5      would start his meetings with what's up, gay boys,
6      what's up, fags, people complained about that.  I
7      don't know who specifically complained about that.
8  Q   But you don't know if he got disciplined for that?
9  A   I'm not sure.
10 Q   Okay.
11 A   Because there was another lieutenant,
12     Lieutenant Frandsen, F-R-A-N-D-S-E-N, Chuck
13     Frandsen was a lieutenant, he called somebody,
14     another officer, a fag, in -- in -- in a joking
15     back-and-forth conversation, another third-party
16     heard it and reported it.  That lieutenant got
17     demoted all the way down to patrolman for saying
18     that, so that was a huge issue in our department,
19     because people had complained about Melby calling
20     people gay boys and fags for months and months.
21     But, again, Melby and Abraham are intertwined with
22     some --
23 Q   Okay.
24 A   None of that probably matters to you, but --
25 Q   No, I -- if -- if this is --

## Page 145

1  A   It's not about what you do, it's about who likes
2      you and who doesn't like you.
3  Q   Got it.
4  A   And it's small-town politics where they can just
5      hide what they want to hide, disclose what they
6      want to disclose because nobody challenges them.
7  Q   This -- this individual that Lieutenant Frandsen
8      called a fag --
9  A   Yes.
10 Q   -- white, black, what?
11 A   White.
12 Q   Okay.
13 A   Cory Brandl.
14 Q   And I assume Melby, when he had his -- these
15     meetings and started out with what's up, gay --
16 A   That was with his supervisor meet -- his meetings
17     with all the supervisors.
18 Q   All the supervisors were white, correct?
19 A   Yeah.
20 Q   Okay.
21 A   Every other officer is white.  That -- that's all
22     there is.
23 Q   All right.  Any other -- any other specific
24     instances that we haven't covered?
25 A   Yeah.  Let me -- I've got to think.  Tyler Pond and

## Page 146

1      Heath Parshall getting into a small bar fight at
2      Del's Bar.
3  Q   Heath Parshall, we've mentioned him before, right?
4  A   Yes.
5  Q   Okay.  A bar fight?
6  A   Yep, at Del's Bar.
7  Q   Were they disciplined, do you know, for this fight?
8  A   No.  They -- they were counseled.
9  Q   Were they on duty when this fight occurred or off
10     duty?
11 A   Off duty.
12 Q   And how do you know they were counseled?
13 A   Because we're all friends, we'd just sit there and
14     talk about it.
15 Q   Okay.
16 A   But they were told be careful going downtown, don't
17     be getting into shit like that, it's going to --
18     it's going to hurt you.
19 Q   Was it something they started or somebody else
20     started?
21 A   Some -- I think some drunk guy grabbed Pond's
22     jacket, and I think Pond started choking him, and
23     they just had a counseling session.  I'm -- I don't
24     know, I'm trying to think of everything bad
25     somebody did.

## Page 147

1  Q   I'm just looking for these instances where you said
2      that these white officers violated a policy or a
3      law and weren't punished.
4  A   Sure.
5  Q   And you've given me a number of examples.  And if
6      you think of any more, just pop in and -- we'll do
7      what we've been doing.
8  A   Sure.
9  Q   You talked about PBT's, and I may have written that
10     down wrong, what -- what are those?
11 A   Like the straw you got to blow in to like check
12     your alcohol level.
13 Q   Okay.
14        MR. OLSON:  Preliminary breath test.
15        MR. RIORDON:  That's what I thought.
16 BY MR. RIORDAN:
17 Q   You made some mention about people getting away
18     with something involving those?
19 A   An officer -- an officer would have -- has to blow
20     every time he would come to work for a while, from
21     -- from -- like because he knows -- he's an
22     alcoholic.  Other officers would sit there and
23     smoke in the car, knowing that it's -- you know --
24     now we're just talking like -- like -- you know,
25     the policy's so dang big that it's like --

## Page 148

1  Q   Sure.

2  A   You don't -- you don't button a button, that's a

3      policy violation, so --

4  Q   Right.  These officers that were being tested

5      before going to work, were -- did they -- had

6      violated the policy beforehand and that's why

7      they're being tested?

8  A   I assume.

9  Q   I mean, not every officer that walked in that day

10     was tested?

11 A   No.

12 Q   It was certain officers that were being tested, and

13     you assume for prior violations, correct?

14 A   Correct.

15 Q   How many officers do you believe were being tested?

16 A   I don't know.  I just know of two that have ever

17     had to do it.

18 Q   And who were those two officers?

19 A   Officer Delaney.

20 Q   Delaney.

21 A   And Officer LeQue.

22 Q   And LeQue?

23 A   L-E-Q-U-E.

24 Q   Okay.  We've mentioned him before.

25 A   Yeah.

## Page 149

1  Q   Okay.  So these two were --

2  A   But Officer LeQue's was a while back, I believe.

3  Q   Okay.

4  A   And he -- and -- and I think he got a day off for

5      it.

6  Q   For?

7  A   For coming to work with alcohol in his system.

8  Q   So they -- they dismissed him when he had alcohol

9      on his breath?

10 A   I think so.

11 Q   Okay.  How about Delaney; was there any problems

12     with Delaney?

13 A   I -- I think that he had came in so many times with

14     alcohol, that that's why he had to blow every day.

15 Q   Okay.  Did -- I mean, obviously if there was traces

16     of alcohol on his breath, he wasn't allowed to

17     work?

18 A   I -- that would be my hopeful assumption, but I --

19     I'm not part of that.

20 Q   Okay.

21 A   I don't know if he ever was positive or not.

22 Q   Okay.

23 A   I just know that obviously he had been at some

24     point, a numerous amount of times, where they felt

25     the need to test him every day.

## Page 150

1  Q   Okay.  And -- and how does this fall into the

2      category of -- of white officers violating policies

3      but not getting punished?

4  A   Because white officers, even if they did violate

5      policy, got a -- a structured, stepped discipline,

6      right --

7  Q   Okay.

8  A   -- not an immediate we're looking for termination

9      and for the state crime lab to come investigate

10     you --

11 Q   Okay.

12 A   -- you know what I mean.  I -- I never received any

13     punishment, suspension, day off, written letter; it

14     was immediate up -- up here, you're fired, God

15     forbid.

16 Q   Got it.  So you're saying that --

17 A   Where other white officers were -- either it was

18     dismissed or they got a progressive discipline like

19     it states in our rules and regulations.

20 Q   Okay.  So -- and you -- you're using Delaney and --

21     and LeQue as the -- the stepped progression and

22     discipline, as examples?

23 A   I wouldn't say that's an example.  That's -- you --

24     normally it depends on the level of what you did,

25     right?

## Page 151

1  Q   Right.

2  A   If you were speeding, you might get counseled; if

3      you crashed your car, you may get -- you have to

4      have remedial training and watch a video of how to

5      break tunnel vision or you might get written up,

6      your next time you might get a day off, you know

7      what I mean?  Like you -- you steal drugs and --

8      you shouldn't just get desk duty, you know what I

9      mean?  Like that's what I'm saying is a --

10 Q   Yep.

11 A   -- like normally your punishment would fit your

12     crime, and if it's something in the middle, like

13     you would slowly work your way up.

14 Q   Now, you indicated you got --

15 A   The only other time I ever seen an officer go from

16     regular to fired was Lieutenant -- oh, what was his

17     name?  He got caught stealing meth at -- at work

18     and using it at work and they fired him.

19 Q   And --

20 A   With the help of the -- the DCI.

21 Q   And you don't remember this guy's name?

22 A   Yeah.  Bigger dude -- he was a third-shift

23     lieutenant when I was there, Brian -- Brian --

24     Brian -- and it's -- it's been years.

25 Q   That's okay.  If -- if it pops into your head --

Page 152

1  A   Yeah.
2  Q   -- yell it out.  White guy or black guy?
3  A   White guy.
4  Q   Now, through your -- through your time with the
5      La Crosse Police Department, you got -- I think you
6      indicated you got a -- a number of warnings; is
7      that correct?
8  A   I didn't say that.
9  Q   Oh, what were the notices that you were getting?
10 A   At the end?
11 Q   Yeah.
12 A   Explaining the policies that I violated.
13 Q   Okay.
14 A   So normally you would get that and then days or
15     weeks later, you would get your punishment.
16 Q   Okay.  So you've never got any -- any warnings from
17     the La Crosse Police Department?
18 A   For this?
19 Q   Just for anything.
20 A   I got a remedial -- I had to do a PowerPoint on an
21     accident, I got written up for being late once -- I
22     got written up for being late twice.  I would have
23     to check my personnel file.
24 Q   Okay.
25 A   Nothing egregious or nothing more than being late.

Page 153

1  Q   Okay.  These -- these policy violations that you
2      were getting notice of --
3  A   Uh-huh.
4  Q   -- explain those to me; how are they different than
5      warnings?
6  A   Because it -- they didn't get to the disciplinary
7      part of it yet.
8  Q   Well --
9  A   Normally you would say here's what you violated,
10     right?
11 Q   Right.
12 A   And a day, two, three days later, you'd have a
13     sit-down with your supervisor, like okay, I gave
14     you this, here's what the remedy is, I have to give
15     you a write-up, you're going to get a day off, I
16     have to just write that we had verbal counseling,
17     and then you have to sign off.
18 Q   Okay.
19 A   It's not like sit down, this is what you did three
20     days ago, I'm going to -- boom.  Normally you just
21     -- you see what you did and then you wait --
22 Q   Okay.
23 A   -- you know.
24 Q   So you were getting these notices of policy
25     violations, but then no discipline that would

Page 154

1      follow it?
2  A   Well, I only did it three days.
3  Q   I'm sorry, you're going to have to explain that one
4      to me.
5  A   I got them the last -- I got them on the 9th,
6      10th and 11th.
7  Q   Of September?
8  A   Yes.
9  Q   Okay.  So those are the only --
10 A   Miniscule things that just -- it was like
11     harassment, like --
12 Q   Okay.  So you got three different policy violations
13     in the last three days?
14 A   In three days.
15 Q   Okay.  What were the policy violations?
16 A   I -- the one -- the only one I can remember right
17     now was Lenell Carter, I videotaped the thing.  And
18     I'd have to relook, man, it's been a while.  I
19     don't -- I -- I --
20 Q   That's okay.
21 A   I -- I -- I knew all this and I purposely -- I'm
22     trying to let it go.
23 Q   But the only time you got policy violations were in
24     the last three days of your term with the La Crosse
25     Police Department?

Page 155

1  A   No.  I said I got written up previous for like
2      being late or missing --
3  Q   Right.  But I'm talking about these -- these policy
4      violations, not the actual warnings.
5  A   I don't know if I was going to get a warning or a
6      write -- I don't know the conclusion of what was to
7      come.
8  Q   I got it.
9  A   It was basically a notice saying I know you did
10     this, I'm -- you know what I mean, like --
11 Q   Okay.
12 A   -- so you're -- you're on notice that we know that
13     you did something wrong.
14 Q   Okay.  So you --
15 A   Your punishment may or may not be a day or a week
16     coming down.
17 Q   So they just didn't sit down and talk to you about
18     the punishment after you got these violations?
19 A   Correct.
20 Q   Okay.  That may have been coming, you're just not
21     sure?
22 A   Correct.
23 Q   Okay.  I understand now.
24 A   Correct.
25 Q   Okay.

Page 156

1  A   It was basically saying I watched all your videos
2      and I saw you did something wrong, oh, I saw you
3      did this wrong, I saw you do this wrong.
4  Q   Okay.
5  A   Nothing like I crashed my car or somebody made a
6      complaint, you know what I mean?
7  Q   They were, in your words, minor violations?
8  A   Yes.
9  Q   They could have come with a discussion about a
10     penalty later, but that just never occurred?
11 A   Correct.
12 Q   Because then you left?
13 A   Correct.
14 Q   Okay.  What made you think that you were going to
15     be terminated from the La Crosse Police Department?
16 A   The chief requesting it.
17 Q   And when did the chief request your termination?
18 A   Through the union people.
19 Q   Okay.
20 A   I was told that he was -- he was going for -- he
21     was requesting the -- the police and fire
22     commission to terminate me.
23 Q   Okay.  He was requesting to have a hearing in front
24     of the police and fire commission?
25 A   Correct.

Page 157

1  Q   Okay.  And the chief had notified the union that
2      this was going to occur?
3  A   Well, when all this started happening, I contacted
4      the union to try to get some help, so then I had
5      like a union steward and like a union lawyer for --
6      starting the day that I met with Eileen Brownlee or
7      whatever, Brown -- Brownlee.
8  Q   Okay.  Once she met with you regarding the
9      interview that was recorded, you got ahold of the
10     union?
11 A   Correct.  So then moving forward, any communication
12     happened between the -- the police department and
13     my union lawyer, and then me and my union lawyer
14     went back and forth.
15 Q   Okay.  So you learned that the chief was going to
16     request a -- a fire and police commission hearing?
17 A   Correct.
18 Q   How close in time was that to your resignation?
19 A   I think --
20 Q   I -- I can -- you -- you -- I can give you the --
21     the --
22 A   Sure.
23 Q   -- if that helps?
24     THE WITNESS:  And I've got to use the
25     restroom.

Page 158

1      MR. RIORDAN:  We'll -- let's take a
2      break.  I'll have this marked.
3      (Recess taken from 1:29 p.m. until 1:34 p.m.)
4      (Exhibit 7 marked for identification.)
5  BY MR. RIORDAN:
6  Q   Mr. Poke, I'm going to hand you what's been marked
7      as Poke Exhibit 7.  It's the separation agreement,
8      waiver and release between the City of La Crosse,
9      you and the Wisconsin Professional Police
10     Association.  Can you review that, please.
11     Is Exhibit 7 the agreement you
12     signed to resolve all of your claims against the
13     City of La Crosse other than the one that you
14     brought here today, or brought here in this
15     particular instance?
16 A   When I decided to resign.
17 Q   This is the document you signed to resign?
18 A   Yes.
19 Q   Okay.  And you've got your signature on page 4 of
20     6; is that correct?
21 A   Yes.
22 Q   And we were looking for a -- a date earlier; it
23     looks like it was 8/10/16 that you signed?
24 A   Yes.
25 Q   Okay.  And you reviewed this document prior to

Page 159

1      signing it?
2  A   Yes.
3  Q   Okay.  We were talking about the chief commencing a
4      fire and commission action against you, and you
5      learning of that action through your union rep,
6      correct?
7  A   Yes.
8  Q   And we were trying to figure out when you first
9      learned about the chief bringing in a fire and
10     commission -- fire and police commission action,
11     obviously it was before you signed Exhibit 7,
12     correct?
13 A   Correct.
14 Q   Do you remember when that occurred, when you first
15     heard about the fire and police commission
16     potential hearing?
17 A   About termination or the police and fire
18     commission?
19 Q   The police and fire commission.
20 A   I was informed through my lawyer that they would be
21     seeking termination, and then in order for them to
22     do that, we would have to go through a police and
23     fire commission hearing in order to get it granted.
24 Q   Okay.  Was it close in time to the signing of
25     Exhibit 7 that you first heard about the

Page 160

1  termination?
2  A  August -- a year later, no.
3  Q  Okay.  And when was the first time that you heard
4  about the chief raising the police and fire
5  commission issue as well as potential termination?
6  A  I was informed by my lawyer that the chief's lawyer
7  stated that they would be seeking to fire me, and
8  then they wanted to talk about -- like mediate --
9  like resolving it without having to do all that,
10  and that it's in my best interest to not go through
11  that proceeding.  So the majority of the
12  conversation was between the chief's lawyer, I
13  don't remember his name, and my -- and Andy
14  Schauer, the union lawyer.
15  Q  Okay.
16  A  And then I -- we had had these conversations long
17  before I --
18  Q  I -- I don't want to hear --
19  A  Yeah, yeah.
20  Q  -- anything about your conversations with your
21  counsel here, so --
22  A  But he was a part of all the --
23  Q  Yes.  Yeah.  Let me see if I can do it this way,
24  when was the first time that you suspected you may
25  be terminated from the La Crosse Police Department?

Page 161

1  A  The -- September 17 of '15.
2  Q  Okay.  And that's when you got the disciplinary
3  administrative leave notice?
4  A  Correct.
5  Q  Okay.  Before that, you had not felt that you were
6  going to be terminated?
7  A  Before that, I didn't feel like the process had
8  started.  I pretty much thought after I came
9  forward, that that was how it was going to be
10  resolved.
11  Q  I'm not sure I understand completely, but let me
12  see if I can ask some questions --
13  A  Sure.
14  Q  -- to clarify it for me.
15      And then -- you testified that the
16  first time you -- you thought you were going to be
17  terminated is when you received the disciplinary
18  administrative leave notice on September 17, 2015;
19  is that correct?
20  A  Correct.
21  Q  Okay.
22  A  That's the first time I felt yes, now it's for sure
23  happening.
24  Q  Like they're going to push me out?
25  A  Yeah.

Page 162

1  Q  Okay.  You testified also that when you first came
2  forward, there was -- it -- it raised the
3  possibility that you may be terminated?  I -- I
4  don't -- that's where I'm confused.  What -- tell
5  me about that.
6  A  Oh, when I met with Kudron and Melby and went over
7  everything -- the minute I found out that
8  Captain Kudron didn't know any details of the
9  conversation that myself and Dittman had August 14,
10  and I found out that I was being reassigned and
11  that Dan -- nothing was -- Dan was still working,
12  at -- that was the point I said I'm getting screwed
13  over and they're going to come after me, yes.
14  Q  Okay.  So that would have been -- let me see
15  here --
16  A  August 31.
17  Q  -- August 31, 2015?
18  A  Correct.
19  Q  That's when you felt okay --
20  A  Yes.
21  Q  -- this is --
22  A  When I found out -- when they came and told me that
23  and I asked -- started asking them well, what about
24  Dan, and they didn't know anything about Dan, and
25  Captain Kudron is Dittman's direct supervisor, and

Page 163

1  I found out Dittman didn't go to Kudron about that,
2  that's -- at that moment right there.
3  Q  Okay.
4  A  That Dittman was trying to take care of that all by
5  himself.
6  Q  Okay.  So when you met with Melby and Kudron on
7  August 31, 2015, is the first time you found out
8  that Captain Kudron did not know anything about the
9  allegations against Ulrich?
10  A  Or the evidence that was collected or any of that.
11  Q  Okay.  Does Captain Kudron normally do those
12  investigations?
13  A  What kind?
14  Q  Like into some misconduct, such as the misconduct
15  that Ulrich was --
16  A  I would assume he would probably be privy to that,
17  because he was -- he's the captain of
18  investigations.
19  Q  Okay.
20  A  Also how our department is is everybody runs up the
21  chain of command, because -- that's just how it is.
22  And I know Dittman very well, if Dittman thought
23  one bad thing was happening, he would -- would go
24  up the chain of command, you know what I mean?
25  Q  Okay.

Page 164

1   A   And when I found out that that never happened, that
2       was the moment I realized, good luck.
3   Q   Okay.  In your August 31, 2015 meeting with Melby
4       and Kudron, what made you think that Captain Kudron
5       did not know about the Ulrich misconduct?
6   A   Because I -- I asked him, I said do you -- did
7       Dittman not tell you any of this?  So that's when I
8       had to sit down and go over all of it verbally and
9       then had to put it in writing the next day.
10  Q   Okay.
11  A   Because I -- because I had -- because Dittman never
12      wanted pictures of the -- of those text messages,
13      so I kept them, and that's when they finally took
14      pictures of -- of the text messages and all that.
15  Q   Did you get the impression that Kudron may have
16      generally known about these complaints, but not the
17      specifics of each complaint?
18  A   I'm not sure what he did and didn't know.
19  Q   Okay.
20  A   His response to me was tell me what happened, I
21      don't know about it.
22  Q   Okay.  And that was his response to you on
23      August 31, 2015?
24  A   Correct.
25  Q   And -- and that's what made you think that he

Page 165

1       knew -- he knew nothing about the misconduct that
2       was reported regarding Ulrich?
3   A   Correct.
4   Q   Okay.
5   A   So then I reported to two captains.
6   Q   Okay.  So it was in -- at the end of August 2015 is
7       when you started suspecting that things were piling
8       up against you?
9   A   Yeah.  Because previous to that, everything was
10      good.
11  Q   Right.
12  A   I got this new job, I got a job offer up here,
13      Abraham pulled me in and told me, you know, you
14      should start thinking about staying, we should
15      think about getting you -- grooming you to get you
16      promoted, talking about I know like your passion is
17      drugs and you want to be a drug investigator, but
18      why don't you start thinking about getting promoted
19      and getting to that path, like everything -- you
20      know, I -- I turned down a job to stay there and --
21      that was in May of '15, two and a half months
22      later, it was horrible.
23  Q   Okay.  So in -- in May of 2015, what was the job
24      offer that you had?
25  A   A Richfield Police Department.

Page 166

1   Q   Okay.  That was the first time you applied to them?
2   A   Correct -- in my life, I've applied there four
3       times.
4   Q   Okay.  But they had offered you a job in May of
5       2015?
6   A   Correct.
7   Q   Okay.  And then you went and talked to --
8   A   And then the chief knew about it, because you
9       know, they had to come down and ask questions
10      and --
11  Q   So then you talked to the assistant chief and the
12      chief, and they were telling you hey, stick around,
13      you're doing a good job --
14  A   Just -- just Abraham, not the chief.
15  Q   Okay.  So Abraham came down and told you hey, stick
16      around, we got big plans for you, we know you're
17      interested --
18  A   Uh-huh.
19  Q   -- in drugs --
20  A   Yeah.  And me and Abraham had a relationship where
21      I would -- if I was pissed off or I was upset about
22      something, I would go to him, like -- you know what
23      I mean?
24  Q   And he would --
25  A   We had a -- we had a fine relationship.  He

Page 167

1       wouldn't give me any more insight than he would
2       give the next person, you know what I mean, but --
3       I just felt comfortable talking to him.
4   Q   And -- and this relationship with Abraham continued
5       up to August 31, 2015?
6   A   Until he exploded on me and started yelling at me
7       for dropping the bomb on the department and --
8   Q   Okay.
9   A   -- stabbing people in the back.
10  Q   So it -- it sounds like everything was going well
11      for you up to --
12  A   Me reporting stuff, August 14, to Dittman.
13  Q   But, I mean, you didn't -- you didn't know anything
14      about things going poorly for you at that time,
15      because it sounds like you had a conversation with
16      Abraham that told you you were doing well and you
17      have --
18  A   That was in May.
19  Q   Oh.
20  A   August 14 I came -- I told Dittman that stuff.
21  Q   Got it.
22  A   Nothing transpired for 17 days.  The 14th is when I
23      told Dittman; the 31st is when I get removed.
24  Q   Okay.
25  A   There was no -- nothing in between, it was still me

Page 168

1    having to work with Dan --
2  Q   All right.
3  A   -- with him probably knowing that I was the one
4    that got -- you know, exposed him for all that
5    stuff.
6  Q   But from August 14, 2015 to August 31, 2015, you
7    had no thoughts about being terminated, it was on
8    August 31, 2015 when that started to creep into
9    your head, when you had this meeting with Melby and
10   Kudron?
11  A   Correct.
12  Q   Okay.  So we can put a definitive timeline as to
13    when you felt this is going bad for me, and that
14    was August 31, 2015, when you realized it, when you
15    felt things were going bad?
16  A   No.  Terminating or not going good for me I would
17    say is two different things.
18  Q   Okay.  Let -- let's start with termination.
19  A   Uh-huh.
20  Q   It sounds like that --
21  A   I didn't feel like I was going to get terminated
22    until the 17th, when they actually took my gun and
23    my badge.
24  Q   Okay.
25  A   That's basically the time it's over.

Page 169

1  Q   And you're saying that that's different from the
2    time that you felt things started to go south for
3    you?
4  A   Correct.
5  Q   When did you believe -- when did you feel things
6    started to go south for you at the La Crosse Police
7    Department?
8  A   Several months into NRO, like I said, like when --
9    when -- when Dan started doing these little things,
10   when you -- when -- when -- like I think you've got
11   to understand like me and Dan's dynamic.  Me coming
12   to Kudron months ago telling him like I'm not
13   really -- you know, me and Dan aren't working
14   together, his -- his response is like do you want
15   to go back to shift, like --
16  Q   Right.
17  A   You know, like clearly explaining that Dan is
18    superior to me, why -- don't -- if I have issues,
19    then I can remove myself --
20  Q   Okay.
21  A   -- you know what I mean?  Casey Kamps came to
22    Dittman with -- with his concerns, and they got rid
23    of him right away, like right away.
24  Q   What were Casey Kamps' concerns?
25  A   Stuff -- stuff about Dan, stuff about Dittman.  He

Page 170

1    went to Dittman and -- and just was like can I have
2    an off-the-record, man-to-man conversation with
3    you, and two days later, he was done.
4  Q   Did they remove him or did he --
5  A   They removed Kamps from NRO.
6  Q   Okay.
7  A   And that -- Gerbig came in after that.
8  Q   Where did Kamps go after they removed him?
9  A   Patrol.
10  Q   Did he complain about being removed from NRO to
11   patrol?
12  A   God yes.
13  Q   Okay.  And what was the --
14  A   He felt like they stabbed him in the back.
15  Q   -- what -- what were the conversations and the
16    issues that Kamps raised with Dittman during this
17    off-the-record conversation, if you know?
18  A   I -- I don't know specifics, I wasn't there.  I
19    just know that he wasn't happy -- he wasn't happy
20    with how Dan like was treating everybody, like --
21    you'd have to ask him --
22  Q   Okay.
23  A   -- it's like -- to -- to go deeper.  It's been a
24    while.
25  Q   So you don't have a real understanding as to why

Page 171

1    Kamps was removed from NRO?
2  A   Kamps was removed because Dittman inherently didn't
3    think he was mentally okay.
4  Q   Okay.  Did Dittman tell you this?
5  A   Yeah.  We all had a meeting about it.
6  Q   Okay.  And by mentally okay, what was -- what was
7    related to you about -- with that particular issue?
8  A   I'm trying to remember.  I -- I don't know -- I --
9    I can't remember exactly what was going on.
10  Q   Okay.  So --
11  A   But the -- Kamps was mentally okay to be a cop,
12    just not an NRO.
13  Q   Okay.  So Dittman had a meeting with all the NRO
14    officers and said here's what's happening with
15    Kamps?
16  A   Yeah.
17  Q   Okay.  And that's when you learned that they felt
18    that he wasn't okay to be an NRO officer?
19  A   You -- right.  But I already knew he got removed
20    from that position, because he came in one day, had
21    a meeting, was crying, left, bitching about it, and
22    then we had a meeting I don't know how many days
23    later to -- to talk about it.
24  Q   Okay.  Do you know what they meant by he was not
25    mentally able to be an NRO officer?

**Page 172**

1   A   I don't know.

2     (Reporter clarification.)

3     THE WITNESS: I have no idea.

4   BY MR. RIORDAN:

5   Q   And -- and I just want to backtrack a little bit, I

6     know we talked about when you first believed you

7     were going to be terminated, and now we're talking

8     about when you first felt things were going south

9     for you at the police department, and it sounds

10    like -- just your whole --

11   A   It was -- it was like this for a couple months.

12   Q   Okay.

13   A   I got pulled aside by Sergeant Hauser at some

14    point, a month, two months before all this, to make

15    sure I was okay, like -- people just could see that

16    I was not enjoying work.

17   Q   Okay. So like -- like a couple months before you

18    were removed from NRO, Hauser came up to you and

19    said hey, listen, what's going on here?

20   A   Uh-huh. He made me meet him at the Boys & Girls

21    Club on the north side, get out of his car, get in

22    -- get out of my car, get in with him.

23   Q   Okay. What -- what did you tell Sergeant Hauser?

24   A   Probably not too much, because I didn't really get

25    along with him.

**Page 173**

1   Q   Kind of just --

2   A   I probably just listened, like -- watch your -- you

3    know, he told me to watch your attitude, people can

4    notice, like -- you know --

5   Q   Okay.

6   A   -- don't let it affect your work, whatever's going

7    on.

8   Q   So it wasn't here's what's happening with Dan,

9    here's all the misconduct, he was kind of telling

10    you, this is what you've got to do to be better at

11    the job or something?

12   A   Yeah. This had nothing to do with Dan.

13   Q   Got it.

14   A   This was just about his observations of me as a

15    person.

16   Q   Got it.

17   A   Yeah.

18   Q   Okay.

19   A   So that's what I'm explaining, is like my downward

20    slide of me in the La Crosse Police Department was

21    not all of a sudden this, it was just --

22   Q   Right. So it -- it started --

23   A   -- a compilation of everything, how they were

24    treating Tony Clark and like -- I just -- you know

25    what I mean, like --

**Page 174**

1   Q   Yeah. So I -- I'm just -- I just want to get a --

2    a time frame on -- on the beginning of the slide;

3    you've indicated it was a few months before you

4    were reassigned from NRO.

5   A   Correct.

6   Q   Okay. So two, three months before August 31, 2015?

7   A   Yeah.

8   Q   Okay. And a lot of this slide started with just

9    dealing with Dan Ulrich?

10   A   It -- that was a -- a lot of it, because I was with

11    Dan every single day, but, I mean, it's still just

12    the dynamic of the police department, of how they

13    treated people and how certain people can just do

14    whatever they want to do in that department and --

15   Q   And -- and what I'm gathering from you with regard

16    to the -- the favorite -- favoritism that you

17    perceived in the police department was the -- the

18    higher-ups had -- had -- had favorites that they

19    treated differently than the others?

20   A   Yeah. I just felt like they ran the police

21    department like it was 1950, and you could just

22    treat people like shit and have zero consequences

23    and talk in a way that you shouldn't be able to

24    talk in 2015, but they do it because they surround

25    themselves by, in essence, family of the same breed

**Page 175**

1    and don't bring in outsiders, and they've never

2    learned that it's not okay to be like that.

3   Q   So --

4   A   They're a nonprogressive, close-minded group of

5    people, and I mean -- I -- I don't mean that

6    rudely, I mean that literally -- literally, that --

7    you look at the people that are there, have never

8    left there, have been born and raised there and

9    know no other way.

10   Q   All right.

11   A   So when people come from different backgrounds or

12    different ideas or, God forbid, speak up against

13    you treating people like crap, there's only one

14    thing, get rid of them, because you're not going

15    to -- you know, they're not going to let you mess

16    up their groove of what they got going on.

17   Q   All right. So it -- what you're telling me is it

18    doesn't matter whether you're black, white, Hmong

19    or anything, if you're not a part of the inner

20    circle, you're treated like crap?

21   A   But not fired.

22   Q   But my statement is true?

23   A   No. I -- well, I wouldn't say if you're not part

24    of the group, because almost everybody is. I would

25    just say if you're not with them, you're against

Page 176

1  them is how they look at it.
2  Q   But that -- being against them doesn't solely mean
3      that you're against them because you're black,
4      there's other individuals that are against them
5      that were other races?
6  A  I'm not saying anybody's against them.  I'm saying
7      that they're perceiving that if you're not on board
8      with what they --
9  Q  Right.
10  A   -- are doing, they look at it as you are against
11     them.
12  Q  Right.  And --
13  A  I'm not saying anybody's against them, I'm just
14     saying --
15  Q  Right.
16  A   -- that's how they interpret -- like if you're
17     going to question then or speak up or voice your
18     opinion or stand up for somebody, that's how they
19     perceive you.
20  Q  All right.  And that could -- they could perceive
21     somebody is against them who's white, Hmong or
22     female, correct?
23  A  They could, yeah.
24  Q  And that -- they also disciplined other officers
25     who were white who weren't part of the group you

Page 177

1      think unfairly as well, correct?
2  A  To what extent -- I don't know what -- how or who.
3  Q  Okay.  But, I mean, you saw unfairness with other
4      officers who were not black, correct?
5  A  I've seen them treat other officers like crap,
6      yeah.
7  Q  Okay.  Your complaint, I guess, with the La Crosse
8      Police Department is they took it one step further
9      with you, because you're black, they terminated
10     you?
11  A  Correct.
12  Q  Okay.
13  A  Compared to what they do with their white officers.
14  Q  Right.  They -- they may treat other white officers
15     like crap, they just don't take the final step and
16     terminate them?
17  A  Well, I don't know how crappy other officers feel
18     like they're treated.  I don't know.  I mean, it
19     could just be my perception of me feeling like
20     they're being treated like crap.
21  Q  All right.  But, I mean, you --
22  A  Maybe they think it's normal.  I don't know.
23  Q   -- but you've seen the higher-ups at the La Crosse
24     Police Department treat other officers, including
25     white officers, like crap?

Page 178

1  A  Have I?  Yes.
2  Q  Okay.  What -- what was it about the
3      nondisciplinary administrative leave notice that
4      you received that indicated to you that this is not
5      going well, I'm terminated?
6  A  You mean the disciplinary --
7  Q  Yeah, the September 17 notice, which I think is
8      Exhibit --
9  A  Exhibit 4.
10  Q   -- Exhibit 4.
11  A  When they call and tell you you got to come and
12     turn in your gun and your badge and -- the only
13     time I've ever seen that is when they fired the
14     guy.
15  Q  Okay.  And that's the first time that you felt this
16     is it, I'm done?
17  A  Yeah, as soon as they took my stuff.
18  Q  Okay.  As a police officer, you're supposed to be
19     familiar with the -- the general orders, the code
20     of conduct and so forth; is that correct?
21  A  Familiar.
22  Q  Okay.  And I assume you were familiar with the fact
23     that if you saw misconduct by another officer, you
24     were supposed to report it to superiors?
25  A  I'm sure that's in that.

Page 179

1  Q  Okay.  But -- and you were familiar with that,
2      generally, correct?
3  A  Yeah, if you see people committing a crime and
4      whatnot.
5  Q  Right.  That you were supposed to report it to
6      superiors and stuff like that --
7  A  Uh-huh.
8  Q   -- if you saw misconduct?
9  A  Yeah.
10  Q  You were familiar with that?
11  A  Yes.
12  Q  Okay.  You indicated that that just wasn't
13     commonplace in the police department; when you saw
14     another officer, you know, committing misconduct,
15     that just wasn't usually reported?
16  A  Correct.
17  Q  Okay.  So you're saying it was unusual in your
18     circumstances because you had reported misconduct,
19     that they were coming at you?
20  A  It was -- say it again.
21  Q  That was a bad question.
22  A  Yeah.
23  Q  Sorry.  I -- I think what you're indicating to me
24     is you -- you kind of broke the code by reporting
25     another officer?

**Page 180**

1   A   Sure, yes.
2   Q   And that's what you felt was the basis for their
3      coming at you later on?
4   A   I think the reason they came at me was -- that's
5      why it started, yeah.
6   Q   Okay. Had -- had you seen other officers report
7      misconduct prior to your incident?
8   A   No.
9   Q   Have you ever heard of other officers reporting
10     misconduct to superiors prior to your --
11   A   Sergeant Gyllander reported Chuck calling Cory
12     Brandl a fag.
13   Q   And then he got demoted, right?
14   A   Correct.
15   Q   Any other instances that you can recall?
16   A   No, not anybody that's made like a formal
17     complaint.
18   Q   Okay.
19   A   People bitch to each other all the time, you know
20     what I mean.
21   Q   But you've just given us an instance where there
22     was a formal complaint made by an officer against
23     another officer, and then there was some severe
24     consequences for the officer that reported it?
25   A   I don't know if Grant made a formal complaint or

**Page 181**

1     not.
2   Q   Okay.
3   A   I don't -- I don't know how that transpired. I
4     wasn't -- I was not there, I just heard of it like
5     everybody else.
6   Q   But once this formal complaint was -- or once this
7     complaint was known to the police department, it
8     appears that the individual who reported the
9     incidents got severely punished?
10   A   The person that -- say it again.
11   Q   The person who made the report was severely
12     punished?
13   A   No. Sergeant Gyllander was not punished; the
14     person that called the person a fag got punished.
15   Q   Okay. Okay.
16   A   Grant -- nothing happened to Grant.
17   Q   Okay. Why is it you believe that you weren't to
18     report misconduct by other officers, or that was
19     discouraged or frowned upon by the police
20     department?
21   A   Why what?
22   Q   Why do you believe that it was discouraged by the
23     police department to report misconduct of other
24     officers?
25   A   I think it's just a culture that they created.

**Page 182**

1   Q   Okay. Just something you perceived?
2   A   Uh-huh.
3   Q   Yes?
4   A   Yes.
5   Q   Okay. No one ever said don't report misconduct of
6     officers?
7   A   No.
8   Q   Okay. There -- there was one instance I want to
9     talk to you about which I think you were talked to
10     about, and that was a visit to a school, I think it
11     was a -- I can't remember the name of the school,
12     Hamilton, I believe?
13   A   Yeah, Hamilton or Lincoln or --
14   Q   We'll go with Hamilton for the moment. It -- it's
15     my understanding --
16   A   Lincoln.
17   Q   Was it Lincoln? Okay. A grade school?
18   A   Yes.
19   Q   And there was a shooting at Lincoln at some point
20     in time that you were going to talk to these
21     individuals about?
22   A   No.
23   Q   Okay. What -- from what I reviewed, it looked like
24     you were -- you and Officer Ulrich were supposed to
25     go to Lincoln to talk to the children, correct?

**Page 183**

1   A   No.
2   Q   Okay. Tell me about the incident then.
3   A   Sergeant Dittman said if you guys don't have
4     nothing to do, you can stop by the school.
5   Q   Okay. And what were you supposed to do when you
6     stopped by the school?
7   A   We weren't supposed to do anything. That's --
8     that's the entire purpose of our position, was that
9     you create your own contact with whomever --
10   Q   Okay.
11   A   -- however you see fit. So I think the last two or
12     three times we went to that school, we went to
13     recess and, you know, played tag and -- and -- you
14     know that pole and the big box and you throw the
15     ball in it and whatever -- wherever it comes out is
16     how many points you get.
17   Q   I have no idea what that's called, so --
18   A   Yeah. Just to -- to hang out and to like build a
19     contact with kids that normally don't --
20   Q   Okay. So part of your duties as a neighborhood
21     response officer is to go to schools and -- and
22     talk to kids and --
23   A   No. Our -- we had no duties.
24   Q   Okay.
25   A   Like -- that's like the hardest thing for me to

## Page 184

1   explain to people, like --

2  Q  Yeah, I'm a little lost on that.

3  A  We didn't have -- we didn't have like an MOU, like

4   we didn't have anybody telling us what to do.

5  Q  Okay.

6  A  We had certain community meetings that -- if they

7   got scheduled, we would be notified about and then

8   have to go to those.

9  Q  Okay.

10  A  Between 7:00 -- or 11:00 a.m. and 7:00 p.m.,

11   there's maybe three or four times that we had set

12   things to do.

13  Q  Okay.

14  A  It was go out, arrest people, get dope off the

15   street and make some positive contacts.

16  Q  Okay.

17  A  Like there was never -- we were never told --

18   that's why that is so funny, Dittman has never

19   written or told me to do anything.

20  Q  Okay.  You --

21  A  Dittman said if you guys have nothing to do, stop

22   by the school, which -- he just said that because

23   -- yeah, he already knows we stop by the school

24   almost every day.

25  Q  Did you as a neighborhood response officer have any

## Page 185

1   duties to attend certain community functions; you

2   indicated there was some meetings that would be

3   noticed up that you'd have to appear at?

4  A  Uh-huh.

5  Q  What were those?

6  A  So we were specifically titled to the Washburn

7   neighborhood, so the Washburn community had a

8   Washburn Community Group that met like once every

9   three weeks or a month, that.  Then if people would

10   call in and say hey, can these NRO's come to this

11   event or this group, we would go.

12  Q  Okay.

13  A  We were paid for by Viterbo College and by Mayo

14   Hospital, that's how all the funding came together.

15   So if -- if Viterbo had a basketball game, we would

16   maybe go, or they had -- the night -- or the days

17   when like all the freshman come in, like the week

18   before, we would come in and do a presentation with

19   them, or they had job fairs, we would go to that.

20   If -- if Mayo wanted us to come talk to a group

21   about -- you know -- you know how it is, these big

22   corporations pay all -- donate all this money and

23   they want to show people, look, this is the cost --

24  Q  Right.

25  A  -- so then we would show up, like this is what

## Page 186

1   we're doing, you know what I mean?

2  Q  So on those occasions, you had a duty to go to

3   these meetings?

4  A  Yes.

5  Q  Okay.  And those were functions where the group

6   would call up the La Crosse Police Department and

7   say hey, listen, we want some neighborhood response

8   officers here to do orientation for the kids?

9  A  Yeah.  Well, at times, or we were -- we were always

10   there, so like we were the contact for these

11   people, these people would call Dan or I, so we had

12   our own schedule, so then if people called and said

13   next Tuesday, could you come from 11:00 to 2:00 for

14   this?  Yep, we'll try.  We'll throw it on the

15   calendar.

16  Q  Got it.

17  A  You know what I mean?  Like we were our --

18   basically our own boss --

19  Q  Okay.

20  A  -- oversight.

21  Q  So when you would report in the morning, Dittman

22   wouldn't tell you okay, you guys are going to

23   Hamilton School --

24  A  God no.

25  Q  -- this morning?

## Page 187

1  A  No.

2  Q  Okay.  That would never happen?

3  A  No.

4  Q  Okay.

5  A  No.

6  Q  Or you have a community meeting tonight you have to

7   go to?

8  A  He may say that.  He may say did you guys see the

9   meeting?  And we'd be like yeah, it's been on our

10   calendar for --

11  Q  Okay.

12  A  -- two weeks, you know what I mean?

13  Q  All right.

14  A  Dittman would never -- Dittman would never have

15   specific detailed things for us to do.  It'd be

16   what are you guys doing today --

17  Q  Okay.

18  A  -- don't get me in trouble.

19  Q  So if he'd say listen, if you got time, stop by the

20   school, Hamilton or Lincoln --

21  A  Uh-huh.

22  Q  -- that wouldn't be, in your mind, an order to do

23   that?

24  A  Say it again.

25  Q  Sure.  If -- if Dittman said to you in the morning

Page 188

1   hey, listen, if you guys have time, stop by Lincoln
2   or Hamilton, in your mind, that wouldn't be Dittman
3   ordering you to do that that day?
4   A   No.
5   Q   If you went to the school --
6   A   Uh-huh.
7   Q   -- then would you have an obligation to go and --
8   and, you know, talk to the kids or -- or do some
9   kind of function with them?
10   A   No.
11   Q   Okay. And my understanding with regard to the
12   issue that we've discussed regarding the Lincoln
13   School is you -- Ulrich went into the school, you
14   did not?
15   A   Correct.
16   Q   And you indicated you didn't go in because you were
17   not in a good mood that day?
18   A   Correct.
19   Q   Do you remember why you weren't in a good mood?
20   A   It was something I had learned in like -- I don't
21   remember if it was a -- if there was a shooting
22   over the weekend or some -- there was something
23   that had happened that I had learned about, and I
24   was just like not -- I was pissed off at -- for --
25   I don't remember what it was.

Page 189

1   Q   Okay. But you thought listen, I'm not going to --
2   A   And I said let's go later; that's what I said to
3   Dan. I'm just going to go now and hand out my
4   stickers.
5   Q   Okay.
6   A   We always had, you know, 30 stickers in our
7   pockets.
8   Q   Okay.
9   A   There'd be times where he would sit in the car and
10   I would run into the Boys & Girls Club.
11   Q   Okay.
12   A   There'd be times where he would sit in the car and
13   I would go into the Y or vice versa. It -- not --
14   that is not uncommon, and it's not -- it's just so
15   far manipulating that it's just -- it's -- it's
16   hurtful.
17   Q   Got it.
18   A   I don't know how better to describe that. I was
19   never ordered to go anywhere. If I was ever
20   ordered to go anywhere, I would do it. I -- I
21   follow commands very well; you have to know how to
22   do that.
23   Q   Right. And --
24   A   Yeah.
25   Q   -- you know that'd be a violation of --

Page 190

1   A   Yeah. Why would I -- why would I disobey -- go --
2   you know what I mean, like -- that's what I'm
3   saying, like it's not like all of a sudden go to
4   the school today, guys, like we've never been
5   there, like you're going to go introduce
6   yourselves --
7   Q   Right.
8   A   -- today at a meeting. Just hey, if you have time,
9   stop by. Yeah, obviously. We stop by every day.
10   Q   So if -- if Dittman said hey, listen, I'm ordering
11   you guys to go to school today to visit --
12   A   Yeah, then you go to school.
13   Q   Okay. And if you didn't, that'd obviously be a
14   violation?
15   A   And there was no time constraint. There's not like
16   go between 11:00 --
17   Q   Right.
18   A   -- and 11:30. I said I'm -- let's -- I don't want
19   to go right now.
20   Q   All right.
21   A   That's cool, I'll just go give my stickers out. He
22   came back, got more stickers and went back in.
23   Q   Okay.
24   A   I have a note saved on my phone from that specific
25   day --

Page 191

1   Q   Okay.
2   A   -- saying -- I -- I'd have to read it. Dude, you
3   should -- are you sure you don't want to come in?
4   These are -- these are the cool kids, not the
5   bastard kids or something, and I wrote it right on
6   my phone that day, and it's still saved under
7   that -- you asked me earlier, can you prove dates
8   and times --
9   Q   Right.
10   A   -- on -- on your phone, you know how it's date
11   coded --
12   Q   Well, again, if you got dates and stuff on your
13   phone, keep them and pass them on to your attorney
14   so we can get those.
15   A   See, that's why I get passionate about these little
16   things, because it's -- it's so fake, man. It's
17   just -- it's BS.
18   Q   Well, and this --
19   A   I'm sorry.
20   Q   No, that's fine. I'm just trying to understand the
21   dynamics of this particular issue.
22   A   Yeah.
23   Q   So -- and excuse me for kind of going over this
24   again, but if -- if Dittman had ordered you to do
25   that, you would have to do that?

Page 192

1  A  Yes.
2  Q  Okay.
3  A  Absolutely.
4  Q  And if you didn't, that would be a violation?
5  A  Correct.
6  Q  Okay. And you -- what you're telling me is this
7     wasn't an order, you guys just normally did this,
8     and this is how you handled it because you
9     scheduled out your own time, right?
10 A  It was a nonchalant, if you have nothing to do,
11    stop by.
12 Q  Got it.
13 A  And -- and I stopped by, I just didn't go in. I
14    had my window down and I talked to people on the
15    sidewalk. I also caught up on some report or
16    something.
17 Q  Okay.
18       MR. RIORDAN: Give me a couple minutes.
19    I might be done. I'm just going to check my notes
20    and stuff.
21       MR. OLSON: Okay.
22       (A discussion was held off the record.)
23 BY MR. RIORDAN:
24 Q  I've just got two small areas to cover with you
25    before we finish.

Page 193

1         I read somewhere that there was an
2     issue about you discussing Assistant Chief Abraham
3     being intoxicated on a boat; do you recall that
4     issue?
5  A  Uh-huh.
6  Q  Yes?
7  A  Yes.
8  Q  Okay. My understanding from reading the
9     documentation is that you were discussing with
10    other officers that the assistant chief got drunk
11    while on a houseboat, then had somebody jump into
12    the spot as the driver, who took the fall for him?
13 A  The rumor was -- is that somebody got arrested
14    leaving his boathouse.
15 Q  Okay. And what -- what were you telling other
16    officers about that rumor, if you recall?
17 A  That -- we were in the -- okay. There's -- so
18    there's a computer room, which is like the hangout/
19    -- that's where you do your reports and everything,
20    that's where everybody's at --
21 Q  Got it.
22 A  -- it's the gossip room, right?
23 Q  Right. Okay.
24 A  So the gossip of the day was, did everybody hear
25    about Abraham? So we were sitting there talking,

Page 194

1     and I was like hmm, okay, wonder if he switched,
2     you know what I mean, because Abraham is a very
3     heavy drinker, and then we were joking, like I
4     wonder how many -- I wonder how many policy
5     violations that would be, da, da, da, da, da. I'm
6     like, Reed, how many you think that is?
7  Q  And who's Reed?
8  A  Jerry Reed was an officer that sat back there like
9     almost all day because he had a -- a -- like a knee
10    replacement, knee surgery.
11 Q  Okay.
12 A  So he was on like light-duty, so he'd be in the
13    computer room all day.
14 Q  All right. So there was a -- this general
15    discussion about whether --
16 A  The -- the discussion was not about if Rob
17    switched. The discussion was just like did you
18    guys hear that Bob had a big party and people got
19    arrested at -- leaving his boathouse.
20 Q  Okay. Okay. Who was in this area when this
21    discussion occurred, if you recall?
22 A  I think it was me, Pond, Dan, Reed -- I don't know
23    if Bowe was in there. It might have just been us
24    five, it might have been like right after we had
25    roll call.

Page 195

1  Q  Okay. So there was this discussion about how many
2     violations the assistant chief committed as a
3     result of this boat party?
4  A  That was the conversation, yeah, I wonder how
5     many -- like sarcastic, joking around.
6  Q  Okay.
7  A  Yeah.
8  Q  And -- and everybody was involved in this
9     conversation or was it just you?
10 A  Me -- me, Reed said he never even heard about it I
11    don't think, so I think it was me and Dale and -- I
12    don't know. You know, like there's a rumor and
13    everybody just sits there and bullshits about it.
14    I --
15       Sorry.
16       MR. RIORDAN: No, it's -- I don't think
17    you're going to offend her, or could.
18       THE WITNESS: See, it -- it was like --
19    it was like the topic of what we were all talking
20    about.
21 BY MR. RIORDAN:
22 Q  Were you the one that raised I wonder how many
23    violations that --
24 A  I'm pretty sure I -- yeah, I'm -- I think I said
25    that.

Page 196

1 Q   Okay.  There was also another issue after you were
2     reassigned from NRO to patrol that -- you said
3     something about the war has now started?
4 A   That's what Pond said I said, but --
5 Q   Okay.  What did you say?
6 A   I may have said that.
7 Q   Okay.  I assume you were -- you were pissed off
8     about being reassigned?
9 A   Uh-huh.
10 Q  Yes?
11 A  I -- I assume.  I don't recall saying that, so
12    that's --
13 Q  Were -- were you upset about being reassigned?
14 A  Absolutely.
15 Q  Okay.  So -- and -- and this may have been
16    something you said?
17 A  It very well may have been.
18 Q  What would you have meant by that if you did say
19    that?
20 A  Probably that I'm going to report every mishap that
21    I know about to everybody.
22 Q  Okay.  Kind of cause general havoc?
23 A  I don't know what -- not general havoc, but --
24    you're basically taught to sit there and absorb it
25    all, you know what I mean?  Like I've done nothing

Page 197

1     but do anything positive for this department, like
2     I'm the reason that you have an NRO department, you
3     bloat me around and use -- you could have Googled
4     my name before August or September 1 and seen three
5     pages of awesome videos and pictures that they did
6     about me, like -- I've done nothing but bring
7     positive credibility to the department, and you --
8     you dog me like that for -- for having the courage
9     to come forward.  I'm telling everybody all the bad
10    stuff I know, like why hold back anymore if that's
11    how they -- you know what I mean, like -- I don't
12    know, I'm sure that's what I meant, like --
13 Q  Okay.
14 A  Like I'm not going to sit there and -- and -- and
15    take it like other officers do.  Those guys know
16    that I'm not from there, those guys know that I've
17    been looking to get out of there and come back to
18    the Cities basically since I got there, like they
19    know I went down there to get experience to build a
20    resume and come back, like -- that wasn't my
21    forever job, where like these people, like -- like
22    Chuck Frandsen that got demoted, like you were
23    making 130,000, now you're going to make 70, like
24    they just -- they just screwed you, like you're
25    going to have to sell your house and get a new --

Page 198

1     you know what I mean?  Like these people are so
2     invested that they can't speak up, you know what I
3     mean?
4 Q   Okay.
5 A   There's a -- guy that has two wives right now,
6     they -- they say the meanest things, like -- they
7     have sexual harassment all the time.
8 Q   He's married to two women currently?
9 A   He's married to a woman, a woman had an affair with
10    another woman, and they have a three-way love,
11    they're all together, and -- and the things they
12    say to this -- like -- and I talked to him, he's a
13    very good friend, and he's like I'm -- why am I
14    going to -- I got three years left, I'm not going
15    to -- I'm not going to risk losing my job or my
16    retirement over these people, you know what I mean,
17    like these people are so anchored into like needing
18    that job --
19 Q   Right?
20 A   -- that they're -- that they're just going to sit
21    there and allow that kind of stuff to happen.  I --
22    I liked that job, but it's not -- I'm -- it's not
23    my end-all, be-all, like -- you know what I mean,
24    like I was taught you work to live, you don't live
25    to work, like I'll go get another job, like

Page 199

1     you're -- don't treat me like that, that's not how
2     I was raised.  I was raised to speak up against
3     unjust things, you know, my -- my dad works --
4     works for the unions, like -- you saw -- back here,
5     supporter of people doing things -- bad things to
6     good people, like I'm not -- I'm not going to
7     tolerate that, like -- so I just -- that's probably
8     what I meant, like, dude, I'm not going to sit back
9     and watch it anymore, like I'm going to speak up.
10    I'm not going to be the silent voice anymore.
11 Q  Just to kind of clean up, and this is a general
12    question --
13 A  Uh-huh.
14 Q  -- we've talked about a lot of stuff today --
15 A  Uh-huh.
16 Q  -- and I asked you about, you know, your -- what
17    you felt was the discriminating actions that were
18    taken against you by the La Crosse Police
19    Department; have we discussed all those actions
20    here today?
21 A  The what?
22 Q  Let me try that again.
23         I asked you, you know, what you felt
24    the La Crosse Police Department did to discriminate
25    you, and we've discussed that throughout the day;

Page 200

1     have we covered all of the instances that you felt
2     discriminated against by the police department?
3   A   Yes.
4   Q   Okay.
5   A   I believe so.
6   Q   And -- and that's fine, I just wanted to make sure
7     I'm -- I at least got -- I touched on all of it,
8     so -- we're done here today.  I appreciate your
9     time.  Thank you.
10         (Deposition concluded at 2:22 p.m.)
11         (Original exhibits attached to the
12    original transcript; copies provided to attorneys
13    ordering exhibit copies.)
14
15
16
17
18
19
20
21
22
23
24
25

Page 201

1   STATE OF WISCONSIN )
                          ) SS:
2   MILWAUKEE COUNTY   )
3
4         I, Shelly Loniello, Registered
5   Professional Reporter and Notary Public in and for
6   the State of Wisconsin, do hereby certify that the
7   preceding deposition was recorded by me and reduced
8   to writing under my personal direction.
9         I further certify that said
10  deposition was taken at von BRIESEN & ROPER, s.c.,
11  10 East Doty Street, Suite 900, Madison, Wisconsin,
12  on the 2nd day of March, 2018, commencing at
13  9:59 a.m.
14         I further certify that I am not a
15  relative or employee or attorney or counsel of any
16  of the parties, or a relative or employee of such
17  attorney or counsel, or financially interested,
18  directly or indirectly, in this action.
19         In witness whereof, I have hereunto
20  set my hand and affixed my seal of office on this
21  13th day of March, 2018.
22
23         _____
24         SHELLY LONIELLO, RPR
           Notary Public
25  My commission expires July 01, 2021.